UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF NEW YORK

In re:

EASTERN NIAGARA HOSPITAL,

Debtor.

Case No. 1-20-10903-CLB

Chapter 11

**DECLARATION OF ANNE E. McCAFFREY IN SUPPORT OF
CHAPTER 11 PETITION AND FIRST DAY MOTIONS**

**Anne E. McCaffrey** declares and says:

1. I am the President and Chief Executive Officer of Eastern Niagara Hospital ("ENH" or the "Debtor"). As such, I am familiar with the day-to-day operations, business and financial affairs of the Debtor.

2. I submit this declaration (i) in support of the petition of the Debtor for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code"), (ii) in support of the various contemporaneously-filed requests for relief in the form of motions and applications (the "First Day Motions"), and (iii) to assist the Court and other interested parties in understanding the circumstances giving rise to the commencement of this Chapter 11 case. I have reviewed the First Day Motions or have otherwise had their contents explained to me, and it is my belief that the relief sought therein is essential to allow for continued operating and sale of certain assets of the Debtor.

3. Except as otherwise indicated, all facts set forth in this declaration are based upon my personal knowledge, my review of relevant documents, information provided to me by employees working under my supervision, or my opinion based upon experience, knowledge and information concerning the operations of the Debtor and the healthcare industry in Western New York State as a whole. If called to testify, I would testify competently to the facts set forth in

1

this declaration. Unless otherwise indicated, the financial information contained herein is unaudited and provided on a consolidated basis.

## COMMENCEMENT OF THE BANKRUPTCY PROCEEDING

4. On July 8, 2020 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. The Debtor intends to continue in possession of its property while it restructures and implements a sustainability plan.

## THE DEBTOR'S BUSINESS AND FINANCIAL DECLINE

5. In 1905 the Ladies Hospital Aid Association raised $5,000 for the building of a Hospital in the Lockport community. This amount was matched by the City of Lockport. The Hospital charter was signed on April 20, 1908 and the officers of the Ladies Hospital Aid Association became members of the first board of managers. Lockport City Hospital, as it was first known, opened on July 1, 1908 with accommodations for 18 patients. The Hospital Guild continues today as an advocacy and fundraising organization dedicated exclusively to supporting the mission of the Hospital.

6. Major building or renovation projects followed from 1938-1983. In 1959 the Hospital name was changed to Lockport Memorial Hospital ("LMH") by the Lockport Common Council. In 1979, ownership of LMH was transferred to a not-for-profit corporation with a community driven Board of Directors.

7. On September 17, 1958, Inter-Community Memorial Hospital opened its doors to the community. Several renovation projects took place during the next five decades resulting in the 71-bed facility present today.

8. In a strategic and unprecedented effort to meet the challenges of the health care industry, the Boards of Directors of Inter-Community Memorial Hospital and Lockport

2

Memorial Hospital made the decision to effect a legal affiliation between the two health care providers in 1999. Together, with the Newfane Rehabilitation & Health Care Center, the Eastern Niagara Health System resulted.

9. In 2009, following the recommendation of the Berger Commission, the Hospitals completed a full asset merger. Eastern Niagara Hospital was established as a result of the merger. The Hospital now operates as one entity with a Lockport site, as well as outpatient facilities. This merger was the next logical step in the partnership and was intended to create a streamlined governance, while realizing further financial economies of scale and strengthening the entire Eastern Niagara Health System's ability to meet the community's health care needs well into the future.

10. After years of strong performance, ENH began to suffer the effects of increased costs of delivering health care services, tightening reimbursement rates and increased competition for higher margin services.

11. ENH struggled to achieve profitability and was supported with deficit funding by the New York State Department of Health while ENH implemented various strategies to address its challenges.

12. Accordingly, ENH elected to commence a Chapter 11 restructuring proceeding to provide it with the necessary relief while it implements its sustainability model. On November 7, 2019, ENH filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101-1330 (the "2019 Chapter 11").

13. During the administration of the 2019 Chapter 11, ENH continued in possession of its assets operating its business. On June 18, 2020, ENH filed a motion requesting that the Court dismiss the 2019 Chapter 11 to allow ENH to obtain a forgivable loan under the Payroll

3

Protection Program under the CARES Act (the "PPP Loan") in the best interests of the estate and its creditors. The Court granted ENH's motion and the 2019 Chapter 11 was dismissed at 1:00 p.m. on June 24, 2020.

14. Subsequent to the dismissal on June 24, 2020, ENH obtained the forgivable PPP Loan and continues to operate its business.

15. While ENH, with the help of consultants, believes it has designed and has begun to implement an operating model that will lead to ENH's being self-sufficient, ENH does not believe it has sufficient liquidity both to implement its sustainability model and service debts incurred prior to the 2019 Chapter 11 case. Accordingly, ENH has elected to commence a new chapter 11 restructuring proceeding to provide it with the necessary relief while it implements its sustainability model

### THE DEBTOR'S BANKRUPTCY PLAN

16. The Debtor believes the reorganization and continued operation of its system after full implementation of the sustainability model is achievable. The Debtor intends to use this Chapter 11 proceeding and the protections of the Bankruptcy Code to conduct an orderly reorganization using the sustainability model as its operational roadmap.

### The First Day Motions

17. On the Petition Date, the Debtor filed the following motions (collectively hereafter the "First Day Motions"):

    a. Motion to Allow Debtor to Continue to Use its Pre-Petition Bank Accounts (the "Bank Account Motion"),

    b. Motion for Interim and Final Orders Authorizing Use of Cash Collateral (the "Cash Collateral Motion"),

    c. Motion of Debtor and Debtor in Possession Pursuant to 11 U.S.C. §§ 105, 507(a)(4), 507(a)(5) and the "Doctrine of Necessity" for an Order Authorizing it to Pay: (A) Petition Employee Wages, Salaries and

4

Related Items; (B) Prepetition Employee Business Expenses; (C) Prepetition Contributions to and Benefits Under Employee Benefit Plans; (D) Prepetition Employee Payroll Deductions and Withholdings; and (E) All Costs and Expenses Incident to the Foregoing Payments and Contributions (the "Wages Motion")

    d.    Motion of the Debtor for Entry of an Order (A) Prohibiting Utility Companies From Altering, Refusing, or Discontinuing Services to and/or Discriminating Against the Debtor on Account of the Bankruptcy Filing or Any Prepetition Amounts Due, (B) Determining that the Debtor's Utilities Are Adequately Assured of Future Payment, (C) Establishing Procedures for Requesting Additional Assurance of Payment, and (D) Establishing Procedures for Objection (the "Utilities Motion"),

    e.    Motion Pursuant to Sections 105(a), 363(b), 1107 and 1108 of the Bankruptcy Code for an Order Authorizing (I) Continuation of Debtor's Various Insurance Policies and (II) Payment of Prepetition Obligations in Respect Thereof (the "Insurance Motion"), and

    f.    Motion of the Debtor Pursuant to Section 105(a) and 541 of the Bankruptcy Code for Authority to Pay Prepetition Sales and Use Taxes (the "Taxes Motion").

I have personal knowledge of the contents of these motions, and believe that the relief requested in the First Day Motions is both in the best interests of the estate and its creditors, and is essential to the Debtor's ability to continue the operation of its businesses and control of its assets.

18. In the Bank Account Motion, the Debtor requests final authorization pursuant to Sections 105(a), 363(c)(1) and 364(a) of the Bankruptcy Code and Bankruptcy Rule 6003, to maintain the Debtors' existing bank accounts (the "Bank Accounts") and maintain the Debtor's existing business forms.

19. The Debtor believes that having to close its current bank accounts will prevent it from receiving Medicare, Medicaid and private insurance payments that are automatically deposited in these accounts and will generally disturb the business operations of ENH. The Debtor's operating account, payroll account and related special purpose accounts are located at

Citizens Bank, N.A., which is on the approved depository list maintained by the Office of the United States Trustee.

20. The proceeds of the PPP loan are currently on deposit at Cornerstone Community Federal Credit Union pending transfer of the funds to an approved depository bank.

21. Accordingly, the Debtor seeks authority to use its existing back accounts but to designate the accounts as "Debtor-in-Possession" or "DIP" accounts.

22. In the Cash Collateral Motion, the Debtor seeks authorization to continue status quo cash collateral usage for ordinary course business operations – primarily meeting payroll obligations to its employees and paying for the ordinary expenses incurred in providing post-petition health care services. The Debtor also seeks to give a rollover lien to the Debtor's secured creditors to the same extent and validity of their prepetition interests in the Debtor's assets and a determination that the rollover liens adequately protect its secured creditors.

23. The Debtor requires immediate access to cash collateral to avoid an immediate shutdown and to prevent irreparable harm to both its creditors and its patients.

24. In the Wages Motion, the Debtor seeks immediate authority to pay its employees their outstanding prepetition wages, benefits and other compensation as well as to forward all payroll deductions, withholdings and costs and expenses incident to the foregoing payments and contributions (the "Payroll Payments").

25. The Debtor believes that if it is not granted immediate authority to make the Payroll Payments that its work force will not remain on the job, which will force an immediate closure of the Debtor's health care facilities and could result in irreparable harm to both the Debtor's creditors and patients.

26. In the Utilities Motion, the Debtor seeks authority to continue to pay its utility bills, including any pre-petition bills, in the ordinary course of business, as adequate assurance of payment for future services and in lieu of any deposit requirements. The Debtor is current on its obligations to is utilities, and rather than negotiate deposits for multiple accounts with multiple utilities, the Debtor proposes to continue paying the utilities as if the case had not been commenced.

27. In the Insurance Motion, the Debtor seeks authority to continue to pay the regular installments on its various insurance policies so as not to jeopardize critical coverage for the hospital, it employees and business operations.

28. In the Taxes Motion, the Debtor seeks authority to remit taxes it may have collected from others (such as sales and withholding taxes) to the appropriate taxing authority.

29. I respectfully request that all of the relief requested in the First Day Motions, and such other relief as maybe just and proper, be granted.

I, the undersigned, Anne McCaffrey, declare under penalty of perjury that the foregoing is true and correct.

Dated: July 8, 2020

*Anne E. McCaffrey*
Anne E. McCaffrey

7

Case 1-20-10903-CLB, Doc 5, Filed 07/08/20, Entered 07/08/20 11:26:09, Description: Main Document , Page 7 of 7