UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF NEW YORK
_____

In re:

    EASTERN NIAGARA HOSPITAL, INC.,

                    Debtor.
_____

Case No. 1-20-10903-CLB

Chapter 11

## MOTION FOR INTERIM AND FINAL ORDERS
## AUTHORIZING USE OF CASH COLLATERAL

Eastern Niagara Hospital, Inc. (the "Debtor"), debtor and debtor in possession, by and through its undersigned counsel, hereby moves this Court for entry of an interim order, the proposed form of which is attached hereto as **Exhibit A** (the "Interim Order"), pursuant to Sections 361 and 363 of Title 11 of the United States Code (as amended, the "Bankruptcy Code") and Fed. R. Bankr. P. ("Bankruptcy Rules") 4001: (i) authorizing the Debtor's use of cash collateral to maintain ongoing operations and avoid immediate and irreparable harm to the Debtor's estate pending a final hearing; (ii) determining that the Debtor's prepetition secured creditors' interests in cash collateral are adequately protected; (iii) scheduling a final hearing in connection with the relief sought in this Motion; and (iv) granting such other and further relief as the Court deems appropriate (the "Motion"). In support of this Motion, the Debtor submits as follows:

### JURISDICTION, VENUE AND BASIS FOR RELIEF

1.      The Court has subject matter jurisdiction to consider this matter pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b) and may be determined by the Bankruptcy Court. Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2.    The statutory predicates for the relief requested herein are Sections 361 and 363(a) and (c)(2) of the Bankruptcy Code and Bankruptcy Rule 4001(b).

## CONCISE STATEMENT PURSUANT TO BANKRUPTCY RULE 4001

3.    All entities with an interest in the Debtor's cash collateral are identified in the Motion below.  This Motion seeks authorization to use cash collateral to maintain the Debtor's ordinary course business operations – primarily meeting payroll obligations to its employees and other expenses necessary to maintain the delivery of health care services.  The proposed terms of usage are set forth in detail in the Interim Order and the Budget (as that term is defined below).  The proposed Interim Order provides the following in favor of the Debtor's main secured creditor, Citizens Bank, N.A. ("Citizens"):

- expiration of the authority to use cash collateral on the date of the final hearing, unless extended by further order of the Court;

- a rollover lien to the same extent and validity of its pre-petition interest in the Debtor's assets;

- regular payments to Citizens, including payment of legal fees and expenses;

- findings that Citizens' notes, security agreements and mortgages are valid and fully enforceable in accordance with their terms;

- a limited period within which an Official Committee of Unsecured Creditors, or other parties in interest, may challenge the extent, validity or priority of Citizens' loans and collateral;

- an allowed superpriority claim pursuant to 11 U.S.C. §507(b) to the extent of any diminution in the value of Citizens' collateral; and

- a waiver of any ability to subject Citizens to the equitable doctrine of "marshaling" or any similar doctrine.

<u>**BACKGROUND**</u>

4.      On July 6, 2020 (the "Petition Date"), the Debtor commenced this Chapter 11 case by filing a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101-1330 (the "Bankruptcy Code"). The Debtor is continuing in possession of its properties and is operating and managing its businesses, as debtor in possession, pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

5.      Additional information about the Debtor's businesses, the events leading up to the Petition Date and the Debtor's Chapter 11 petition can be found in the Declaration of Anne E. McCaffrey in Support of Chapter 11 Petition and First Day Motions (the "McCaffrey Declaration"). The Debtor relies on the McCaffrey Declaration in making the Motion and incorporates it herein by reference.

6.      The Debtor is a not for profit general hospital, organized and existing under the laws of the State of New York, licensed under Article 28 of the New York State Public Health Law.

7.      The Debtor owns and operates medical facilities in Lockport, New York.

8.      Through this bankruptcy proceeding, the Debtor intends to reorganize its operations.

9.      In order to continue to deliver health care services and to maintain its assets, the Debtor must have access to and be able to use the cash generated by its operations (the "Cash Collateral").

10.     Through this motion, the Debtor requests that the Court allow it to use the Cash Collateral because such use is critical to Debtor's operations and because the security interests of the Debtor's secured creditor, Citizens Bank, N.A., will be adequately protected.

**SECURED CREDITORS WITH INTERESTS IN CASH COLLATERAL**

11.     On or about September 13, 2013, RBS Citizens Bank, N.A. ("Citizens Bank") and Debtor entered into a $4,000,000 Note and a related security agreement and mortgage, and other related documents (the "$4mm Facility"). Copies of the Note and Security Agreement evidencing the $4mm Facility are annexed hereto as **Exhibit B**.  On or about November 6, 2013, RBS Citizens Bank, N.A. and Debtor entered into a $3mm Note and a related security agreement and mortgage, and other related documents (the "$3mm Facility"). Copies of the Note and Security Agreement evidencing the $3mm Facility are annexed hereto **Exhibit C**.  The current balance on the $4mm Note is approximately $3,482,439.16 while the current balance on the $3mm Note is approximately $2,628,855.00.  The regular monthly payments made by Debtor under the $4mm Note and the $3mm Note are $21,256.82 and $17,987.40, respectively.

12.     As described above, the $4mm Facility and the $3mm Facility are each secured pursuant to general security agreements with the Debtor.   Among other things, the Debtor granted Citizens Bank  security interests in certain personal property pursuant to the terms of security agreements (the "Security Agreements").   The Security Agreements provide Citizens Bank a security interest in certain assets of the Debtor as more fully described in the Security Agreement including accounts, Health Care Insurance Receivables and Deposit Accounts.

**RELIEF REQUESTED**

13.     By this Motion the Debtor seeks entry of the Interim Order pursuant to Sections 361 and 363 of the Bankruptcy Code and Bankruptcy Rule 4001(b):  (i) authorizing the Debtor to

use cash that may otherwise serve as collateral security for the amounts owed to Citizens Bank (the "Cash Collateral"), pursuant to the budget set forth in **Exhibit D** annexed hereto (the "Budget"), as working capital to purchase goods and services and pay operating expenses related to the Debtor's ordinary course business operations, and in order to preserve the value of the Debtor's estate, including without limitation, using Cash Collateral per the Budget for a brief interim period to satisfy (a) any prepetition operating and other expenses that may be approved by the Court, (b) obligations incurred in the ongoing post-petition operations of the Debtor, and (c) any and all costs and expenses arising in connection with the administration of the Debtor's estate, on an interim basis and pending a final hearing; (ii) determining that Citizens Bank's interest in Cash Collateral is adequately protected and authorizing the Debtor to make adequate protection payments as provided for in the Budget; and (iii) scheduling a final hearing on the Motion to consider entry of a Final Order granting the relief requested herein.

## ARGUMENT

14.     The Debtor should be granted use of Cash Collateral in accordance with the proposed Budget because:

- The Debtor's access to the Cash Collateral is absolutely necessary for the Debtor to preserve the value of its business and Citizens Bank's collateral during the pendency of the Debtor's Chapter 11 case, and

- The proposed use of Cash Collateral is modest in scope and primarily designed to satisfy employee claims and to maintain critical operations pending a final hearing.

Accordingly, the proposed use of Cash Collateral is necessary and appropriate under Section 363 of the Bankruptcy Code and the Bank's interests in such will be adequately protected.

## A.  Debtor's Need to Use Cash Collateral

15.    To the extent the Debtor's cash on hand constitutes Cash Collateral, and the Debtor believes it does, it is subject to the use restriction set forth in Section 363(c)(2) of the Bankruptcy Code.  Without authorization from the Court for the Debtor to use the Cash Collateral in accordance with Section 363(c)(2)(B) of the Bankruptcy Code, the Debtor will be left without a source of working capital and will be unable to operate its businesses and, thereby, preserve the value of its estate for the benefit of creditors.  The ability of the Debtor to preserve its business and assets, and ultimately to reorganize, will be adversely affected if the Debtor is unable to use the Cash Collateral to fund its daily business operations.  Without the ability to fund the Debtor's current operations on an interim basis, the value of the Debtor's assets will be irreparably harmed as indeed the failure of the business itself is likely if Cash Collateral use is not permitted.

## B.  Adequate Protection

16.    Pursuant to Section 363(c)(2) of the Bankruptcy Code, a debtor-in-possession may not use cash collateral without the consent of the secured party or approval by the Court.  By obtaining approval to use cash collateral, a debtor can continue to operate its business and maintain and enhance the value of its lenders' collateral.  *See, e.g., In re Megan Racine Associates Inc.*, 202 B.R. 660, 663 (Bankr. N.D.N.Y. 2002); *In re Constable Plaza Assocs., L.P.*, 125 B.R. 98, 105 (Bankr. S.D.N.Y. 1991).  Section 363(e) of the Bankruptcy Code provides that on request of an entity that has an interest in property used or proposed to be used by the debtor, the court shall prohibit or condition such use as is necessary to provide "adequate protection" of that interest.  11 U.S.C. §363(e); s*ee Zink v. Vanmiddlesworth*, 300 B.R. 394, 402-03 (N.D.N.Y.

2003) (burden is on creditor to show collateral value decline in order to justify provision of adequate protection or additional adequate protection).

17.     What constitutes "adequate protection" must be decided on a case-by-case basis. *See In re O'Connor*, 808 F.2d 1393, 1396-97 (10th Cir. 1987); *In re Martin*, 761 F.2d 472, 474 (8th Cir. 1985). The adequate protection requirement is meant to prevent the diminution in the value of the secured creditors' interests in their collateral during the reorganization process. *See Megan Racine, supra* (*citing, In re Gallegos Research Group Corp.*, 193 B.R. 577, 584 (Bankr. D. Colo. 1995) (*citing in turn, United Savings Ass'n of Texas v. Timbers of Imwood Forest Assoc., Ltd.*, 484 U.S. 365 (1988) ("[T]o determine whether an entity is entitled to adequate protection and the type and amount of adequate protection required, a court must determine the value of the collateral, the creditor's interest in the collateral and the extent to which that value will decrease during the course of the bankruptcy case"); *In re Ledgemere Land Corp.*, 116 B.R. 338, 343 (Bankr. D. Mass. 1990) (permitting bank to receive adequate protection only where value of lender's entire property interest, not just its interest in the cash sought to be used, is declining); *In re Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986) (focus is on protection of the secured creditor from diminution in value of its collateral during reorganization process). Where a debtor's cash is liened and used to enhance a secured creditor's collateral value and to increase the value of collateral, such use demonstrates the existence of adequate protection. *In re 499 W. Warren Street Associates Ltd. Partnership*, 142 B.R. 53, 56 (Bankr. N.D.N.Y. 1992); s*ee also In re Diaconix Corp.*, 69 B.R. 333, 336 (Bankr. E.D. Pa. 1987) (third party guaranty can serve as adequate protection).

18.     In this case, where the Budget is designed to maintain the Debtor's critical operations, the proposed Cash Collateral usage allows the generation of additional receivables,

and maintains the value of Citizens Bank's other collateral. It is in the interests of Citizens Bank (as well as all of the Debtor's creditors) to maintain the orderly operation of the business operations, while the Debtor works on its reorganization.

19.     Further, the Debtor will suffer great harm if it is not authorized to use the Cash Collateral, as the Debtor will have no source of working capital for the business, and the business will not be able to fund its daily business operations, which again, are all preservative of and of direct benefit to the value of Citizens Bank's collateral. The Debtor will not be able to pay suppliers, employees or other ordinary course obligations if it is not allowed to use Cash Collateral per the Budget and to use it with appropriate flexibility as set forth in the Interim Order. Failure to approve the use of the Cash Collateral as requested herein will lead to disastrous consequences not only for the Debtor, but for all parties in interest, including Citizens Bank, other creditors, and the communities served by the Debtor.

## C.     The Need for Immediate Relief

20.     Pursuant to Bankruptcy Rule 4001(b)(2), a final hearing on a motion for the use of cash collateral may not be commenced earlier than fourteen (14) days after service of that motion. However, the court may conduct an interim hearing before the expiration of the 14-day period and authorize the use of cash collateral to the extent necessary to avoid immediate and irreparable harm to a debtor's estate.

21.     Pursuant to Bankruptcy Rule 4001(b), the Debtor requests that the Court conduct an expedited interim hearing on or prior to **July 10, 2020**, pending any hearing to be held to consider the final relief requested by this Motion. In connection with such interim hearing, and the pendency period thereafter to any final hearing set by the Court, the Debtor requests that the Court authorize the Debtor to use such Cash Collateral as is essential to make its payroll, to

Case 1-20-10903-CLB,    Doc 7,    Filed 07/08/20,    Entered 07/08/20 11:30:37,
Description: Main Document , Page 8 of 84

ensure the maintenance of ongoing operations, and to avoid immediate and irreparable harm to its estate -- all as reflected in the line items of the Budget.

22. Without the Court's authorization to use the Cash Collateral on an interim basis pending a final hearing on this Motion, the Debtor's estate will be imminently and irreparably harmed. Employees will not be paid and, as discussed above, the Debtor will not be able to operate without the use of Cash Collateral, resulting in adverse consequences not only for the Debtor, but also for Citizens Bank, other creditors, employees, local suppliers, the community served by the Debtor's operations, and all parties in interest. Under the circumstances, the interim use of the Cash Collateral by the Debtor is appropriate in this case.

<u>**NOTICE**</u>

23. Notice of this Motion has been provided to: (i) the Office of the United States Trustee; (ii) counsel to Citizens Bank; (iii) the creditors holding the 20 largest unsecured claims against the Debtor's estate, as identified in the Debtor's Chapter 11 petition; and (iv) counsel for the Official Committee of Unsecured Creditors appointed in the 2019 Chapter 11 case. The Debtor submits that no other or further notice need be provided.

<u>**NO PRIOR REQUEST**</u>

24. No prior motion for the relief requested herein has been made to this or any other court.

WHEREFORE, the Debtor respectfully requests that the Court enter the Interim Order: (i) authorizing the Debtor to use cash that may otherwise serve as Cash Collateral pursuant to the Budget for the period specified in the Interim Order; (ii) determining that Citizens Bank's interest in Cash Collateral is adequately protected; (iii) scheduling hearings in connection with

the relief sought in the Motion; and (iv) granting such other and further relief as the Court deems

appropriate.

Dated: July 8, 2020
    Syracuse, New York

                                        **BARCLAY DAMON LLP**
                                        *Proposed Counsel for Debtor and Debtor in*
                                        *Possession*

                                        By:   */s/Jeffrey A. Dove*_____
                                        Jeffrey A. Dove, Esq.
                                        Office and Post Office Address
                                        Barclay Damon Tower
                                        125 East Jefferson Street
                                        Syracuse, New York 13202
                                        Telephone:  (315) 413-7112
                                        Facsimile:  (315) 703-7346
                                        Email:  jdove@barclaydamon.com

# EXHIBIT "A"

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF NEW YORK
_____

In re:

    EASTERN NIAGARA HOSPITAL, INC.,

                       Debtor.
_____

Case No. 1-20-10903-CLB

Chapter 11

## INTERIM ORDER AUTHORIZING USE OF CASH COLLATERAL

This matter having come before the Court on July 10, 2020 for a hearing on Eastern Niagara Hospital, Inc.'s ("ENH" or the "Debtor"), debtor and debtor in possession, application (the "Motion") for authority to use cash collateral and to provide adequate protection to Citizens Bank, N.A., f/k/a RBS Citizens, N.A. (the "Secured Creditor"). The Debtor seeks entry of an order authorizing the use of cash collateral and providing adequate protection to the Secured Creditor. The Debtor has represented to the Court, and the Court hereby finds:

A.      As security for ENH's performance of its obligations under the loan agreements for the $3mm Facility[1] and the $4mm Facility (the "Pre-Petition Loan Agreements"), ENH granted the Secured Creditor valid and binding first priority liens on certain of ENH's personal property, including its equipment, inventory, certain accounts receivable, and proceeds thereof as well as ENH's general intangibles, all as more specifically defined: (i) as "Collateral" (which definition is incorporated herein) in that certain Amended and Restated Security Agreement dated as of November 6, 2013 by and among ENH and the Secured Creditor and (ii) "Mortgaged Property" (which definition is incorporated herein) in that certain First Mortgage, Assignment of Leases and Rents and Security Agreement dated as of September 13, 2013 by and among ENH and the Secured Creditor, and (iii) "Mortgaged Property" (which definition is incorporated

---

[1] Capitalized terms not defined herein shall have the meanings ascribed to them in the Motion.

Case 1-20-10903-CLB,   Doc 7,   Filed 07/08/20,   Entered 07/08/20 11:30:37,
Description: Main Document , Page 12 of 84

herein and together with the Collateral, the "Pre-Petition First Lien Collateral") in that certain First Mortgage, Assignment of Leases and Rents and Security Agreement dated as of November 6, 2013 by and among ENH and the Secured Creditor. The Pre-Petition First Lien Collateral includes, among other things, ENH's present and future cash collateral, as such term is defined in Section 363 of the Bankruptcy Code (the "Cash Collateral"). The Secured Creditor asserts that the Debtor may not use Cash Collateral unless the interests of the Secured Creditor is adequately protected.

B.     As of the Petition Date, ENH was obligated and indebted to the Secured Creditor under the $3mm Facility in the amount of $3,533,556.28 and under the $4mm Facility in the amount of $2,679,787.96 and together with accrued and unpaid interest thereon and all other fees and expenses, including, without limitation, the reasonable and documented fees and expenses of the Secured Creditors' attorneys, consultants, attorneys, consultants, accountants, experts and financial advisors required to be reimbursed by ENH pursuant to the Pre-Petition Loan Agreements (the "Pre-Petition Indebtedness").

C.     The Debtor provided notice of the Motion to the Secured Creditor, the Office of the U.S. Trustee, each of the Debtor's twenty largest unsecured creditors, and all parties requesting notice.

D.     The Debtor alleges that the continued operation of the business is dependent upon the ability to use Cash Collateral. The Debtor alleges that there is an immediate need for entry of an order authorizing use of Cash Collateral, and, absent entry of such an order, the Debtor's estate will be irreparably harmed.

Based upon the foregoing, the statements of counsel for the parties and all others matters heard by the Court, THE COURT HEREBY ORDERS:

1.     Attached to the Motion as EXHIBIT E is a thirteen-week cash flow projection (on a weekly basis) (the "Budget"), which has been prepared by ENH.  The Debtor is authorized to use Cash Collateral from July 8, 2020 through July ____, 2020 (inclusive) in an aggregate amount equal to the amounts in the Budget with a variance of 10% (i) per line item permitted, (ii) of gross disbursements and (iii) of gross collections, each measured on the last business day of each week; provided that such use of Cash Collateral shall be exclusively in the ordinary course of the Debtor's business and only for those items set out in the Budget.  On Tuesday of each week, the Debtor shall provide the Secured Creditor an updated Budget and a report reconciling the Debtor's actual performance to Budget, an accounts payable aging schedule and an accounts receivable aging schedule.  The Debtor's authority to use Cash Collateral shall terminate on **July _____, 2020** unless extended by subsequent Court order.  Notwithstanding this authorization, the Debtor shall not use Cash Collateral for the payment or satisfaction of any expense that will result in the Debtor spending more than 110% of any line item amount budgeted for such period.

2.     ENH shall provide the Secured Creditor with such financial reports and information as is required under any applicable loan documents or as Secured Creditor may reasonably request.

3.     ENH shall permit agents of the Secured Creditor to inspect the Debtor's books, records, assets, and facilities, and to make copies or abstracts from the books and records, during regular business hours, except that the Debtor reserves its rights not to share proprietary or statutorily protected information without appropriate safeguards.

4.     The Debtor shall not (a) take any action outside the ordinary course of its business, including without limitation the settlement of accounts receivable for less than face

value except as is customary and in conformance with its past business practice, without the prior approval of the Court, or (b) grant, permit or suffer to exist any lien upon or security interests in its assets (other than liens and security interests in existence on the Petition Date) during the term of this Order unless agreed to by the Secured Creditor or authorized by the Court.

5.     Each of the Pre-Petition Loan Agreements and all security agreements, notes, guarantees, mortgages, Uniform Commercial Code financing statements and all other related agreements, documents and instruments executed and/or delivered in connection with Pre-Petition Loan Agreements or related thereto is valid, binding, and enforceable in accordance with its terms.   The Pre-Petition Indebtedness is secured by valid, binding, properly perfected, enforceable, non-avoidable, first-priority liens and security interests (the "Pre-Petition First Priority Liens") in and against the Pre-Petition First Lien Collateral (including, without limitation, Cash Collateral). There exists no basis upon which the Debtor can properly challenge or avoid the validity, enforceability, priority or perfection of the Pre-Petition Indebtedness or the Pre-Petition First Priority Liens, and the Debtor shall not assert any claim, challenge or counterclaim in respect of the Pre-Petition Indebtedness, the Pre-Petition First Priority Liens or the amounts paid or payable to the Secured Creditor.   No portion of the Pre-Petition Indebtedness, the Pre-Petition First Priority Liens, or any amounts paid or payable to the Secured Creditor or applied to the obligations owing under the First Lien Loan Documents prior to the Petition Date is subject to avoidance, subordination (whether equitable, contractual or otherwise), recharacterization, recovery, attack, offset, counterclaim, cross-claims, disallowance, impairment, recoupment, defense, challenge, objection, reduction, disgorgement, or claim (as defined in section 101(5) of the Bankruptcy Code) of any kind pursuant to the Bankruptcy Code or applicable non-bankruptcy law.   The provisions of this paragraph 5 shall be binding on any

Committee or chapter 7 or chapter 11 trustee appointed or elected for any of the Debtors (a "Trustee"), for all purposes unless (a) (i) any party in interest other than the Committee, no later than _____, 2020, and (ii) the Committee, no later than forty-five (45) days after their appointment (subject in all respects to any agreement or applicable law which may limit or affect such entity's right or ability to do so) (as applicable for clauses (i) and (ii), the "Challenge Period"), has properly filed an adversary proceeding as required under the Bankruptcy Rules (x) challenging the amount, validity, enforceability, priority or extent of the Pre-Petition Indebtedness or the Pre-Petition First Priority Liens, or (y) otherwise asserting any other claims, counterclaims, causes of action, objections, contests or defenses against the Secured Creditor on behalf of the Debtor's estates. The findings herein shall be binding upon the Debtor, its estate, all parties in interest in this case and their respective successors and assigns, including any trustee or other fiduciary appointed in this case or any subsequently converted bankruptcy case(s) of the Debtor and shall inure to the benefit of the Secured Creditor and the Debtor and their respective successors and assigns.

6.      No Cash Collateral may be used to: (a) object, contest or raise any defense to, the validity, perfection, priority, extent or enforceability of the Pre-Petition Indebtedness, the Pre-Petition First Priority Liens, or the liens or claims granted under this order; (b) assert any claims and defenses against the Secured Creditor or its agents, affiliates, representatives, attorneys or advisors; or (c) seek to modify any of the rights granted to the Secured Creditor hereunder.

7.      Pursuant to Sections 361(2), 363(e) and 506 of the Bankruptcy Code, in order to provide adequate protection of the Secured Creditor's interests under applicable law in the Cash Collateral against diminution in the value of the Pre-Petition First Lien Collateral ("Collateral Diminution") caused by the Debtor's use of Cash Collateral pursuant to this Order, ENH grants,

and the Secured Creditor is hereby granted, roll-over security interests in the Debtor's post-petition acquired assets of the same type, and to the same extent, validity and priority as the Secured Creditor holds on the Petition Date (other than any avoidance actions under Sections 547, 548 or 549 of the Bankruptcy Code) (the "Roll-Over Liens"), Such Roll-Over Liens shall be (i) in addition to all security interests, liens and rights of setoff existing in favor of the Secured Creditor on the Petition Date, (ii) valid, perfected, enforceable liens and effective as of the Petition Date without any further action by the Debtor or the Secured Creditor and without the execution, filing or recordation of any document otherwise required under applicable law for granting and perfecting security interests and liens, and (iii) security for the use of Cash Collateral and as protection against Collateral Diminution.  Notwithstanding the foregoing, the Debtor is hereby authorized and directed at its expense to execute, file and record any security agreements, financing statements, instruments, or other documents as may be reasonably requested by the Secured Creditor to otherwise evidence and perfect the Roll-Over Liens.  The security interests and liens granted pursuant to this Order shall be binding upon the Debtor, any successor in interest to the Debtor or their assigns, and creditors who have or may hereafter extend credit to the Debtor or their estates.  The Roll-Over Liens shall have the same extent and validity as the Secured Creditor's Pre-Petition First Priority Liens.  No other liens or claims are or will be prior to or on parity with the liens or claims of the Secured Creditor with respect to the Roll-Over Liens (unless authorized by the Court).

8.      As further adequate protection, the Debtor shall continue to timely pay the Secured Creditor all monthly payments due under the Pre-Petition Loan Agreements, at the non-default rate of interest as set forth in the Pre-Petition Loan Agreements (the "Adequate Protection Amortization Payments") and the Secured Creditor shall receive payment of its fees

and expenses, including without limitation, the reasonable fees and disbursements of its counsel (the "Adequate Protection Fees" and together with the Adequate Protection Amortization Payment, the "Adequate Protection Payments"). The Adequate Protection Payments shall be paid by the Debtor as follows: (i) on the first business day of each month, the Debtor shall pay the Adequate Protection Amortization Payments; (ii) monthly, within ten business days of Debtor's receipt of an invoice, with a copy to any Committee, with time-entry detail, identifying the Adequate Protection Fees and with any necessary redactions thereto, the Debtor shall pay that portion of the Adequate Protection Fees to which the Debtors and the Committee have no objection. In the event of any objection by the Debtor or any Committee to any Adequate Protection Fees, such Adequate Protection Fees that are the subject of such objection shall not be paid by the Debtor until the dispute over such amounts are resolved by the Debtor or any Committee and the Secured Creditor or by this Court. The parties shall work in good faith to resolve any such objection, and to the extent the parties cannot resolve such objection, the Court will have exclusive jurisdiction to determine it.

9.     As further adequate protection for any Collateral Diminution, the Secured Creditor is hereby granted as and to the extent provided by section 507(b) of the Bankruptcy Code, allowed superpriority administrative expense claims in this case and any successor bankruptcy cases. Such claims shall have priority over all administrative expense claims and unsecured claims against the Debtor and its estate now existing or hereafter arising, of any kind or nature whatsoever.

10.     The Secured Creditor shall not be subject to the equitable doctrine of "marshaling" and/or any other similar doctrine with respect to any of the Pre-Petition First Lien Collateral (including Cash Collateral).

11.     Nothing herein shall be deemed to be a waiver by the Secured Creditor of any other rights it may have under applicable law in or against the Debtor's interests in property, including, but not limited to, setoff and recoupment rights, which rights the Secured Creditor expressly reserves.

12.     Nothing herein shall be deemed to prevent the Secured Creditor from seeking to terminate the use of Cash Collateral for any breach by the Debtor of the terms hereof or to obtain relief from the automatic stay or to assert any other rights, claims, remedies, or defenses available to them, nor shall anything contained herein deprive the Debtor or any other party in interest of the right to oppose any such action.

13.     Any reversal, modification, or vacation of this Order shall not affect the validity or priority of any obligation of the Debtor to the Secured Creditor incurred or arising by operation of law, or any security interest or lien granted to the Secured Creditor under this Order, before the effective date of such reversal, modification, or vacation.  Notwithstanding the entry of any subsequent stay or any such reversal, modification, or vacation, all uses of the Cash Collateral, and the security interests and liens granted to the Secured Creditor by the Debtor under this Order before the effective date of such stay, reversal, modification, or vacation, shall be governed in all respects by the original provisions of this Order and the Secured Creditor shall be entitled to all the rights, privileges, and benefits with respect to all such uses, obligations, security interests, and liens.

14.     Nothing herein shall preclude the Secured Creditor from asserting that it is not adequately protected, requesting additional adequate protection or making any contention respecting valuation of collateral or the amount of their claims.

15.     A final hearing on the Motion will be held on _____**, 2020** at _____

**a.m.** at the United States Courthouse, 2 Niagara Square, Buffalo, New York.

16.     Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this order

are immediately effective and enforceable upon its entry.

Dated:     July _____, 2020

_____
HON. CARL L. BUCKI,
CHIEF U.S. BANKRUPTCY JUDGE

# EXHIBIT "B"



## PROMISSORY NOTE

$4,000,000.00

Syracuse, New York
September 13, 2013

   **FOR VALUE RECEIVED**, the undersigned, **EASTERN NIAGARA HOSPITAL, INC.**, a New York not-for-profit corporation, with its chief executive office located at 521 East Avenue, Lockport, New York 14094 ("*Borrower*") promises to pay to the order of **RBS CITIZENS, N.A.**, a national banking association with an address of 250 South Clinton Street, Syracuse, New York 13202 (together with its successors and assigns, "*Bank*"), the principal amount of Four Million and 00/100 Dollars ($4,000,000.00) on the Maturity Date (as defined below), together with interest from the date hereof, at the Interest Rate set forth below, on the unpaid principal balance until paid in full as set forth below.

   Capitalized words and terms used in this Note and not defined herein shall have the meanings assigned to them in that certain Loan Agreement of even date herewith (as amended, supplemented or otherwise modified, "*Loan Agreement*"), by and between the Borrower and the Bank. In the event of a conflict between the terms of this Note and the terms of the Loan Agreement, the terms of the Loan Agreement shall govern. As used herein, the following terms shall be defined as follows:

   "*Account*" means Account No. 4011257221 maintained by the Bank in the name of the Borrower.

   "*Adjusted LIBOR Rate*" means, relative to each LIBOR Interest Period, a rate per annum determined by dividing (x) 30-Day LIBOR for such LIBOR Interest Period by (y) a percentage equal to one hundred percent (100%) minus the LIBOR Reserve Percentage. The Adjusted LIBOR Rate will be deemed to change on each date when there is a change in the LIBOR Reserve Percentage.

   "*Affiliate*" means with respect to any person, (a) any person which, directly or indirectly through one or more intermediaries controls, or is controlled by, or is under common control with, such person, or (b) any person who is a director or officer (i) of such person, (ii) of any subsidiary of such person, or (iii) any person described in clause (a) above. For purposes of this definition, control of a person shall mean the power, direct or indirect, (x) to vote 5% or more of the capital stock having ordinary voting power for the election of directors (or comparable equivalent) of such person, or (y) to direct or cause the direction of the management and policies of such person whether by contract or otherwise. Control may be by ownership, contract, or otherwise.

   "*Bank Affiliate*" means any Affiliate of Bank or any lender acting as a participant under any loan arrangement between Bank and Borrower or any Affiliate of Bank under a Secured Hedge Agreement.

   "*Business Day*" means any day which is (y) neither a Saturday nor a Sunday nor a legal holiday on which commercial banks are authorized or required to be closed in New York City; and (z) a

London Banking Day; and when such term is used to describe a day on which an Interest Rate determination is to be made, any day which is a London Banking Day.

"*Event of Default*" has the meaning given to it in the Loan Agreement.

"*Interest Payment Date*" means the first of each month commencing November 1, 2013.

"*LIBOR Breakage Fee*" means an amount as calculated by the Bank, equal to the amount of any losses, expenses and liabilities (including, without limitation, any loss of margin and anticipated profits) that the Bank may sustain as a result of the prepayment (voluntary or otherwise) of all or a portion of this Note.

"*LIBOR Interest Period*" means:

    i.    initially, the period beginning on (and including) the date hereof and ending on (and including) September 30;

    ii.    thereafter, each period commencing on the first of each month and ending on the last day of such month; provided, however, that if such LIBOR Interest Period would otherwise end on a day which is not a Business Day, such LIBOR Interest Period shall end on the next following Business Day unless such day falls in the next calendar month, in which case such LIBOR Interest Period shall end on the first preceding Business Day.

"*LIBOR Rate Margin*" means 2.28% (228 basis points).

"*LIBOR Reserve Percentage*" means, relative to any day of any LIBOR Interest Period, the maximum aggregate (without duplication) of the rates (expressed as a decimal fraction) of reserve requirements (including all basic, emergency, supplemental, marginal and other reserves and taking into account any transitional adjustments or other scheduled changes in reserve requirements) under any regulations of the Board of Governors of the Federal Reserve System (the "*Board*") or other governmental authority having jurisdiction with respect thereto as issued from time to time and then applicable to assets or liabilities consisting of "Eurocurrency Liabilities," as currently defined in Regulation D of the Board, having a term approximately equal or comparable to such LIBOR Interest Period.

"*London Banking Day*" means a day on which dealings in U.S. dollar deposits are transacted in the London interbank market.

"*Maturity Date*" means September 1, 2023.

"*Mortgage*" means the First Mortgage, Assignment of Leases and Rents and Security Agreement of even date herewith granted to the Bank by the Borrower secured by premises located in the City of Lockport, County of Niagara, New York.

"*Prime Rate*" shall mean a rate per annum equal to the rate of interest announced by Bank from time to time as its "Prime Rate." Any change in the Prime Rate shall be effective immediately from and after such change in the Prime Rate. Interest accruing by reference to the Prime Rate shall be calculated on the basis of actual days elapsed and a 360-day year. The Borrower acknowledges that the Bank may make loans to its customers above, at or below the Prime Rate.

"*30-Day LIBOR*" means, relative to any LIBOR Interest Period, the offered rate for deposits of U.S. Dollars in an amount approximately equal to the principal amount of this Note for a one-month period which the British Bankers' Association fixes as its LIBOR rate as of 11:00 a.m.

London time on the day that is two London Banking Days prior to the commencement of such LIBOR Interest Period. If the Bank cannot determine such offered rate by the British Bankers' Association, the Bank may, in its discretion, select a replacement index based on the arithmetic mean of the quotations, if any, of the interbank offered rate by first class banks in London or New York for deposits in comparable amounts and maturities. Notwithstanding the foregoing, if the Bank shall determine (which determination shall, upon notice thereof to the Borrower, be conclusive and binding on the Borrower) that the introduction of or any change in or in the interpretation of any law, rule, regulation or guideline (whether or not having the force of law) makes it unlawful, or any central bank or other governmental authority asserts that it is unlawful, for the Bank to maintain obligations priced with reference to 30-Day LIBOR; or if the Bank shall have determined, in its sole discretion, with respect to any LIBOR Interest Period that U.S. dollar deposits in the relevant amount and for the relevant LIBOR Interest Period are not available in the London interbank market; or by reasons of circumstances affecting the London interbank market, adequate and reasonable means do not exist for ascertaining 30-Day LIBOR applicable to the relevant LIBOR Interest Period; or 30-Day LIBOR no longer adequately and fairly reflects the Bank's cost of funding loans; then, upon notice of any of the foregoing given by the Bank to the Borrower, "30-Day LIBOR" for the relevant LIBOR Interest Period will be deemed to be the Bank's Prime Rate, with a change in such rate to become effective on each date when a change in the Prime Rate occurs.

**Interest Provisions.** Interest on the outstanding principal amount hereof shall accrue during each applicable LIBOR Interest Period at a rate (the "*Interest Rate*") per annum equal to the sum of the Adjusted LIBOR Rate for such LIBOR Interest Period plus the LIBOR Rate Margin and be payable on each Interest Payment Date. The Interest Rate in effect on the date hereof is 2.4624%.

**Repayment of Principal of this Note.** The Borrower shall pay consecutive monthly installments of principal commencing on November 1, 2013 and on the first day of each calendar month thereafter, in an amount equal to the monthly principal payment set forth on Schedule A attached hereto based on an amortization period of 300 months and a final payment equal to the unpaid principal balance hereof.

Notwithstanding the foregoing, all amounts due under this Note shall mature and become payable in full upon the Maturity Date (or such earlier date in the event the Bank accelerates the Borrower's obligations hereunder). On or after October 1, 2018 (but no later than October 1, 2022) and on or after October 1 of every fifth (5th) year thereafter (but no later than every tenth (10th) year thereafter), the Borrower may request in writing that the Bank extend the maturity date of this Note for an additional ten (10) years, provided that no Event of Default has occurred and is continuing. The Bank will notify the Borrowers within ninety (90) days after the Bank's receipt of the Borrower's written request of whether or not the Bank elects to extend the maturity date. If approved by the Bank, each extension shall be effective upon the date of the Bank's approval of the Borrower's request.

**Prepayment.** Borrower may prepay principal of the Loan, in part or in whole (voluntary or otherwise), provided that prior to September 13, 2015 if such prepayment is a prepayment in whole, then a prepayment penalty (the "*Prepayment Penalty*") calculated by multiplying one percent (1%) times the amount of such principal prepayment will be due and payable. Notwithstanding the foregoing to the contrary, (a) upon any prepayment (voluntary or otherwise) of all or any portion of the principal of the Loan on a day other than the last day of a LIBOR Interest Period, the Borrower shall pay to the Bank the LIBOR Breakage Fee, (b) upon any prepayment (voluntary or otherwise) of all or any portion of the principal of the Loan, the Borrower shall pay all termination fees and other amounts due under any

3

Secured Hedge Agreement, and (c) prepayment of all or any portion of the Loan prior to September 13, 2015 made with money not obtained, directly or indirectly, through Indebtedness of the Borrower shall not be subject to payment of the Prepayment Penalty.

This Note is secured by the Mortgage and shall be secured by any additional collateral hereafter granted to the Bank by the Borrower or by any other party.

Principal and interest shall be payable at the Bank's main office or at such other place as the Bank may designate in writing in immediately available funds in lawful money of the United States of America without set-off, deduction or counterclaim. Interest shall be calculated on the basis of actual number of days elapsed and a 360-day year.

At the option of the Bank, this Note shall become immediately due and payable without notice or demand upon the occurrence at any time of an Event of Default. Any payments received by the Bank on account of this Note shall, at the Bank's option, be applied, first, to any LIBOR Breakage Fee, costs, expenses or charges then owed to the Bank by the Borrower, second, to accrued and unpaid interest; and third, to the unpaid principal balance hereof. Notwithstanding the foregoing, any payments received after the occurrence and during the continuance of an Event of Default shall be applied in such manner as the Bank may determine. The Borrower hereby authorizes the Bank to charge any deposit account which the Borrower may maintain with the Bank for any payment required hereunder and then due and owing without prior notice to the Borrower. Notwithstanding anything in this paragraph to the contrary, the security interest and right of set-off granted hereby shall not apply to any deposit accounts to the extent specially and exclusively used for payroll, payroll taxes and other employee wage and benefit payments to or for the benefit of Borrower's employees.

If pursuant to the terms of this Note, the Borrower is at any time obligated to pay interest on the principal balance at a rate in excess of the maximum interest rate permitted by applicable law for the loan evidenced by this Note, the applicable interest rate shall be immediately reduced to such maximum rate and all previous payments in excess of the maximum interest rate shall be deemed to have been payments in reduction of principal and not on account of the interest due hereunder.

**The Borrower represents to the Bank that the proceeds of this Note will not be used for personal, family or household purposes or for the purpose of purchasing or carrying margin stock or margin securities within the meaning of Regulations U and X of the Federal Reserve Board, 12 C.F.R. Parts 221 and 224.**

The Borrower and each endorser or guarantor hereof grant to the Bank a continuing lien on and security interest in any and all deposits or other sums at any time credited by or due from the Bank or any Bank Affiliate to the Borrower and each endorser or guarantor hereof and any cash, securities, instruments or other property of the Borrower and each endorser or guarantor hereof in the possession of the Bank or any Bank Affiliate, whether for safekeeping or otherwise, or in transit to or from the Bank or any Bank Affiliate as security for the full and punctual payment and performance of all of the liabilities and obligations of the Borrower and each endorser or guarantor hereof to the Bank or any Bank Affiliate and such deposits and other sums may be applied or set off against such liabilities and obligations of the Borrower and each endorser or guarantor hereof to the Bank or any Bank Affiliate at any time, if such are then due, whether or not demand has been made and whether or not other collateral is then available to the Bank or any Bank Affiliate.

No delay or omission on the part of the Bank in exercising any right hereunder shall operate as a waiver of such right or of any other right of the Bank, nor shall any delay, omission or waiver on any

7459987.2

one occasion be deemed a bar to or waiver of the same or any other right on any future occasion. The Borrower, regardless of the time, order or place of signing, waives presentment, demand, protest, notice of intent to accelerate, notice of acceleration and all other notices of every kind in connection with the delivery, acceptance, performance or enforcement of this Note and assents to any extension or postponement of the time of payment or any other indulgence, to any substitution, exchange or release of collateral, and to the addition or release of any other party or person primarily or secondarily liable and waives all recourse to suretyship and guarantor defenses generally, including any defense based on impairment of collateral.

The Borrower and each endorser or guarantor hereof shall indemnify, defend and hold the Bank and Bank Affiliates and their directors, officers, employees, agents and attorneys (each an "*Indemnitee*") harmless against any claim brought or threatened against any Indemnitee by the Borrower, each endorser or guarantor hereof or by any other person (as well as from attorneys' reasonable fees and expenses in connection therewith) on account of the Bank's relationship with the Borrower and each endorser or guarantor hereof (each of which may be defended, compromised, settled or pursued by the Bank with counsel of the Bank's selection, but at the expense of the Borrower and each endorser or guarantor hereof), except for any claim arising out of the gross negligence or willful misconduct of the Bank.

The Borrower and each endorser or guarantor hereof agrees to pay, upon demand, costs of collection of all amounts under this Note after an Event of Default, including, without limitation, principal and interest, or in connection with the enforcement of, or realization on, any security for this Note, including, without limitation, to the extent permitted by applicable law, reasonable attorneys' fees and expenses. Upon the occurrence and during the continuance of an Event of Default, interest shall accrue at a rate per annum equal to the aggregate of 4.0% plus the Interest Rate. If any payment due under this Note is unpaid for 10 days or more, the Borrower and each endorser or guarantor hereof shall pay, in addition to any other sums due under this Note (and without limiting the Bank's other remedies on account thereof), a late charge equal to the greater of $25.00 or 4.0% of such unpaid amount. In addition, the Borrower and each endorser or guarantor hereof shall pay the Bank's customary fee if any payment made on account of this Note is dishonored.

This Note shall be binding upon the Borrower, each endorser or guarantor hereof and upon their respective successors, assigns and legal representatives, and shall inure to the benefit of the Bank and its successors, endorsees and assigns.

The Borrower authorizes the Bank to complete this Note if delivered incomplete in any respect. A photographic or other reproduction of this Note may be made by the Bank, and any such reproduction shall be admissible in evidence with the same effect as the original itself in any judicial or administrative proceeding, whether or not the original is in existence.

The Borrower and each endorser or guarantor hereof will from time to time execute and deliver to the Bank such documents, and take or cause to be taken all such other further action, as the Bank may reasonably request in order to effect and confirm or vest more securely in the Bank all rights contemplated by this Note or any other loan documents related thereto (including, without limitation, to correct clerical errors) or to vest more fully in or assure to the Bank the security interest in any collateral securing this Note or to comply with applicable statute or law.

This Note shall be governed by federal law applicable to the Bank and to the extent not preempted by federal law, the laws of the State of New York.

7459987.2

Any notices under or pursuant to this Note shall be deemed duly received and effective if delivered in hand to the authorized representative of the Borrower or to any officer or agent of the Bank, or if mailed by registered or certified mail, return receipt requested, addressed to the Borrower or the Bank at the address set forth in this Note or as any party may from time to time designate by written notice to the other party.

The Borrower and each endorser or guarantor hereof irrevocably submits to the nonexclusive jurisdiction of any Federal or state court sitting in the State of New York, over any suit, action or proceeding arising out of or relating to this Note. The Borrower irrevocably waives, to the fullest extent it may effectively do so under applicable law, any objection it may now or hereafter have to the laying of the venue of any such suit, action or proceeding brought in any such court and any claim that the same has been brought in an inconvenient forum. The Borrower hereby consents to any and all process which may be served in any such suit, action or proceeding (i) by mailing a copy thereof by registered and certified mail, postage prepaid, return receipt requested, to the Borrower's address first set forth above to the attention of: Clare A. Haar, Chief Executive Officer, or as notified to the Bank, and (ii) by serving the same upon the Borrower in any other manner otherwise permitted by law, and agrees that such service shall in every respect be deemed effective service upon the Borrower.

**BORROWER, EACH ENDORSER HEREOF AND THE BANK EACH HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY, AND AFTER AN OPPORTUNITY TO CONSULT WITH LEGAL COUNSEL, (A) WAIVE ANY AND ALL RIGHTS TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING IN CONNECTION WITH THIS NOTE, ANY OF THE OBLIGATIONS OF BORROWER TO THE BANK, AND ALL MATTERS CONTEMPLATED HEREBY AND DOCUMENTS EXECUTED IN CONNECTION HEREWITH, AND (B) AGREE NOT TO SEEK TO CONSOLIDATE ANY SUCH ACTION WITH ANY OTHER ACTION IN WHICH A JURY TRIAL CANNOT BE, OR HAS NOT BEEN, WAIVED. BORROWER AND EACH ENDORSER HEREOF EACH CERTIFIES THAT NEITHER THE BANK NOR ANY OF ITS REPRESENTATIVES, AGENTS OR COUNSEL HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT THE BANK WOULD NOT IN THE EVENT OF ANY SUCH PROCEEDING SEEK TO ENFORCE THIS WAIVER OF RIGHT TO TRIAL BY JURY.**

7459987.2

Executed and dated as of the date first set forth above.

EASTERN NIAGARA HOSPITAL, INC.

By: _Clare A. Haar_

Clare A. Haar
Chief Executive Officer

7459987.2

SCHEDULE A

| Payment Due Date | Monthly Principal Payment |
|---|---|
| November 1, 2013 | $6,389.64 |
| December 1, 2013 | $6,389.64 |
| January 1, 2014 | $6,389.64 |
| February 1, 2014 | $6,389.64 |
| March 1, 2014 | $6,389.64 |
| April 1, 2014 | $6,389.64 |
| May 1, 2014 | $6,389.64 |
| June 1, 2014 | $6,389.64 |
| July 1, 2014 | $6,389.64 |
| August 1, 2014 | $6,389.64 |
| September 1, 2014 | $6,389.64 |
| October 1, 2014 | $6,389.64 |
| November 1, 2014 | $6,750.07 |
| December 1, 2014 | $6,750.07 |
| January 1, 2015 | $6,750.07 |
| February 1, 2015 | $6,750.07 |
| March 1, 2015 | $6,750.07 |
| April 1, 2015 | $6,750.07 |
| May 1, 2015 | $6,750.07 |
| June 1, 2015 | $6,750.07 |
| July 1, 2015 | $6,750.07 |
| August 1, 2015 | $6,750.07 |
| September 1, 2015 | $6,750.07 |
| October 1, 2015 | $6,750.07 |
| November 1, 2015 | $7,130.83 |
| December 1, 2015 | $7,130.83 |
| January 1, 2016 | $7,130.83 |
| February 1, 2016 | $7,130.83 |
| March 1, 2016 | $7,130.83 |
| April 1, 2016 | $7,130.83 |
| May 1, 2016 | $7,130.83 |
| June 1, 2016 | $7,130.83 |
| July 1, 2016 | $7,130.83 |
| August 1, 2016 | $7,130.83 |
| September 1, 2016 | $7,130.83 |
| October 1, 2016 | $7,130.83 |
| November 1, 2016 | $7,533.06 |
| December 1, 2016 | $7,533.06 |
| January 1, 2017 | $7,533.06 |
| February 1, 2017 | $7,533.06 |
| March 1, 2017 | $7,533.06 |
| April 1, 2017 | $7,533.06 |

7459987.2

8

| | |
|---|---|
| May 1, 2017 | $7,533.06 |
| June 1, 2017 | $7,533.06 |
| July 1, 2017 | $7,533.06 |
| August 1, 2017 | $7,533.06 |
| September 1, 2017 | $7,533.06 |
| October 1, 2017 | $7,533.06 |
| November 1, 2017 | $7,957.98 |
| December 1, 2017 | $7,957.98 |
| January 1, 2018 | $7,957.98 |
| February 1, 2018 | $7,957.98 |
| March 1, 2018 | $7,957.98 |
| April 1, 2018 | $7,957.98 |
| May 1, 2018 | $7,957.98 |
| June 1, 2018 | $7,957.98 |
| July 1, 2018 | $7,957.98 |
| August 1, 2018 | $7,957.98 |
| September 1, 2018 | $7,957.98 |
| October 1, 2018 | $7,957.98 |
| November 1, 2018 | $8,406.88 |
| December 1, 2018 | $8,406.88 |
| January 1, 2019 | $8,406.88 |
| February 1, 2019 | $8,406.88 |
| March 1, 2019 | $8,406.88 |
| April 1, 2019 | $8,406.88 |
| May 1, 2019 | $8,406.88 |
| June 1, 2019 | $8,406.88 |
| July 1, 2019 | $8,406.88 |
| August 1, 2019 | $8,406.88 |
| September 1, 2019 | $8,406.88 |
| October 1, 2019 | $8,406.88 |
| November 1, 2019 | $8,881.09 |
| December 1, 2019 | $8,881.09 |
| January 1, 2020 | $8,881.09 |
| February 1, 2020 | $8,881.09 |
| March 1, 2020 | $8,881.09 |
| April 1, 2020 | $8,881.09 |
| May 1, 2020 | $8,881.09 |
| June 1, 2020 | $8,881.09 |
| July 1, 2020 | $8,881.09 |
| August 1, 2020 | $8,881.09 |
| September 1, 2020 | $8,881.09 |
| October 1, 2020 | $8,881.09 |
| November 1, 2020 | $9,382.05 |
| December 1, 2020 | $9,382.05 |
| January 1, 2021 | $9,382.05 |
| February 1, 2021 | $9,382.05 |

7459987.2

9

| | |
|---|---|
| March 1, 2021 | $9,382.05 |
| April 1, 2021 | $9,382.05 |
| May 1, 2021 | $9,382.05 |
| June 1, 2021 | $9,382.05 |
| July 1, 2021 | $9,382.05 |
| August 1, 2021 | $9,382.05 |
| September 1, 2021 | $9,382.05 |
| October 1, 2021 | $9,382.05 |
| November 1, 2021 | $9,911.28 |
| December 1, 2021 | $9,911.28 |
| January 1, 2022 | $9,911.28 |
| February 1, 2022 | $9,911.28 |
| March 1, 2022 | $9,911.28 |
| April 1, 2022 | $9,911.28 |
| May 1, 2022 | $9,911.28 |
| June 1, 2022 | $9,911.28 |
| July 1, 2022 | $9,911.28 |
| August 1, 2022 | $9,911.28 |
| September 1, 2022 | $9,911.28 |
| October 1, 2022 | $9,911.28 |
| November 1, 2022 | $10,470.35 |
| December 1, 2022 | $10,470.35 |
| January 1, 2023 | $10,470.35 |
| February 1, 2023 | $10,470.35 |
| March 1, 2023 | $10,470.35 |
| April 1, 2023 | $10,470.35 |
| May 1, 2023 | $10,470.35 |
| June 1, 2023 | $10,470.35 |
| July 1, 2023 | $10,470.35 |
| August 1, 2023 | $10,470.35 |
| September 1, 2023 | $3,027,181.97* |

*Maturity

# SECURITY AGREEMENT

**THIS SECURITY AGREEMENT** (this "*Agreement*"), dated September 13, 2013, by and between **EASTERN NIAGARA HOSPITAL, INC.**, a New York not-for-profit corporation ("*Borrower*"), having a principal office located at 521 East Avenue, Lockport, New York 14094 and **RBS CITIZENS, N.A.**, a national banking association ("*Bank*"), with an office located at 250 South Clinton Street, Syracuse, New York 13202.

THE MEANING OF CAPITALIZED TERMS (NOT OTHERWISE DEFINED)
CAN BE DETERMINED BY REFERENCE TO SECTION I HEREOF

## W I T N E S S E T H :

**WHEREAS**, Borrower has applied to Bank for a loan (the "*Loan*") in the amount of Four Million and 00/100 Dollars U.S. ($4,000,000.00) (the "*Loan Amount*"); and

**WHEREAS**, the purpose of the Loan is to pay or reimburse the Borrower payments due to the Pension Benefit Guaranty Corporation with respect to pension fund obligations; and

**WHEREAS**, Borrower has executed and delivered a certain promissory note of even date herewith, in the principal sum of Four Million and 00/100 Dollars U.S. ($4,000,000.00) made payable to the order of Bank (the "*Note*") and entered into a loan agreement dated of even date herewith (as amended, supplemented or otherwise modified, the "*Loan Agreement*"), with Bank; and

**WHEREAS**, Borrower is the owner in fee simple of a parcel of real property (the "*Premises*") located in the City of Lockport, County of Niagara, New York as improved on the date hereof and has granted to Bank a first mortgage on and security interest in the Premises pursuant to a first mortgage, assignment of leases and rents and security agreement of even date herewith (as amended, supplemented or otherwise modified, the "*Mortgage*"); and

**WHEREAS**, pursuant to this Agreement, Borrower intends to grant to Bank a first priority security interest in revenues of Borrower;

**WHEREAS**, Borrower is required to execute and deliver this Agreement and grant the security interest described herein as a condition to obtaining the Loan;

**NOW, THEREFORE,** the parties hereto agree as follows:

**1.    DEFINITIONS.** Capitalized words and terms used in this Agreement and not defined herein shall have the meanings assigned to them in the Loan Agreement, except that all terms defined in the Uniform Commercial Code ("*UCC*") of the State and used herein shall have the same definitions herein as specified therein.

**2.    GRANT OF SECURITY INTEREST.** Borrower hereby grants to Bank, to secure the payment and performance in full of the Obligations, a security interest in and pledges



and assigns to Bank the following property, assets and rights of Borrower, consisting of all issues, profits, revenues, rents, income, receipts, moneys and royalties derived from the medical, healthcare, community-based, clinical or other services provided by Borrower or otherwise, all gifts, grants, donations and contributions, however denominated, including without limitation (a) program income, non-program income, operating revenues and gains, all as determined in accordance with GAAP, (b) federal or State grant or other programs, Medicaid or Medicare reimbursements and payments, and (c) investment income on all funds and accounts held by Bank, and all rights to receive the same, whether in the form of accounts receivable, contract rights, chattel paper, instruments, general intangibles of Borrower and the proceeds thereof, the proceeds of any insurance coverage on and condemnation awards in respect of the Mortgaged Property or any gain on the sale or other disposition of any Property now or hereafter attached to the Mortgaged Property, all of the foregoing, whether now existing or hereafter coming into existence, and whether now owned or held or hereafter acquired by Borrower, but excluding (i) any contribution, grant (excluding grants by the United States or the State) or gift made to Borrower subject to restrictions on its use which restrictions do not permit application to or in connection with Indebtedness of Borrower, or (ii) any income derived from the investment of any such restricted contribution, grant or gift;

wherever located, whether now owned or hereafter acquired or arising, and all proceeds, products and accessions thereof, including, without limitation, (a) Accounts, (b) Chattel Paper (whether tangible or electronic), (c) Commercial Tort Claims, (d) Deposit Accounts, (e) Documents, (f) General Intangibles (including payment intangibles), (g) Instruments (including promissory notes), (h) Investment Property (including all securities), (i) Letter-of-Credit Rights (whether or not the Letter of Credit is evidenced by a writing), (j) Money (including contract rights or rights to the payment of money), (k) Supporting Obligations, and (l) to the extent not listed above as original Collateral, proceeds and products of the foregoing (all of the same being hereinafter individually and collectively called the "*Collateral*").

3.    **AUTHORIZATION TO FILE FINANCING STATEMENTS.**    Borrower hereby irrevocably authorizes Bank at any time and from time to time to file in any filing office in any UCC jurisdiction, at Borrower's expense, any financing statements and amendments and continuations thereto that (a) indicate the Collateral (i) as all assets of Borrower or words of similar effect, regardless of whether any particular asset included in the Collateral falls within the scope of the UCC of the State or such jurisdiction, or (ii) as being of an equal or lesser scope or with greater detail; and (b) provide any other information required by the UCC of the State or such jurisdiction for the sufficiency or filing office acceptance of any financing statement or amendment.  Borrower agrees to furnish any such information to Bank promptly upon Bank's request.

4.    **OTHER ACTIONS.**    Further to insure the attachment, perfection and first priority of, and the ability of Bank to enforce, Bank's security interest in the Collateral, Borrower agrees, in each case at Borrower's expense, to take the following actions with respect to the



following Collateral and without limitation of Borrower's other obligations contained in this Agreement:

(a) **Promissory Notes and Tangible Chattel Paper.** If Borrower shall at any time hold or acquire Collateral consisting of any promissory notes or tangible chattel paper, Borrower shall forthwith endorse and assign the same to Bank and deliver the same to Bank, accompanied by such instruments of transfer or assignment duly executed in blank as Bank may from time to time specify.

(b) **Deposit Accounts.** Borrower shall maintain a primary depository relationship, including corporate credit cards, cash management services and merchant services, only with Bank. If Borrower desires to open a deposit account with any other institution, Borrower, with the prior written consent of Bank, which Bank may withhold in Bank's sole discretion, cause each depository bank where Borrower at any time desires to open or maintain an account, to enter into an agreement in form and substance satisfactory to Bank, which either (i) causes the depository bank to agree to comply, without further consent of Borrower, at any time with instructions from Bank to such depository bank directing the disposition of funds from time to time credited to such deposit account, or (ii) arranges for Bank to become the customer of the depository bank with respect to the deposit account, with Borrower being permitted, only with the consent of Bank, to exercise rights to withdraw funds from such deposit account, provided that both options shall require the depository bank to subordinate its interest in such accounts to the interest of Bank. The provisions of this paragraph shall not apply to (x) any deposit account for which Borrower, the depository bank and Bank have entered into a cash collateral agreement specially negotiated among Borrower, the depository bank and Bank for the specific purpose set forth therein, and (y) any deposit accounts to the extent specially and exclusively used for payroll, payroll taxes and other employee wage and benefit payments to or for the benefit of Borrower's employees.

(c) **Investment Property.** If Borrower shall at any time hold or acquire any Collateral consisting of certificated securities, Borrower shall forthwith endorse, assign and deliver the same to Bank, accompanied by such instruments of transfer or assignment duly executed in blank as Bank may from time to time specify. If any Collateral consisting of securities now or hereafter acquired by Borrower are uncertificated and are issued to Borrower or its nominee directly by the issuer thereof, Borrower shall immediately notify Bank thereof and, at the request and option of Bank, pursuant to an agreement in form and substance satisfactory to Bank, either (i) cause the issuer to agree to comply, without further consent of Borrower or such nominee, at any time with instructions from Bank as to such securities, or (ii) arrange for Bank to become the registered owner of the securities. If any Collateral consisting of securities, whether certificated or uncertificated, or other investment property now or hereafter acquired by Borrower are held by Borrower or its nominee through a securities intermediary or commodity intermediary, Borrower shall immediately notify Bank thereof and, at the request and option of Bank, pursuant to an agreement in form and substance satisfactory to Bank, either (y) cause such

- 3 -



securities intermediary or (as the case may be) commodity intermediary to agree to comply, in each case without further consent of Borrower or such nominee, at any time with entitlement orders or other instructions from Bank to such securities intermediary as to such securities or other investment property, or (as the case may be) to apply any value distributed on account of any commodity contract as directed by Bank to such commodity intermediary, or (z) in the case of financial assets or other investment property held through a securities intermediary, arrange for Bank to become the entitlement holder with respect to such investment property, with Borrower being permitted, only with the consent of Bank, to exercise rights to withdraw or otherwise deal with such investment property. Bank agrees with Borrower that Bank shall not give any such entitlement orders or instructions or directions to any such issuer, securities intermediary or commodity intermediary, and shall not withhold its consent to the exercise of any withdrawal or dealing rights by Borrower, unless an Event of Default has occurred and is continuing or, after giving effect to any such investment and withdrawal rights not otherwise permitted by the Credit Documents, would occur. The provisions of this paragraph shall not apply to any financial assets credited to a securities account for which Bank is the securities intermediary.

(d) *Collateral in the Possession of a Bailee.* If any Collateral is at any time in the possession of a bailee, Borrower shall promptly notify Bank thereof and, at the request and option of Bank, shall promptly obtain an acknowledgement from the bailee, in form and substance satisfactory to Bank, that the bailee holds such Collateral for the benefit of Bank and such bailee's agreement to comply, without further consent of Borrower, at any time with instructions of Bank as to such Collateral. Bank agrees with Borrower that Bank shall not give any such instructions unless an Event of Default has occurred and is continuing or would occur after taking into account any action by Borrower with respect to the bailee.

(e) *Electronic Chattel Paper.* If Borrower at any time holds or acquires any Collateral consisting of an interest in any electronic chattel paper, Borrower shall promptly notify Bank thereof and, at the request and option of Bank, shall take such action as Bank may reasonably request to vest in Bank control, under the UCC, of such electronic chattel paper. Bank agrees with Borrower that Bank will arrange, pursuant to procedures satisfactory to Bank and so long as such procedures will not result in Bank's loss of control, for Borrower to make alterations to the electronic chattel paper permitted under the UCC for a party in control to make without loss of control, unless an Event of Default has occurred and is continuing or would occur after taking into account any action by Borrower with respect to such electronic chattel paper.

(f) *Letter-of-Credit Rights.* If Borrower is at any time a beneficiary under Collateral consisting of a letter of credit now or hereafter, Borrower shall promptly notify Bank thereof, and at the request and option of Bank, Borrower shall, pursuant to an agreement in form and substance satisfactory to Bank, either (i) arrange for the issuer and any confirmer or other nominated person of such letter of credit to consent to an assignment to Bank of the proceeds of

- 4 -



the letter of credit, or (ii) arrange for Bank to become the transferee beneficiary of the letter of credit.

(g) **Commercial Tort Claims.** If Borrower shall at any time hold or acquire Collateral consisting of a commercial tort claim, Borrower shall immediately notify Bank in a writing signed by Borrower of the particulars thereof and grant to Bank in such writing a co-equal first priority security interest therein and in the proceeds thereof, all upon the terms of this Agreement, with such writing to be in form and substance satisfactory to Bank.

(h) **Other Actions as to Any and All Collateral.** Borrower further agrees, upon request of Bank and at Bank's option, to take any and all other actions as Bank may determine to be necessary or useful for the attachment, perfection and first priority of, and the ability of Bank to enforce, Bank's security interest in any and all of the Collateral, including, without limitation, (i) delivering and, where appropriate, filing financing statements and amendments relating thereto under the UCC, to the extent, if any, that Borrower's signature thereon is required therefor; (ii) complying with any provision of any statute, regulation or treaty of the United States as to any Collateral if compliance with such provision is a condition to attachment, perfection or priority of, or ability of Bank to enforce, Bank's security interest in such Collateral; (iii) obtaining governmental and other third-party waivers, consents and approvals in form and substance satisfactory to Bank, including, without limitation, any consent of any licensor, lessor or other person obligated on Collateral; (iv) obtaining waivers from mortgagees and landlords in form and substance satisfactory to Bank; and (v) taking all actions under any earlier versions of the UCC or under any other law, as reasonably determined by Bank to be applicable in any relevant UCC or other jurisdiction, including any foreign jurisdiction.

5. **RELATION TO OTHER DOCUMENTS.** The provisions of this Agreement supplement the provisions of the Mortgage or any other real estate mortgage granted by Borrower to Bank and which secures the payment or performance of any of the Obligations. Nothing contained in any such real estate mortgage shall derogate from any of the rights or remedies of Bank hereunder. In addition to the provisions of this Agreement being so read and construed with any such mortgage, the provisions of this Agreement shall be read and construed with the other Credit Documents.

6. **REPRESENTATIONS AND WARRANTIES CONCERNING THE COMPANY'S LEGAL STATUS.** Borrower represents and warrants to Bank as follows: (a) it is a not-for-profit corporation which is duly organized, validly existing and in good standing under the laws of the State and is validly existing and in good standing in all states in which Borrower is doing business; (b) it has full power and authority to own its properties and to transact the businesses in which it is presently engaged or presently proposes to engage; (c) the execution, delivery and performance of this Agreement have been duly authorized by all necessary action of Borrower; and (d) this Agreement constitutes, and any instrument or agreement required hereunder to be given by Borrower to Bank when delivered will constitute,

- 5 -



the legal, valid and binding obligation of Borrower, enforceable against Borrower in accordance with their respective terms, except as limited by general principles of equity and by bankruptcy, insolvency, reorganization, moratorium or similar laws relating to or affecting generally the enforcement of creditors' rights.

7. **COVENANTS CONCERNING THE COMPANY'S LEGAL STATUS.** Borrower covenants to and with Bank as follows: (a) except as set forth in <u>Schedule II</u> attached hereto, there is no pending or threatened litigation, claim for infringement, proceeding or investigation by any governmental authority or any other person known to Borrower against or otherwise affecting Borrower or any of its assets or its officers, directors or agents in their capacities as such, nor does Borrower know of any ground for any such litigation, infringement claims, proceedings or investigations; (b) no contract or organizational document prohibits any term or condition of this Agreement; (c) the execution and delivery of this Agreement will not violate any law or agreement governing Borrower or to which Borrower is a party; and (d) all information and statements furnished in connection with the Credit Documents, and any other documents related to this secured transaction, are true and correct, and contain no false or misleading statement.

8. **REPRESENTATIONS AND WARRANTIES CONCERNING COLLATERAL AND SECURITY AGREEMENT.** Borrower further represents and warrants to Bank as follows: (a) Borrower has rights in the Collateral, free from any right or claim of any person or any adverse lien, security interest or other encumbrance; (b) none of the Collateral constitutes, or is the proceeds of, "farm products" as defined in the UCC of the State; (c) none of the account debtors or other persons obligated on any of the Collateral is a governmental authority covered by the federal Assignment of Claims Act or like federal, state or local statute or rule in respect of such Collateral; (d) Borrower holds no commercial tort claim; (e) Borrower has at all times operated its business in compliance with all applicable provisions of the federal Fair Labor Standards Act, as amended, and with all applicable provisions of federal, state and local statutes and ordinances dealing with the control, shipment, storage or disposal of hazardous materials or substances; and (f) all other information set forth in this Agreement pertaining to the Collateral is accurate and complete.

9. **COVENANTS CONCERNING COLLATERAL.** Borrower further covenants with Bank as follows: (a) the Collateral, to the extent not delivered to Bank pursuant to Section 2 or 4 above, will be kept at those locations listed on <u>Schedule I</u> attached hereto, and Borrower will not remove the Collateral from such locations without providing at least thirty (30) days' prior written notice to Bank; (b) except for the security interest granted herein and in the Mortgage, Borrower shall be the owner of the Collateral free from any right or claim of any other person or any lien, security interest or other encumbrance, and Borrower shall defend the same against all claims and demands of all persons at any time claiming the same or any interests therein adverse to Bank; (c) Borrower shall not pledge, mortgage or create or suffer to exist any right of any person in or claim by any person to the Collateral, or any security interest, lien or

- 6 -



other encumbrance in the Collateral in favor of any person, other than Bank, as permitted by the Mortgage and the Loan Agreement; (d) Borrower will permit Bank or its designees to inspect the Collateral at any reasonable time, wherever located; (e) Borrower will pay promptly when due all taxes, assessments, governmental charges and levies upon the Collateral or incurred in connection with the use or operation of such Collateral or incurred in connection with this Agreement; (f) Borrower will continue to operate its business in compliance with all applicable provisions of the federal Fair Labor Standards Act, as amended, and with all applicable provisions of federal, state and local statutes and ordinances dealing with the control, shipment, storage or disposal of hazardous materials or substances; (g) Borrower will not sell or otherwise dispose, or offer to sell or otherwise dispose, of the Collateral or any interest therein; and (h) there are no off-sets or defenses to the Obligations.

### 10. COLLATERAL PROTECTION EXPENSES; PRESERVATION OF COLLATERAL.

(a)     *Expenses Incurred by Bank.*  In Bank's discretion, if Borrower fails to do so, Bank may discharge taxes and other encumbrances at any time levied or placed on any of the Collateral, make repairs thereto and pay any necessary filing fees or insurance premiums. Borrower agrees to reimburse Bank on demand for all expenditures so made.  Bank shall have no obligation to Borrower to make any such expenditures, nor shall the making thereof be construed as a waiver or cure any Event of Default.

(b)     *Bank's Obligations and Duties.*     Anything herein to the contrary notwithstanding, Borrower shall remain obligated and liable under each contract or agreement included in the Collateral to be observed or performed by Borrower thereunder.  Bank shall not have any obligation or liability under any such contract or agreement by reason of or arising out of this Agreement or the receipt by Bank of any payment relating to any of the Collateral, nor shall Bank be obligated in any manner to perform any of the obligations of Borrower under or pursuant to any such contract or agreement, to make inquiry as to the nature or sufficiency of any payment received by Bank in respect of the Collateral or as to the sufficiency of any performance by any party under any such contract or agreement, to present or file any claim, to take any action to enforce any performance or to collect the payment of any amounts which may have been assigned to Bank or to which Bank may be entitled at any time or times.  Bank's sole duty with respect to the custody, safe keeping and physical preservation of the Collateral in its possession, under the UCC of the State or otherwise, shall be to deal with such Collateral in the same manner as Bank deals with similar property for its own account.

### 11. SECURITIES AND DEPOSITS. Bank may at any time following and during the continuance of an Event of Default, at its option, transfer to itself or any nominee any securities constituting Collateral, receive any income thereon and hold such income as additional Collateral or apply it to the Obligations in accordance with the Loan Agreement.  Whether or not any Obligations are due, Bank may, following and during the continuance of an Event of

- 7 -



Default, demand, sue for, collect or make any settlement or compromise which it deems desirable with respect to the Collateral. Regardless of the adequacy of Collateral or any other security for the Obligations, any deposits or other sums at any time credited by or due from Bank to Borrower may at any time be applied to or set off against any of the Obligations then due and owing.

**12. NOTIFICATION TO ACCOUNT DEBTORS AND OTHER PERSONS OBLIGATED ON COLLATERAL.** If an Event of Default shall have occurred and be continuing, Borrower shall, at the request and option of Bank, notify account debtors and other persons obligated on any of the Collateral of the security interest of Bank in any account, chattel paper, general intangible, instrument or other Collateral and that payment thereof is to be made directly to Bank or to any financial institution designated by Bank as Bank's agent therefor, and Bank may itself, if an Event of Default shall have occurred and be continuing, without notice to or demand upon Borrower, so notify account debtors and other persons obligated on Collateral. After the making of such a request or the giving of any such notification, Borrower shall hold any proceeds of collection of accounts, chattel paper, general intangibles, instruments and other Collateral received by Borrower or Bank without commingling the same with other funds of Borrower and shall turn the same over to Bank in the identical form received, together with any necessary endorsements or assignments. Bank shall apply the proceeds of collection of accounts, chattel paper, general intangibles, instruments and other Collateral received by Bank to the Obligations in accordance with the Loan Agreement, such proceeds to be immediately credited after final payment in cash or other immediately available funds of the items giving rise to them.

**13. POWER OF ATTORNEY.**

 **(a)**  *Appointment and Powers of Bank.* Borrower hereby irrevocably constitutes and appoints Bank and any officer or agent thereof, with full power of substitution, as its true and lawful attorneys-in-fact, with full irrevocable power and authority in the place and stead of Borrower or in Bank's own name, for the purpose of carrying out the terms of this Agreement, to take any and all appropriate action and to execute any and all documents and instruments that may be necessary or useful to accomplish the purposes of this Agreement and, without limiting the generality of the foregoing, hereby gives said attorneys the power and right, on behalf of Borrower, without notice to or assent by Borrower, to do the following:

  (i)  upon the occurrence and during the continuance of an Event of Default, generally to sell, transfer, pledge, make any agreement with respect to or otherwise dispose of or deal with any of the Collateral in such manner as is consistent with the UCC of the State and as fully and completely as though Bank were the absolute owner thereof for all purposes, and to do, at Borrower's expense, at any time or from time to time, all acts and things which Bank deems necessary or useful to protect, preserve or realize upon the Collateral and Bank's security interest therein, in order to effect the intent of this Agreement, all no less fully and effectively as Borrower might do,

- 8 -



including, without limitation, (A) the filing and prosecuting of registration and transfer applications with the appropriate federal, state or local agencies or authorities with respect to trademarks, copyrights and patentable inventions and processes; (B) upon written notice to Borrower, the exercise of voting rights with respect to voting securities, which rights may be exercised, if Bank so elects, with a view to causing the liquidation of assets of the issuer of any such securities; and (C) the execution, delivery and recording, in connection with any sale or other disposition of any Collateral, of the endorsements, assignments or other instruments of conveyance or transfer with respect to such Collateral; and

      (ii) to the extent that Borrower's authorization given in Section 3 above is not sufficient, to file financing statements with respect hereto or a photocopy of this Agreement in substitution for a financing statement, as Bank may deem appropriate.

      **(b)** *Ratification by Borrower.* To the extent permitted by law, Borrower hereby ratifies all that said attorneys shall lawfully do or cause to be done by virtue hereof. This power of attorney is a power coupled with an interest and is irrevocable.

      **(c)** *No Duty on Bank.* The powers conferred on Bank hereunder are solely to protect its interests in the Collateral and shall not impose any duty upon it to exercise any such powers. Bank shall be accountable only for the amounts that it actually receives as a result of the exercise of such powers, and neither it nor any of its officers, directors, employees or agents shall be responsible to Borrower for any act or failure to act, except for Bank's own gross negligence or willful misconduct.

    **14.** **Events of Default Defined.** The following shall be "Events of Default" under this Agreement and the terms *"Event of Default"* or *"default"* shall mean, whenever they are used in this Agreement, any one or more of the following events:

      (a) an Event of Default under the Loan Agreement or any other Credit Document;

      (b) the Collateral, or any part thereof, is in any manner, whether voluntarily or involuntarily, encumbered, assigned, leased, subleased, sold, transferred or conveyed, except as is expressly provided in the Loan Agreement or the Mortgage, or Borrower threatens to encumber, assign, lease, sublease, sell, transfer or convey the Collateral, or any part thereof, to any person except as is expressly provided in the Loan Agreement or the Mortgage; or

      (c) the imposition of a Lien on the Collateral other than a Lien being contested as provided herein or in the Mortgage.

- 9 -



**15.    RIGHTS AND REMEDIES.** If any Event of Default shall occur, Bank may, at its election, and without demand or notice of any kind, do any one or more of the following:

(a)    declare all of the Obligations to Bank to be immediately due and payable, whereupon all unpaid principal, interest and fees in respect of such Obligations, together with all of Bank's reasonable costs, expenses and attorneys' fees related thereto, under the terms of the Credit Documents or otherwise, shall be immediately due and payable;

(b)    exercise any and all rights and remedies available to Bank under any applicable law; or

(c)    exercise any and all rights and remedies granted to Bank under the terms of this Agreement or any of the other Credit Documents;

In any jurisdiction in which enforcement hereof is sought, in addition to all other rights and remedies, Bank shall have the rights and remedies of a secured party under the UCC of the State and additional rights and remedies as may be provided to a secured party in the jurisdiction in which Collateral is located, including, without limitation, the right to take possession of the Collateral, and for that purpose, Bank may, so far as Borrower can give authority therefor, enter upon premises on which the Collateral may be situated and remove the collateral therefrom. Bank may in its discretion require Borrower to assemble all or any part of the Collateral at such location or locations within the jurisdiction(s) of Borrower's principal office(s) or at such other locations as Bank may reasonably designate. Unless the Collateral is perishable or threatens to decline speedily in value or is of a type custom sold on a recognized market, Bank shall give to Borrower at least at ten (10) days' prior written notice of the time and place of any public sale of Collateral or of the time after which any private sale or any other intended disposition is to be made. Borrower hereby acknowledges that ten (10) days' prior written notice of such sale or sales shall be reasonable notice. In addition, Borrower waives any and all rights that it may have to a judicial hearing in advance of the enforcement of any of Bank's rights and remedies hereunder, including, without limitation, its right following an Event of Default to take immediate possession of Collateral and to exercise its rights and remedies with respect thereto. Bank may also have a receiver appointed to take charge of all or any portion of the Collateral and to exercise all rights of Bank under this Agreement.

The remedies in this Section are in addition to, not in limitation of, any other right, power, privilege or remedy, either in law, in equity, or otherwise, to which Bank may be entitled. No failure or delay on the part of Bank in exercising any right, power or remedy will operate as a waiver thereof, nor will any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right hereunder. The remedies in this Agreement are in addition to, not in limitation of, any other right, power, privilege or remedy, either in law, in equity, or otherwise, to which Bank may be entitled. All of Bank's rights and

- 10 -



remedies, whether evidenced by this Agreement or by any other agreement, instrument or document, shall be cumulative and may be exercised singularly or concurrently.

16. **STANDARDS FOR EXERCISING RIGHTS AND REMEDIES.** To the extent that applicable law imposes duties on Bank to exercise remedies in a commercially reasonable manner, Borrower acknowledges and agrees that it is not commercially unreasonable for Bank (a) to fail to incur expenses reasonably deemed significant by Bank to prepare Collateral for disposition or otherwise to fail to complete raw material or work in process into finished goods or other finished products for disposition; (b) to fail to obtain third-party consents for access to Collateral to be disposed of, or to obtain or, if not required by other law, to fail to obtain governmental or third-party consents for the collection or disposition of Collateral to be collected or disposed of; (c) to fail to exercise collection remedies against account debtors or other persons obligated on Collateral or to fail to remove liens or encumbrances on or any adverse claims against Collateral; (d) to exercise collection remedies against account debtors and other persons obligated on Collateral directly or through the use of collection agencies and other collection specialists; (e) to advertise dispositions of Collateral through publications or media of general circulation, whether or not the Collateral is of a specialized nature; (f) to contact other persons, whether or not in the same business as Borrower, for expressions of interest in acquiring all or any portion of the Collateral; (g) to hire one or more professional auctioneers to assist in the disposition of Collateral, whether or not the Collateral is of a specialized nature; (h) to dispose of Collateral by utilizing Internet sites that provide for the auction of assets of the types included in the Collateral or that have the reasonable capability of doing so, or that match buyers and sellers of assets; (i) to dispose of assets in wholesale rather than retail markets; (j) to disclaim disposition warranties; (k) to purchase insurance or credit enhancements to insure Bank against risks of loss, collection or disposition of Collateral or to provide to Bank a guaranteed return from the collection or disposition of Collateral; or (l) to the extent deemed appropriate by Bank, to obtain the services of other brokers, investment bankers, consultants and other professionals to assist Bank in the collection or disposition of any of the Collateral. Borrower acknowledges that the purpose of this Section is to provide non-exhaustive indications of what actions or omissions by Bank would fulfill Bank's duties under the UCC of the State or any other relevant jurisdiction in Bank's exercise of remedies against the Collateral and that other actions or omissions by Bank shall not be deemed to fail to fulfill such duties solely on account of not being indicated in this Section. Without limitation upon the foregoing, nothing contained in this Section shall be construed to grant any rights to Borrower or to impose any duties on Bank that would not have been granted or imposed by this Agreement or by applicable law in the absence of this Section.

17. **NO WAIVER BY THE BANK.** Bank shall not be deemed to have waived any of its rights and remedies in respect of the Obligations or the Collateral unless such waiver shall be in writing and signed by Bank. No delay or omission on the part of Bank in exercising any right or remedy shall operate as a waiver of such right or remedy or any other right or remedy. A waiver on any one occasion shall not be construed as a bar to or waiver of any right or remedy on

- 11 -



any future occasion. All rights and remedies of Bank with respect to the Obligations or the Collateral, whether evidenced hereby or by any other instrument or papers, shall be cumulative and may be exercised singularly, alternatively, successively or concurrently at such time or at such times as Bank deems expedient.

18. **SURETYSHIP WAIVERS BY COMPANY.** Borrower waives demand, notice, protest, notice of acceptance of this Agreement, notice of loans made, credit extended, Collateral received or delivered or other action taken in reliance hereon and all other demands and notices of any description. With respect to both the Obligations and the Collateral, Borrower assents to any extension or postponement of the time of payment or any other indulgence, to any substitution, exchange or release of or failure to perfect any security interest in any Collateral, to the addition or release of any party or person primarily or secondarily liable, to the acceptance of partial payment thereon and the settlement, compromising or adjusting of any thereof, all in such manner and at such time or times as Bank may deem advisable. Bank shall have no duty as to the collection or protection of the Collateral or any income therefrom, the preservation of rights against prior parties, or the preservation of any rights pertaining thereto beyond the safe custody thereof as set forth in Section 10(b) above. Borrower further waives any and all other suretyship defenses.

19. **MARSHALLING.** Bank shall not be required to marshal any present or future collateral security (including, but not limited to, the Collateral) for, or other assurances of payment of, the Obligations or any of them or to resort to such collateral security or other assurances of payment in any particular order, and all of its rights and remedies hereunder and in respect of such collateral security and other assurances of payment shall be cumulative and in addition to all other rights and remedies, however existing or arising. To the extent that it lawfully may, Borrower hereby agrees that it will not invoke any law relating to the marshalling of collateral which might cause delay in or impede the enforcement of Bank's rights and remedies under this Agreement or under any other instrument creating or evidencing any of the Obligations or under which any of the Obligations is outstanding or by which any of the Obligations is secured or payment thereof is otherwise assured, and to the extent that it lawfully may, Borrower hereby irrevocably waives the benefits of all such laws.

20. **PROCEEDS OF DISPOSITIONS; EXPENSES.** Borrower shall pay to Bank on demand any and all reasonable expenses, including reasonable attorneys' fees and disbursements, incurred or paid by Bank in protecting, preserving or enforcing Bank's rights and remedies under or in respect of any of the Obligations or any of the Collateral. After application to said expenses in accordance with the Loan Agreement, the residue of any proceeds of collection or sale or other disposition of Collateral shall, to the extent actually received in cash, be applied to the payment of the Obligations in such order or preference as required under the Loan Agreement. In the absence of final payment and satisfaction in full of all of the Obligations, Borrower shall remain liable for any deficiency.

- 12 -



**21.  OVERDUE AMOUNTS.**  Until paid, all amounts due and payable by Borrower hereunder shall be a debt secured by the Collateral and shall bear, whether before or after judgment, interest at a rate per annum equal to the interest rate payable under the Note plus 4.0%.

**22.  GOVERNING LAW; CONSENT TO JURISDICTION.**  This Agreement shall be governed by, and construed in accordance with, federal law applicable to Bank and to the extent not preempted by federal law, the laws of the State of New York, without reference to conflicts-of-laws principles.  Borrower hereby irrevocably submits to the non-exclusive jurisdiction of any New York state or federal court sitting in Albany County over any action or proceeding arising out of or relating to this Agreement, or any document related to the Obligations, and Borrower hereby irrevocably agrees that all claims in respect of such action or proceeding may be heard and determined in such New York state or federal court.  Borrower hereby waives any objection that it may now or hereafter have to the venue of any such suit or any such court or that such suit is brought in an inconvenient court.

**23.  WAIVER OF JURY TRIAL.  THE COMPANY AND THE BANK EACH WAIVE ANY RIGHT TO HAVE A JURY PARTICIPATE IN RESOLVING ANY DISPUTE, WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE, BETWEEN THE BANK AND THE COMPANY ARISING OUT OF, IN CONNECTION WITH, RELATED TO OR INCIDENTAL TO THE RELATIONSHIP ESTABLISHED BETWEEN THEM IN CONNECTION WITH THIS AGREEMENT OR ANY PROMISSORY NOTE OR OTHER INSTRUMENT, DOCUMENT OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH OR THE TRANSACTIONS RELATED THERETO.**

**24.  NOTICES.**  All notices, requests, demands or other communications provided for hereunder shall be in writing and, if to Borrower, mailed or delivered to it, addressed to it at the address specified in the preamble of this Agreement or, if to Bank, mailed or delivered to it, addressed to the address of Bank specified in the preamble of this Agreement.  All notices, statements, requests, demands and other communications provided for hereunder shall be deemed to be given or made when delivered or forty-eight (48) hours after being deposited in the mail with postage prepaid, by registered or certified mail, addressed as aforesaid, or sent by facsimile with telephonic confirmation of receipt, except that notices from Borrower to Bank pursuant to any of the provisions hereof shall not be effective until received by Bank.

**25.  MISCELLANEOUS.**  The headings of each section of this Agreement are for convenience only and shall not define or limit the provisions thereof.  This Agreement and all rights and obligations hereunder shall be binding upon Borrower and its successors and assigns, and shall inure to the benefit of Bank and its successors and assigns.  If any term of this Agreement shall be held to be invalid, illegal or unenforceable, the validity of all other terms hereof shall in no way be affected thereby, and this Agreement shall be construed and be

- 13 -



enforceable as if such invalid, illegal or unenforceable term had not been included herein. Borrower acknowledges receipt of a copy of this Agreement.



**IN WITNESS WHEREOF,** intending to be legally bound, Borrower and Bank caused this Security Agreement to be duly executed as of the date first above written.

EASTERN NIAGARA HOSPITAL, INC.

By: _____
Clare A. Haar
Chief Executive Officer

RBS CITIZENS, N.A.

By: _____
Patrick R. Szalach
Senior Vice President

- 15 -

# SCHEDULE I

## LOCATION OF COLLATERAL

521 East Avenue, Lockport, Niagara County, New York

2600 William Street, Newfane, Niagara County, New York



# SCHEDULE II

## PENDING LITIGATION

Pending lawsuits previously disclosed in the letters from Michael J. Roach, Esq. of Connors & Vilardo LLP dated September 11, 2013, Clare A. Haar, CEO of Eastern Niagara Hospital dated September 11, 2013, Keith J. Vaverchak, Senior Claims Examiner of MLMIC dated September 11, 2013 and September 12, 2013, Joseph V. McCarthy, Esq. of Roach, Brown, McCarthy & Gruber, P.C. dated September 9, 2013 and James N. Schmit, Esq., of Jaeckle, Fleischmann & Mugel LLP dated September 6, 2013.



# EXHIBIT "C"



# ❊ Citizens Bank

## PROMISSORY NOTE

$3,000,000.00

Lockport, New York

November 6, 2013

**FOR VALUE RECEIVED,** the undersigned, **EASTERN NIAGARA HOSPITAL, INC.,** a New York not-for-profit corporation, with its chief executive office located at 521 East Avenue, Lockport, New York 14094 (the *"Borrower"*) promises to pay to the order of **RBS CITIZENS, N.A.,** a national banking association with an address of 250 South Clinton Street, Syracuse, New York 13202 (together with its successors and assigns, the *"Bank"*), the principal amount of Three Million and 00/100 Dollars ($3,000,000.00) or so much thereof as advanced under the non-replenishing construction line of credit established pursuant to that certain Non-Replenishing Line of Credit Loan Agreement of even date herewith (as amended from time to time, *"Loan Agreement"*), by and between the Borrower and the Bank on the Maturity Date (as defined below), together with interest from the date hereof, at the Interest Rate set forth below, on the unpaid principal balance from time to time outstanding until paid in full as set forth below.

Capitalized words and terms used in this Note and not defined herein shall have the meanings assigned to them in the Loan Agreement. In the event of a conflict between the terms of this Note and the terms of the Loan Agreement, the terms of the Loan Agreement shall govern. As used herein, the following terms shall be defined as follows:

*"Account"* means Account No. 4011257221 maintained by the Bank in the name of the Borrower.

*"Adjusted LIBOR Rate"* means, relative to each LIBOR Interest Period, a rate per annum determined by dividing (x) 30-Day LIBOR for such LIBOR Interest Period by (y) a percentage equal to one hundred percent (100%) minus the LIBOR Reserve Percentage. The Adjusted LIBOR Rate will be deemed to change on each date when there is a change in the LIBOR Reserve Percentage.

*"Affiliate"* means with respect to any person, (a) any person which, directly or indirectly through one or more intermediaries controls, or is controlled by, or is under common control with, such person, or (b) any person who is a director or officer (i) of such person, (ii) of any subsidiary of such person, or (iii) any person described in clause (a) above. For purposes of this definition, control of a person shall mean the power, direct or indirect, (x) to vote 5% or more of the capital stock having ordinary voting power for the election of directors (or comparable equivalent) of such person, or (y) to direct or cause the direction of the management and policies of such person whether by contract or otherwise. Control may be by ownership, contract, or otherwise.

*"Amortization Commencement Date"* means December 1, 2014.

*"Bank Affiliate"* means (i) any Affiliate of the Bank including any Affiliate of the Bank under a Secured Hedge Agreement, or (ii) any lender acting as a participant under any loan arrangement between the Bank and the Borrower.

7550497.3

*"Business Day"* means any day which is (y) neither a Saturday nor a Sunday nor a legal holiday on which commercial banks are authorized or required to be closed in New York City; and (z) a London Banking Day; and when such term is used to describe a day on which an Interest Rate determination is to be made, any day which is a London Banking Day.

*"Construction Term"* means the period commencing on the date hereof and ending November 1, 2014.

*"Event of Default"* has the meaning given to it in the Loan Agreement.

*"Facility"* means the ambulatory surgery center building to be constructed and equipped by the Borrower and located on the real property located at 5875 Transit Road, Lockport, New York.

*"Interest Payment Date"* means the first of each month commencing January 1, 2014.

*"LIBOR Breakage Fee"* means an amount as calculated by the Bank, equal to the amount of any losses, expenses and liabilities (including, without limitation, any loss of margin and anticipated profits) that the Bank may sustain as a result of the prepayment (voluntary or otherwise) of all or a portion of this Note.

*"LIBOR Interest Period"* means:

  i.   initially, the period beginning on (and including) the date hereof and ending on (and including) November 30;

  ii.  thereafter, each period commencing on the first of each month and ending on the last day of such month; provided, however, that if such LIBOR Interest Period would otherwise end on a day which is not a Business Day, such LIBOR Interest Period shall end on the next following Business Day unless such day falls in the next calendar month, in which case such LIBOR Interest Period shall end on the first preceding Business Day.

*"LIBOR Rate Margin"* means 2.28% (228 basis points).

*"LIBOR Reserve Percentage"* means, relative to any day of any LIBOR Interest Period, the maximum aggregate (without duplication) of the rates (expressed as a decimal fraction) of reserve requirements (including all basic, emergency, supplemental, marginal and other reserves and taking into account any transitional adjustments or other scheduled changes in reserve requirements) under any regulations of the Board of Governors of the Federal Reserve System (the *"Board"*) or other governmental authority having jurisdiction with respect thereto as issued from time to time and then applicable to assets or liabilities consisting of "Eurocurrency Liabilities," as currently defined in Regulation D of the Board, having a term approximately equal or comparable to such LIBOR Interest Period.

*"London Banking Day"* means a day on which dealings in U.S. dollar deposits are transacted in the London interbank market.

*"Maturity Date"* means November 1, 2023.

*"Mortgage"* means the First Mortgage, Assignment of Leases and Rents and Security Agreement of even date herewith granted to the Bank by the Borrower secured by the Borrower's hospital campus located in the City of Lockport, County of Niagara, New York.

7550497.3

"*Prime Rate*" shall mean a rate per annum equal to the rate of interest announced by the Bank from time to time as its "Prime Rate." Any change in the Prime Rate shall be effective immediately from and after such change in the Prime Rate. Interest accruing by reference to the Prime Rate shall be calculated on the basis of actual days elapsed and a 360-day year. The Borrower acknowledges that the Bank may make loans to its customers above, at or below the Prime Rate.

"*30-Day LIBOR*" means, relative to any LIBOR Interest Period, the offered rate for deposits of U.S. Dollars in an amount approximately equal to the principal amount of this Note for a one-month period which the British Bankers' Association fixes as its LIBOR rate as of 11:00 a.m. London time on the day that is two London Banking Days prior to the commencement of such LIBOR Interest Period. If the Bank cannot determine such offered rate by the British Bankers' Association, the Bank may, in its discretion, select a replacement index based on the arithmetic mean of the quotations, if any, of the interbank offered rate by first class banks in London or New York for deposits in comparable amounts and maturities. Notwithstanding the foregoing, if the Bank shall determine (which determination shall, upon notice thereof to the Borrower, be conclusive and binding on the Borrower) that the introduction of or any change in or in the interpretation of any law, rule, regulation or guideline (whether or not having the force of law) makes it unlawful, or any central bank or other governmental authority asserts that it is unlawful, for the Bank to maintain obligations priced with reference to 30-Day LIBOR; or if the Bank shall have determined, in its sole discretion, with respect to any LIBOR Interest Period that U.S. dollar deposits in the relevant amount and for the relevant LIBOR Interest Period are not available in the London interbank market; or by reasons of circumstances affecting the London interbank market, adequate and reasonable means do not exist for ascertaining 30-Day LIBOR applicable to the relevant LIBOR Interest Period; or 30-Day LIBOR no longer adequately and fairly reflects the Bank's cost of funding loans; then, upon notice of any of the foregoing given by the Bank to the Borrower, "30-Day LIBOR" for the relevant LIBOR Interest Period will be deemed to be the Bank's Prime Rate, with a change in such rate to become effective on each date when a change in the Prime Rate occurs.

**Funding of Advances.** Upon the terms and subject to the conditions of the Loan Agreement, advances shall be made available to the Borrower upon request thereunder by a deposit to the Account (or as otherwise instructed by the Borrower in writing).

**Interest Provisions.** Interest on the outstanding principal amount hereof shall accrue during each applicable LIBOR Interest Period at a rate (the "*Interest Rate*") per annum equal to the sum of the Adjusted LIBOR Rate for such LIBOR Interest Period plus the LIBOR Rate Margin and be payable on each Interest Payment Date. The Interest Rate in effect on the date hereof is 2.4485%.

**Repayment of Principal of this Note.** The Borrower shall pay consecutive monthly installments of principal commencing on December 1, 2014 and on the first day of each calendar month thereafter, in an amount equal to the monthly principal payment set forth on Schedule A attached hereto based on an amortization period of 300 months and a final payment equal to the unpaid principal balance hereof.

Notwithstanding the foregoing, all amounts due under this Note shall mature and become payable in full upon the Maturity Date (or such earlier date in the event the Bank accelerates the Borrower's obligations hereunder). Upon any prepayment (voluntary or otherwise) of this Note on a

3

day other than the last day of a LIBOR Interest Period, the Borrower shall pay to the Bank the LIBOR Breakage Fee.

**Prepayment.** Borrower may prepay principal of the Loan, in part or in whole (voluntary or otherwise), provided that prior to November 5 2015 if such prepayment is a prepayment in whole, then a prepayment penalty (the "*Prepayment Penalty*") calculated by multiplying one percent (1%) times the amount of such principal prepayment will be due and payable. Notwithstanding the foregoing to the contrary, (a) upon any prepayment (voluntary or otherwise) of all or any portion of the principal of the Loan on a day other than the last day of a LIBOR Interest Period, the Borrower shall pay to the Bank the LIBOR Breakage Fee, (b) upon any prepayment (voluntary or otherwise) of all or any portion of the principal of the Loan, the Borrower shall pay all termination fees and other amounts due under any Secured Hedge Agreement, and (c) prepayment of all or any portion of the Loan prior to November 5, 2015 made with money not obtained, directly or indirectly, through Indebtedness of the Borrower shall not be subject to payment of the Prepayment Penalty.

This Note is secured by the Mortgage and shall be secured by any additional collateral hereafter granted to the Bank by the Borrower or by any other party.

Principal and interest shall be payable at the Bank's main office or at such other place as the Bank may designate in writing in immediately available funds in lawful money of the United States of America without set-off, deduction or counterclaim. Interest shall be calculated on the basis of actual number of days elapsed and a 360-day year.

At the option of the Bank, this Note shall become immediately due and payable without notice or demand upon the occurrence at any time of an Event of Default. Any payments received by the Bank on account of this Note shall, at the Bank's option, be applied, first, to any LIBOR Breakage Fee, costs, expenses or charges then owed to the Bank by the Borrower, second, to accrued and unpaid interest; and third, to the unpaid principal balance hereof. Notwithstanding the foregoing, any payments received after the occurrence and during the continuance of an Event of Default shall be applied in such manner as the Bank may determine. The Borrower hereby authorizes the Bank to charge any deposit account which the Borrower may maintain with the Bank for any payment required hereunder and then due and owing without prior notice to the Borrower. Notwithstanding anything in this paragraph to the contrary, the security interest and right of set-off granted hereby shall not apply to any deposit accounts to the extent specially and exclusively used for payroll, payroll taxes and other employee wage and benefit payments to or for the benefit of Borrower's employees.

If pursuant to the terms of this Note, the Borrower is at any time obligated to pay interest on the principal balance at a rate in excess of the maximum interest rate permitted by applicable law for the loan evidenced by this Note, the applicable interest rate shall be immediately reduced to such maximum rate and all previous payments in excess of the maximum interest rate shall be deemed to have been payments in reduction of principal and not on account of the interest due hereunder.

**The Borrower represents to the Bank that the proceeds of this Note will not be used for personal, family or household purposes or for the purpose of purchasing or carrying margin stock or margin securities within the meaning of Regulations U and X of the Federal Reserve Board, 12 C.F.R. Parts 221 and 224.**

The Borrower and each endorser or guarantor hereof grant to the Bank a continuing lien on and security interest in any and all deposits or other sums at any time credited by or due from the Bank or any Bank Affiliate to the Borrower and each endorser or guarantor hereof and any cash, securities,

4

7550497.3

instruments or other property of the Borrower and each endorser or guarantor hereof in the possession of the Bank or any Bank Affiliate, whether for safekeeping or otherwise, or in transit to or from the Bank or any Bank Affiliate as security for the full and punctual payment and performance of all of the liabilities and obligations of the Borrower and each endorser or guarantor hereof to the Bank or any Bank Affiliate and such deposits and other sums may be applied or set off against such liabilities and obligations of the Borrower and each endorser or guarantor hereof to the Bank or any Bank Affiliate at any time, if such are then due, whether or not demand has been made and whether or not other collateral is then available to the Bank or any Bank Affiliate.

No delay or omission on the part of the Bank in exercising any right hereunder shall operate as a waiver of such right or of any other right of the Bank, nor shall any delay, omission or waiver on any one occasion be deemed a bar to or waiver of the same or any other right on any future occasion. The Borrower, regardless of the time, order or place of signing, waives presentment, demand, protest, notice of intent to accelerate, notice of acceleration and all other notices of every kind in connection with the delivery, acceptance, performance or enforcement of this Note and assents to any extension or postponement of the time of payment or any other indulgence, to any substitution, exchange or release of collateral, and to the addition or release of any other party or person primarily or secondarily liable and waives all recourse to suretyship and guarantor defenses generally, including any defense based on impairment of collateral.

The Borrower and each endorser or guarantor hereof shall indemnify, defend and hold the Bank and Bank Affiliates and their directors, officers, employees, agents and attorneys (each an "*Indemnitee*") harmless against any claim brought or threatened against any Indemnitee by the Borrower, each endorser or guarantor hereof or by any other person (as well as from attorneys' reasonable fees and expenses in connection therewith) on account of the Bank's relationship with the Borrower and each endorser or guarantor hereof (each of which may be defended, compromised, settled or pursued by the Bank with counsel of the Bank's selection, but at the expense of the Borrower and each endorser or guarantor hereof), except for any claim arising out of the gross negligence or willful misconduct of the Bank.

The Borrower and each endorser or guarantor hereof agrees to pay, upon demand, costs of collection of all amounts under this Note after an Event of Default, including, without limitation, principal and interest, or in connection with the enforcement of, or realization on, any security for this Note, including, without limitation, to the extent permitted by applicable law, reasonable attorneys' fees and expenses. Upon the occurrence and during the continuance of an Event of Default, interest shall accrue at a rate per annum equal to the aggregate of 4.0% plus the Interest Rate. If any payment due under this Note is unpaid for 10 days or more, the Borrower and each endorser or guarantor hereof shall pay, in addition to any other sums due under this Note (and without limiting the Bank's other remedies on account thereof), a late charge equal to the greater of $25.00 or 4.0% of such unpaid amount. In addition, the Borrower and each endorser or guarantor hereof shall pay the Bank's customary fee if any payment made on account of this Note is dishonored.

This Note shall be binding upon the Borrower, each endorser or guarantor hereof and upon their respective successors, assigns and legal representatives, and shall inure to the benefit of the Bank and its successors, endorsees and assigns.

The Borrower authorizes the Bank to complete this Note if delivered incomplete in any respect. A photographic or other reproduction of this Note may be made by the Bank, and any such reproduction

7550497.3

shall be admissible in evidence with the same effect as the original itself in any judicial or administrative proceeding, whether or not the original is in existence.

The Borrower and each endorser or guarantor hereof will from time to time execute and deliver to the Bank such documents, and take or cause to be taken all such other further action, as the Bank may reasonably request in order to effect and confirm or vest more securely in the Bank all rights contemplated by this Note or any other loan documents related thereto (including, without limitation, to correct clerical errors) or to vest more fully in or assure to the Bank the security interest in any collateral securing this Note or to comply with applicable statute or law.

This Note shall be governed by federal law applicable to the Bank and to the extent not preempted by federal law, the laws of the State of New York.

Any notices under or pursuant to this Note shall be deemed duly received and effective if delivered in hand to the authorized representative of the Borrower or to any officer or agent of the Bank, or if mailed by registered or certified mail, return receipt requested, addressed to the Borrower or the Bank at the address set forth in this Note or as any party may from time to time designate by written notice to the other party.

The Borrower and each endorser or guarantor hereof irrevocably submits to the nonexclusive jurisdiction of any Federal or state court sitting in the State of New York, over any suit, action or proceeding arising out of or relating to this Note. The Borrower irrevocably waives, to the fullest extent it may effectively do so under applicable law, any objection it may now or hereafter have to the laying of the venue of any such suit, action or proceeding brought in any such court and any claim that the same has been brought in an inconvenient forum. The Borrower hereby consents to any and all process which may be served in any such suit, action or proceeding (i) by mailing a copy thereof by registered and certified mail, postage prepaid, return receipt requested, to the Borrower's address first set forth above to the attention of: Clare A. Haar, Chief Executive Officer, or as notified to the Bank, and (ii) by serving the same upon the Borrower in any other manner otherwise permitted by law, and agrees that such service shall in every respect be deemed effective service upon the Borrower.

**BORROWER, EACH ENDORSER HEREOF AND THE BANK EACH HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY, AND AFTER AN OPPORTUNITY TO CONSULT WITH LEGAL COUNSEL, (A) WAIVE ANY AND ALL RIGHTS TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING IN CONNECTION WITH THIS NOTE, ANY OF THE OBLIGATIONS OF BORROWER TO THE BANK, AND ALL MATTERS CONTEMPLATED HEREBY AND DOCUMENTS EXECUTED IN CONNECTION HEREWITH, AND (B) AGREE NOT TO SEEK TO CONSOLIDATE ANY SUCH ACTION WITH ANY OTHER ACTION IN WHICH A JURY TRIAL CANNOT BE, OR HAS NOT BEEN, WAIVED. BORROWER AND EACH ENDORSER HEREOF EACH CERTIFIES THAT NEITHER THE BANK NOR ANY OF ITS REPRESENTATIVES, AGENTS OR COUNSEL HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT THE BANK WOULD NOT IN THE EVENT OF ANY SUCH PROCEEDING SEEK TO ENFORCE THIS WAIVER OF RIGHT TO TRIAL BY JURY.**

6

7550497.3

Executed and dated as of the date first set forth above.

EASTERN NIAGARA HOSPITAL, INC.

By: _Clare A. Haar_
Clare A. Haar
Chief Executive Officer

7

7550497.3

## SCHEDULE A

| Due Date | Principal Balance | Principal Payment |
|---|---|---|
| 1-Dec-14 | $3,000,000.00 | $ 4,863.09 |
| 2-Jan-15 | $2,995,136.91 | $ 4,863.09 |
| 2-Feb-15 | $2,990,273.82 | $ 4,863.09 |
| 2-Mar-15 | $2,985,410.74 | $ 4,863.09 |
| 1-Apr-15 | $2,980,547.65 | $ 4,863.09 |
| 1-May-15 | $2,975,684.56 | $ 4,863.09 |
| 1-Jun-15 | $2,970,821.47 | $ 4,863.09 |
| 1-Jul-15 | $2,965,958.38 | $ 4,863.09 |
| 3-Aug-15 | $2,961,095.30 | $ 4,863.09 |
| 1-Sep-15 | $2,956,232.21 | $ 4,863.09 |
| 1-Oct-15 | $2,951,369.12 | $ 4,863.09 |
| 2-Nov-15 | $2,946,506.03 | $ 4,863.09 |
| 1-Dec-15 | $2,941,642.94 | $ 5,132.29 |
| 4-Jan-16 | $2,936,510.65 | $ 5,132.29 |
| 1-Feb-16 | $2,931,378.36 | $ 5,132.29 |
| 1-Mar-16 | $2,926,246.06 | $ 5,132.29 |
| 1-Apr-16 | $2,921,113.77 | $ 5,132.29 |
| 3-May-16 | $2,915,981.48 | $ 5,132.29 |
| 1-Jun-16 | $2,910,849.19 | $ 5,132.29 |
| 1-Jul-16 | $2,905,716.89 | $ 5,132.29 |
| 1-Aug-16 | $2,900,584.60 | $ 5,132.29 |

7550497.3

| | | |
|---|---|---|
| 1-Sep-16 | $2,895,452.31 | $ 5,132.29 |
| 3-Oct-16 | $2,890,320.01 | $ 5,132.29 |
| 1-Nov-16 | $2,885,187.72 | $ 5,132.29 |
| 1-Dec-16 | $2,880,055.43 | $ 5,416.40 |
| 3-Jan-17 | $2,874,639.03 | $ 5,416.40 |
| 1-Feb-17 | $2,869,222.63 | $ 5,416.40 |
| 1-Mar-17 | $2,863,806.23 | $ 5,416.40 |
| 3-Apr-17 | $2,858,389.83 | $ 5,416.40 |
| 2-May-17 | $2,852,973.43 | $ 5,416.40 |
| 1-Jun-17 | $2,847,557.03 | $ 5,416.40 |
| 3-Jul-17 | $2,842,140.63 | $ 5,416.40 |
| 1-Aug-17 | $2,836,724.23 | $ 5,416.40 |
| 1-Sep-17 | $2,831,307.83 | $ 5,416.40 |
| 2-Oct-17 | $2,825,891.43 | $ 5,416.40 |
| 1-Nov-17 | $2,820,475.03 | $ 5,416.40 |
| 1-Dec-17 | $2,815,058.63 | $ 5,716.24 |
| 2-Jan-18 | $2,809,342.39 | $ 5,716.23 |
| 1-Feb-18 | $2,803,626.16 | $ 5,716.23 |
| 1-Mar-18 | $2,797,909.93 | $ 5,716.23 |
| 3-Apr-18 | $2,792,193.69 | $ 5,716.23 |
| 1-May-18 | $2,786,477.46 | $ 5,716.23 |
| 1-Jun-18 | $2,780,761.22 | $ 5,716.23 |
| 2-Jul-18 | $2,775,044.99 | $ 5,716.23 |
| 1-Aug-18 | $2,769,328.76 | $ 5,716.23 |

9

| | | | |
|---|---|---|---|
| 4-Sep-18 | $2,763,612.52 | $ | 5,716.23 |
| 1-Oct-18 | $2,757,896.29 | $ | 5,716.23 |
| 1-Nov-18 | $2,752,180.05 | $ | 5,716.23 |
| 3-Dec-18 | $2,746,463.82 | $ | 6,032.67 |
| 2-Jan-19 | $2,740,431.15 | $ | 6,032.67 |
| 1-Feb-19 | $2,734,398.49 | $ | 6,032.67 |
| 1-Mar-19 | $2,728,365.82 | $ | 6,032.67 |
| 1-Apr-19 | $2,722,333.15 | $ | 6,032.67 |
| 1-May-19 | $2,716,300.49 | $ | 6,032.67 |
| 3-Jun-19 | $2,710,267.82 | $ | 6,032.67 |
| 1-Jul-19 | $2,704,235.15 | $ | 6,032.67 |
| 1-Aug-19 | $2,698,202.49 | $ | 6,032.67 |
| 3-Sep-19 | $2,692,169.82 | $ | 6,032.67 |
| 1-Oct-19 | $2,686,137.15 | $ | 6,032.67 |
| 1-Nov-19 | $2,680,104.49 | $ | 6,032.67 |
| 2-Dec-19 | $2,674,071.82 | $ | 6,366.62 |
| 2-Jan-20 | $2,667,705.21 | $ | 6,366.62 |
| 3-Feb-20 | $2,661,338.59 | $ | 6,366.61 |
| 2-Mar-20 | $2,654,971.98 | $ | 6,366.62 |
| 1-Apr-20 | $2,648,605.36 | $ | 6,366.62 |
| 1-May-20 | $2,642,238.74 | $ | 6,366.61 |
| 1-Jun-20 | $2,635,872.13 | $ | 6,366.62 |
| 1-Jul-20 | $2,629,505.51 | $ | 6,366.61 |
| 3-Aug-20 | $2,623,138.90 | $ | 6,366.62 |

7550497.3

| | | | |
|---|---|---|---|
| 1-Sep-20 | $2,616,772.28 | $ | 6,366.62 |
| 1-Oct-20 | $2,610,405.67 | $ | 6,366.62 |
| 2-Nov-20 | $2,604,039.05 | $ | 6,366.61 |
| 1-Dec-20 | $2,597,672.44 | $ | 6,719.05 |
| 4-Jan-21 | $2,590,953.39 | $ | 6,719.05 |
| 1-Feb-21 | $2,584,234.34 | $ | 6,719.05 |
| 1-Mar-21 | $2,577,515.29 | $ | 6,719.05 |
| 1-Apr-21 | $2,570,796.24 | $ | 6,719.05 |
| 4-May-21 | $2,564,077.19 | $ | 6,719.05 |
| 1-Jun-21 | $2,557,358.14 | $ | 6,719.05 |
| 1-Jul-21 | $2,550,639.09 | $ | 6,719.05 |
| 2-Aug-21 | $2,543,920.04 | $ | 6,719.05 |
| 1-Sep-21 | $2,537,200.98 | $ | 6,719.05 |
| 1-Oct-21 | $2,530,481.93 | $ | 6,719.05 |
| 1-Nov-21 | $2,523,762.88 | $ | 6,719.05 |
| 1-Dec-21 | $2,517,043.83 | $ | 7,091.00 |
| 4-Jan-22 | $2,509,952.84 | $ | 7,091.00 |
| 1-Feb-22 | $2,502,861.84 | $ | 7,090.99 |
| 1-Mar-22 | $2,495,770.85 | $ | 7,091.00 |
| 1-Apr-22 | $2,488,679.85 | $ | 7,091.00 |
| 3-May-22 | $2,481,588.86 | $ | 7,090.99 |
| 1-Jun-22 | $2,474,497.86 | $ | 7,091.00 |
| 1-Jul-22 | $2,467,406.87 | $ | 7,091.00 |
| 1-Aug-22 | $2,460,315.87 | $ | 7,091.00 |

7550497.3

| | | | |
|---|---|---|---|
| 1-Sep-22 | $2,453,224.88 | $ | 7,090.99 |
| 3-Oct-22 | $2,446,133.88 | $ | 7,091.00 |
| 1-Nov-22 | $2,439,042.89 | $ | 7,091.00 |
| 1-Dec-22 | $2,431,951.89 | $ | 7,483.53 |
| 3-Jan-23 | $2,424,468.36 | $ | 7,483.53 |
| 1-Feb-23 | $2,416,984.83 | $ | 7,483.53 |
| 1-Mar-23 | $2,409,501.30 | $ | 7,483.53 |
| 3-Apr-23 | $2,402,017.77 | $ | 7,483.53 |
| 2-May-23 | $2,394,534.24 | $ | 7,483.53 |
| 1-Jun-23 | $2,387,050.71 | $ | 7,483.53 |
| 3-Jul-23 | $2,379,567.18 | $ | 7,483.53 |
| 1-Aug-23 | $2,372,083.65 | $ | 7,483.53 |
| 1-Sep-23 | $2,364,600.12 | $ | 7,483.53 |
| 2-Oct-23 | $2,357,116.60 | $ | 7,483.53 |
| 1-Nov-23 | $2,349,633.07 | $ | 2,349,633.07 * |

*Maturity

7550497.3

# AMENDED AND RESTATED SECURITY AGREEMENT

**THIS AMENDED AND RESTATED SECURITY AGREEMENT** (this "*Agreement*"), dated November 6, 2013, by and between **EASTERN NIAGARA HOSPITAL, INC.**, a New York not-for-profit corporation ("*Borrower*"), having a principal office located at 521 East Avenue, Lockport, New York 14094 and **RBS CITIZENS, N.A.**, a national banking association ("*Bank*"), with an office located at 250 South Clinton Street, Syracuse, New York 13202.

THE MEANING OF CAPITALIZED TERMS (NOT OTHERWISE DEFINED)
CAN BE DETERMINED BY REFERENCE TO SECTION I HEREOF

## WITNESSETH:

**WHEREAS,** Borrower executed and delivered a certain promissory note dated September 13, 2013, in the principal sum of $4,000,000 made payable to the order of Bank (the "*Term Loan Note*") and entered into a loan agreement dated September 13, 2013 (as amended, supplemented or otherwise modified, the "*Term Loan Agreement*"), with Bank; and

**WHEREAS,** Borrower is the owner in fee simple of a parcel of improved real property with a street address of 521 East Avenue (the "*Premises*") located in the City of Lockport, County of Niagara, New York and granted to Bank a first mortgage on and security interest in the Premises pursuant to a first mortgage, assignment of leases and rents and security agreement dated September 13, 2013 (as amended, supplemented or otherwise modified, the "*Term Loan Mortgage*"); and

**WHEREAS,** Borrower granted Bank a first priority security interest in revenues of Borrower pursuant to a security agreement dated September 13, 2013 (the "*Initial Security Agreement*"); and

**WHEREAS,** Borrower has requested that Bank make a non- replenishing line of credit loan (the "*Construction Loan*") in an aggregate amount of up to $3,000,000.00 (the "*Construction Loan Amount*") pursuant to a non-replenishing line of credit loan agreement dated November 6, 2013 (as amended, supplemented or otherwise modified, the "*Construction Loan Agreement*" and together with the Term Loan Agreement, the "*Loan Agreements*"), between Borrower and Bank to finance a portion of the costs of constructing an ambulatory surgery center; and

**WHEREAS,** the Construction Loan will be evidenced by a certain promissory note dated November 6, 2013, in the principal sum of $3,000,000.00 made payable to or upon the order of Bank (the "*Construction Note*" and together with the Term Note, the "*Notes*"); and

**WHEREAS,** the Construction Note will be secured by (a) a first mortgage, assignment of leases and rents and security agreement of even date herewith (as amended, supplemented or otherwise modified, a "*Construction Loan Mortgage*" and together with the Term Loan Mortgage, the "*Mortgages*") given by Borrower to Bank and constituting a first mortgage on

Case 1-20-10903-CLB,   Doc 7,   Filed 07/08/20,   Entered 07/08/20 11:30:37,
Description: Main Document , Page 62 of 84

Premises, co-equal with the lien of the Term Loan Mortgage, (b) a first lien on Gross Receipts (as hereinafter defined) granted by Borrower to Bank pursuant to this Agreement, and (c) an amended and restated negative pledge of even date herewith (as further amended, supplemented or otherwise modified, the *"Negative Pledge"*) by Borrower in favor of Bank; and

**WHEREAS,** in order to induce Bank to enter into the Construction Loan Agreement, the Borrower is willing to amend and restate the Initial Security Agreement; and

**WHEREAS,** pursuant to this Agreement, Borrower intends to grant to Bank a first lien on the revenues of Borrower;

**NOW, THEREFORE,** the parties hereto agree as follows:

1. **DEFINITIONS.** Capitalized words and terms used in this Agreement and not defined herein shall have the meanings assigned to them in the Loan Agreements, except that all terms defined in the Uniform Commercial Code (*"UCC"*) of the State and used herein shall have the same definitions herein as specified therein.

2. **GRANT OF SECURITY INTEREST.** Borrower hereby grants to Bank, to secure the payment and performance in full of the Obligations, a security interest in and pledges and assigns to Bank the following property, assets and rights of Borrower, consisting of all issues, profits, revenues, rents, income, receipts, moneys and royalties derived from the medical, healthcare, community-based, clinical or other services provided by Borrower or otherwise, all gifts, grants, donations and contributions, however denominated, including without limitation (a) program income, non-program income, operating revenues and gains, all as determined in accordance with GAAP, (b) federal or State grant or other programs, Medicaid or Medicare reimbursements and payments, and (c) investment income on all funds and accounts held by Bank, and all rights to receive the same, whether in the form of accounts receivable, contract rights, chattel paper, instruments, general intangibles of Borrower and the proceeds thereof, the proceeds of any insurance coverage on and condemnation awards in respect of the Mortgaged Property or any gain on the sale or other disposition of any Property now or hereafter attached to the Mortgaged Property, all of the foregoing, whether now existing or hereafter coming into existence, and whether now owned or held or hereafter acquired by Borrower, but excluding (i) any contribution, grant (excluding grants by the United States or the State) or gift made to Borrower subject to restrictions on its use which restrictions do not permit application to or in connection with Indebtedness of Borrower, or (ii) any income derived from the investment of any such restricted contribution, grant or gift;

wherever located, whether now owned or hereafter acquired or arising, and all proceeds, products and accessions thereof, including, without limitation, (a) Accounts, (b) Chattel Paper (whether tangible or electronic), (c) Commercial Tort Claims, (d) Deposit Accounts, (e) Documents, (f) General Intangibles (including payment intangibles), (g) Instruments (including promissory notes), (h) Investment Property (including all securities), (i) Letter-of-Credit Rights (whether or not the Letter of Credit is evidenced by a writing), (j) Money (including contract rights or rights to the payment of money), (k) Supporting Obligations, and (l) to the extent not listed above as original Collateral, proceeds and products of the foregoing (all of the same being hereinafter individually and collectively called the *"Collateral"*).

- 2 -

7550294.2

**3.  AUTHORIZATION TO FILE FINANCING STATEMENTS.**  Borrower hereby irrevocably authorizes Bank at any time and from time to time to file in any filing office in any UCC jurisdiction, at Borrower's expense, any financing statements and amendments and continuations thereto that (a) indicate the Collateral (i) as all assets of Borrower or words of similar effect, regardless of whether any particular asset included in the Collateral falls within the scope of the UCC of the State or such jurisdiction, or (ii) as being of an equal or lesser scope or with greater detail; and (b) provide any other information required by the UCC of the State or such jurisdiction for the sufficiency or filing office acceptance of any financing statement or amendment.  Borrower agrees to furnish any such information to Bank promptly upon Bank's request.

**4.  OTHER ACTIONS.**  Further to insure the attachment, perfection and first priority of, and the ability of Bank to enforce, Bank's security interest in the Collateral, Borrower agrees, in each case at Borrower's expense, to take the following actions with respect to the following Collateral and without limitation of Borrower's other obligations contained in this Agreement:

> **(a)  *Promissory Notes and Tangible Chattel Paper.***  If Borrower shall at any time hold or acquire Collateral consisting of any promissory notes or tangible chattel paper, Borrower shall forthwith endorse and assign the same to Bank and deliver the same to Bank, accompanied by such instruments of transfer or assignment duly executed in blank as Bank may from time to time specify.

> **(b)  *Deposit Accounts.***  Borrower shall maintain a primary depository relationship, including corporate credit cards, cash management services and merchant services, only with Bank.  If Borrower desires to open a deposit account with any other institution, Borrower, with the prior written consent of Bank, which Bank may withhold in Bank's sole discretion, cause each depositary bank where Borrower at any time desires to open or maintain an account, to enter into an agreement in form and substance satisfactory to Bank, which either (i) causes the depositary bank to agree to comply, without further consent of Borrower, at any time with instructions from Bank to such depositary bank directing the disposition of funds from time to time credited to such deposit account, or (ii) arranges for Bank to become the customer of the depositary bank with respect to the deposit account, with Borrower being permitted, only with the consent of Bank, to exercise rights to withdraw funds from such deposit account, provided that both options shall require the depositary bank to subordinate its interest in such accounts to the interest of Bank.  The provisions of this paragraph shall not apply to (x) any deposit account for which Borrower, the depositary bank and Bank have entered into a cash collateral agreement specially negotiated among Borrower, the depositary bank and Bank for the specific purpose set forth therein, and (y) any deposit accounts to the extent specially and exclusively used for payroll, payroll taxes and other employee wage and benefit payments to or for the benefit of Borrower's employees.

> **(c)  *Investment Property.***  If Borrower shall at any time hold or acquire any Collateral consisting of certificated securities, Borrower shall forthwith endorse, assign and deliver the same to Bank, accompanied by such instruments of transfer or assignment duly executed in blank as Bank may from time to time specify.  If any Collateral consisting of securities now or hereafter acquired by Borrower are uncertificated and are issued to Borrower or

- 3 -

7550294.2

its nominee directly by the issuer thereof, Borrower shall immediately notify Bank thereof and, at the request and option of Bank, pursuant to an agreement in form and substance satisfactory to Bank, either (i) cause the issuer to agree to comply, without further consent of Borrower or such nominee, at any time with instructions from Bank as to such securities, or (ii) arrange for Bank to become the registered owner of the securities. If any Collateral consisting of securities, whether certificated or uncertificated, or other investment property now or hereafter acquired by Borrower are held by Borrower or its nominee through a securities intermediary or commodity intermediary, Borrower shall immediately notify Bank thereof and, at the request and option of Bank, pursuant to an agreement in form and substance satisfactory to Bank, either (y) cause such securities intermediary or (as the case may be) commodity intermediary to agree to comply, in each case without further consent of Borrower or such nominee, at any time with entitlement orders or other instructions from Bank to such securities intermediary as to such securities or other investment property, or (as the case may be) to apply any value distributed on account of any commodity contract as directed by Bank to such commodity intermediary, or (z) in the case of financial assets or other investment property held through a securities intermediary, arrange for Bank to become the entitlement holder with respect to such investment property, with Borrower being permitted, only with the consent of Bank, to exercise rights to withdraw or otherwise deal with such investment property. Bank agrees with Borrower that Bank shall not give any such entitlement orders or instructions or directions to any such issuer, securities intermediary or commodity intermediary, and shall not withhold its consent to the exercise of any withdrawal or dealing rights by Borrower, unless an Event of Default has occurred and is continuing or, after giving effect to any such investment and withdrawal rights not otherwise permitted by the Credit Documents, would occur. The provisions of this paragraph shall not apply to any financial assets credited to a securities account for which Bank is the securities intermediary.

(d)    *Collateral in the Possession of a Bailee.*  If any Collateral is at any time in the possession of a bailee, Borrower shall promptly notify Bank thereof and, at the request and option of Bank, shall promptly obtain an acknowledgement from the bailee, in form and substance satisfactory to Bank, that the bailee holds such Collateral for the benefit of Bank and such bailee's agreement to comply, without further consent of Borrower, at any time with instructions of Bank as to such Collateral. Bank agrees with Borrower that Bank shall not give any such instructions unless an Event of Default has occurred and is continuing or would occur after taking into account any action by Borrower with respect to the bailee.

(e)    *Electronic Chattel Paper.*  If Borrower at any time holds or acquires any Collateral consisting of an interest in any electronic chattel paper, Borrower shall promptly notify Bank thereof and, at the request and option of Bank, shall take such action as Bank may reasonably request to vest in Bank control, under the UCC, of such electronic chattel paper. Bank agrees with Borrower that Bank will arrange, pursuant to procedures satisfactory to Bank and so long as such procedures will not result in Bank's loss of control, for Borrower to make alterations to the electronic chattel paper permitted under the UCC for a party in control to make without loss of control, unless an Event of Default has occurred and is continuing or would occur after taking into account any action by Borrower with respect to such electronic chattel paper.

(f)    *Letter-of-Credit Rights.*  If Borrower is at any time a beneficiary under Collateral consisting of a letter of credit now or hereafter, Borrower shall promptly notify Bank

- 4 -

7550294.2

thereof, and at the request and option of Bank, Borrower shall, pursuant to an agreement in form and substance satisfactory to Bank, either (i) arrange for the issuer and any confirmer or other nominated person of such letter of credit to consent to an assignment to Bank of the proceeds of the letter of credit, or (ii) arrange for Bank to become the transferee beneficiary of the letter of credit.

(g) **_Commercial Tort Claims._** If Borrower shall at any time hold or acquire Collateral consisting of a commercial tort claim, Borrower shall immediately notify Bank in a writing signed by Borrower of the particulars thereof and grant to Bank in such writing a co-equal first priority security interest therein and in the proceeds thereof, all upon the terms of this Agreement, with such writing to be in form and substance satisfactory to Bank.

(h) **_Other Actions as to Any and All Collateral._** Borrower further agrees, upon request of Bank and at Bank's option, to take any and all other actions as Bank may determine to be necessary or useful for the attachment, perfection and first priority of, and the ability of Bank to enforce, Bank's security interest in any and all of the Collateral, including, without limitation, (i) delivering and, where appropriate, filing financing statements and amendments relating thereto under the UCC, to the extent, if any, that Borrower's signature thereon is required therefor; (ii) complying with any provision of any statute, regulation or treaty of the United States as to any Collateral if compliance with such provision is a condition to attachment, perfection or priority of, or ability of Bank to enforce, Bank's security interest in such Collateral; (iii) obtaining governmental and other third-party waivers, consents and approvals in form and substance satisfactory to Bank, including, without limitation, any consent of any licensor, lessor or other person obligated on Collateral; (iv) obtaining waivers from mortgagees and landlords in form and substance satisfactory to Bank; and (v) taking all actions under any earlier versions of the UCC or under any other law, as reasonably determined by Bank to be applicable in any relevant UCC or other jurisdiction, including any foreign jurisdiction.

5. **RELATION TO OTHER DOCUMENTS.** The provisions of this Agreement supplement the provisions of the Mortgages or any other real estate mortgage granted by Borrower to Bank and which secures the payment or performance of any of the Obligations. Nothing contained in any such real estate mortgage shall derogate from any of the rights or remedies of Bank hereunder. In addition to the provisions of this Agreement being so read and construed with any such mortgage, the provisions of this Agreement shall be read and construed with the other Credit Documents.

6. **REPRESENTATIONS AND WARRANTIES CONCERNING THE COMPANY'S LEGAL STATUS.** Borrower represents and warrants to Bank as follows: (a) it is a not-for-profit corporation which is duly organized, validly existing and in good standing under the laws of the State and is validly existing and in good standing in all states in which Borrower is doing business; (b) it has full power and authority to own its properties and to transact the businesses in which it is presently engaged or presently proposes to engage; (c) the execution, delivery and performance of this Agreement have been duly authorized by all necessary action of Borrower; and (d) this Agreement constitutes, and any instrument or agreement required hereunder to be given by Borrower to Bank when delivered will constitute, the legal, valid and binding obligation of Borrower, enforceable against Borrower in accordance with their respective terms, except as limited by general principles of equity and by bankruptcy,

- 5 -

7550294.2

insolvency, reorganization, moratorium or similar laws relating to or affecting generally the enforcement of creditors' rights.

7. **COVENANTS CONCERNING THE COMPANY'S LEGAL STATUS.** Borrower covenants to and with Bank as follows: (a) except as set forth in Schedule II attached hereto, there is no pending or threatened litigation, claim for infringement, proceeding or investigation by any governmental authority or any other person known to Borrower against or otherwise affecting Borrower or any of its assets or its officers, directors or agents in their capacities as such, nor does Borrower know of any ground for any such litigation, infringement claims, proceedings or investigations; (b) no contract or organizational document prohibits any term or condition of this Agreement; (c) the execution and delivery of this Agreement will not violate any law or agreement governing Borrower or to which Borrower is a party; and (d) all information and statements furnished in connection with the Credit Documents, and any other documents related to this secured transaction, are true and correct, and contain no false or misleading statement.

8. **REPRESENTATIONS AND WARRANTIES CONCERNING COLLATERAL AND SECURITY AGREEMENT.** Borrower further represents and warrants to Bank as follows: (a) Borrower has rights in the Collateral, free from any right or claim of any person or any adverse lien, security interest or other encumbrance; (b) none of the Collateral constitutes, or is the proceeds of, "farm products" as defined in the UCC of the State; (c) none of the account debtors or other persons obligated on any of the Collateral is a governmental authority covered by the federal Assignment of Claims Act or like federal, state or local statute or rule in respect of such Collateral; (d) Borrower holds no commercial tort claim; (e) Borrower has at all times operated its business in compliance with all applicable provisions of the federal Fair Labor Standards Act, as amended, and with all applicable provisions of federal, state and local statutes and ordinances dealing with the control, shipment, storage or disposal of hazardous materials or substances; and (f) all other information set forth in this Agreement pertaining to the Collateral is accurate and complete.

9. **COVENANTS CONCERNING COLLATERAL.** Borrower further covenants with Bank as follows: (a) the Collateral, to the extent not delivered to Bank pursuant to Section 2 or 4 above, will be kept at those locations listed on Schedule I attached hereto, and Borrower will not remove the Collateral from such locations without providing at least thirty (30) days' prior written notice to Bank; (b) except for the security interest granted herein and in the Mortgages, Borrower shall be the owner of the Collateral free from any right or claim of any other person or any lien, security interest or other encumbrance, and Borrower shall defend the same against all claims and demands of all persons at any time claiming the same or any interests therein adverse to Bank; (c) Borrower shall not pledge, mortgage or create or suffer to exist any right of any person in or claim by any person to the Collateral, or any security interest, lien or other encumbrance in the Collateral in favor of any person, other than Bank, as permitted by the Mortgages and the Loan Agreements; (d) Borrower will permit Bank or its designees to inspect the Collateral at any reasonable time, wherever located; (e) Borrower will pay promptly when due all taxes, assessments, governmental charges and levies upon the Collateral or incurred in connection with the use or operation of such Collateral or incurred in connection with this Agreement; (f) Borrower will continue to operate its business in compliance with all applicable provisions of the federal Fair Labor Standards Act, as amended, and with all applicable

- 6 -

provisions of federal, state and local statutes and ordinances dealing with the control, shipment, storage or disposal of hazardous materials or substances; (g) Borrower will not sell or otherwise dispose, or offer to sell or otherwise dispose, of the Collateral or any interest therein; and (h) there are no off-sets or defenses to the Obligations.

10. **COLLATERAL PROTECTION EXPENSES; PRESERVATION OF COLLATERAL.**

(a) *Expenses Incurred by Bank.* In Bank's discretion, if Borrower fails to do so, Bank may discharge taxes and other encumbrances at any time levied or placed on any of the Collateral, make repairs thereto and pay any necessary filing fees or insurance premiums. Borrower agrees to reimburse Bank on demand for all expenditures so made. Bank shall have no obligation to Borrower to make any such expenditures, nor shall the making thereof be construed as a waiver or cure any Event of Default.

(b) *Bank's Obligations and Duties.* Anything herein to the contrary notwithstanding, Borrower shall remain obligated and liable under each contract or agreement included in the Collateral to be observed or performed by Borrower thereunder. Bank shall not have any obligation or liability under any such contract or agreement by reason of or arising out of this Agreement or the receipt by Bank of any payment relating to any of the Collateral, nor shall Bank be obligated in any manner to perform any of the obligations of Borrower under or pursuant to any such contract or agreement, to make inquiry as to the nature or sufficiency of any payment received by Bank in respect of the Collateral or as to the sufficiency of any performance by any party under any such contract or agreement, to present or file any claim, to take any action to enforce any performance or to collect the payment of any amounts which may have been assigned to Bank or to which Bank may be entitled at any time or times. Bank's sole duty with respect to the custody, safe keeping and physical preservation of the Collateral in its possession, under the UCC of the State or otherwise, shall be to deal with such Collateral in the same manner as Bank deals with similar property for its own account.

11. **SECURITIES AND DEPOSITS.** Bank may at any time following and during the continuance of an Event of Default, at its option, transfer to itself or any nominee any securities constituting Collateral, receive any income thereon and hold such income as additional Collateral or apply it to the Obligations in accordance with the Loan Agreements. Whether or not any Obligations are due, Bank may, following and during the continuance of an Event of Default, demand, sue for, collect or make any settlement or compromise which it deems desirable with respect to the Collateral. Regardless of the adequacy of Collateral or any other security for the Obligations, any deposits or other sums at any time credited by or due from Bank to Borrower may at any time be applied to or set off against any of the Obligations then due and owing.

12. **NOTIFICATION TO ACCOUNT DEBTORS AND OTHER PERSONS OBLIGATED ON COLLATERAL.** If an Event of Default shall have occurred and be continuing, Borrower shall, at the request and option of Bank, notify account debtors and other persons obligated on any of the Collateral of the security interest of Bank in any account, chattel paper, general intangible, instrument or other Collateral and that payment thereof is to be made directly to Bank or to any financial institution designated by Bank as Bank's agent therefor, and

- 7 -

Bank may itself, if an Event of Default shall have occurred and be continuing, without notice to or demand upon Borrower, so notify account debtors and other persons obligated on Collateral. After the making of such a request or the giving of any such notification, Borrower shall hold any proceeds of collection of accounts, chattel paper, general intangibles, instruments and other Collateral received by Borrower or Bank without commingling the same with other funds of Borrower and shall turn the same over to Bank in the identical form received, together with any necessary endorsements or assignments. Bank shall apply the proceeds of collection of accounts, chattel paper, general intangibles, instruments and other Collateral received by Bank to the Obligations in accordance with the Loan Agreements, such proceeds to be immediately credited after final payment in cash or other immediately available funds of the items giving rise to them.

### 13.   POWER OF ATTORNEY.

(a)   *Appointment and Powers of Bank.*   Borrower hereby irrevocably constitutes and appoints Bank and any officer or agent thereof, with full power of substitution, as its true and lawful attorneys-in-fact, with full irrevocable power and authority in the place and stead of Borrower or in Bank's own name, for the purpose of carrying out the terms of this Agreement, to take any and all appropriate action and to execute any and all documents and instruments that may be necessary or useful to accomplish the purposes of this Agreement and, without limiting the generality of the foregoing, hereby gives said attorneys the power and right, on behalf of Borrower, without notice to or assent by Borrower, to do the following:

(i)   upon the occurrence and during the continuance of an Event of Default, generally to sell, transfer, pledge, make any agreement with respect to or otherwise dispose of or deal with any of the Collateral in such manner as is consistent with the UCC of the State and as fully and completely as though Bank were the absolute owner thereof for all purposes, and to do, at Borrower's expense, at any time or from time to time, all acts and things which Bank deems necessary or useful to protect, preserve or realize upon the Collateral and Bank's security interest therein, in order to effect the intent of this Agreement, all no less fully and effectively as Borrower might do, including, without limitation, (A) the filing and prosecuting of registration and transfer applications with the appropriate federal, state or local agencies or authorities with respect to trademarks, copyrights and patentable inventions and processes; (B) upon written notice to Borrower, the exercise of voting rights with respect to voting securities, which rights may be exercised, if Bank so elects, with a view to causing the liquidation of assets of the issuer of any such securities; and (C) the execution, delivery and recording, in connection with any sale or other disposition of any Collateral, of the endorsements, assignments or other instruments of conveyance or transfer with respect to such Collateral; and

(ii)   to the extent that Borrower's authorization given in Section 3 above is not sufficient, to file financing statements with respect hereto or a photocopy of this Agreement in substitution for a financing statement, as Bank may deem appropriate.

(b)   *Ratification by Borrower.*   To the extent permitted by law, Borrower hereby ratifies all that said attorneys shall lawfully do or cause to be done by virtue hereof. This power of attorney is a power coupled with an interest and is irrevocable.

- 8 -

(c) *No Duty on Bank.* The powers conferred on Bank hereunder are solely to protect its interests in the Collateral and shall not impose any duty upon it to exercise any such powers. Bank shall be accountable only for the amounts that it actually receives as a result of the exercise of such powers, and neither it nor any of its officers, directors, employees or agents shall be responsible to Borrower for any act or failure to act, except for Bank's own gross negligence or willful misconduct.

14. **Events of Default Defined.** The following shall be "Events of Default" under this Agreement and the terms *"Event of Default"* or *"default"* shall mean, whenever they are used in this Agreement, any one or more of the following events:

(a) an Event of Default under the Loan Agreements or any other Credit Document;

(b) the Collateral, or any part thereof, is in any manner, whether voluntarily or involuntarily, encumbered, assigned, leased, subleased, sold, transferred or conveyed, except as is expressly provided in the Loan Agreements or the Mortgages, or Borrower threatens to encumber, assign, lease, sublease, sell, transfer or convey the Collateral, or any part thereof, to any person except as is expressly provided in the Loan Agreements or the Mortgages; or

(c) the imposition of a Lien on the Collateral other than a Lien being contested as provided herein or in the Mortgages.

15. **RIGHTS AND REMEDIES.** If any Event of Default shall occur, Bank may, at its election, and without demand or notice of any kind, do any one or more of the following:

(a) declare all of the Obligations to Bank to be immediately due and payable, whereupon all unpaid principal, interest and fees in respect of such Obligations, together with all of Bank's reasonable costs, expenses and attorneys' fees related thereto, under the terms of the Credit Documents or otherwise, shall be immediately due and payable;

(b) exercise any and all rights and remedies available to Bank under any applicable law; or

(c) exercise any and all rights and remedies granted to Bank under the terms of this Agreement or any of the other Credit Documents;

In any jurisdiction in which enforcement hereof is sought, in addition to all other rights and remedies, Bank shall have the rights and remedies of a secured party under the UCC of the State and additional rights and remedies as may be provided to a secured party in the jurisdiction in which Collateral is located, including, without limitation, the right to take possession of the Collateral, and for that purpose, Bank may, so far as Borrower can give authority therefor, enter upon premises on which the Collateral may be situated and remove the collateral therefrom. Bank may in its discretion require Borrower to assemble all or any part of the Collateral at such location or locations within the jurisdiction(s) of Borrower's principal office(s) or at such other locations as Bank may reasonably designate. Unless the Collateral is perishable or threatens to decline speedily in value or is of a type custom sold on a recognized

- 9 -

7550294.2

market, Bank shall give to Borrower at least at ten (10) days' prior written notice of the time and place of any public sale of Collateral or of the time after which any private sale or any other intended disposition is to be made. Borrower hereby acknowledges that ten (10) days' prior written notice of such sale or sales shall be reasonable notice. In addition, Borrower waives any and all rights that it may have to a judicial hearing in advance of the enforcement of any of Bank's rights and remedies hereunder, including, without limitation, its right following an Event of Default to take immediate possession of Collateral and to exercise its rights and remedies with respect thereto. Bank may also have a receiver appointed to take charge of all or any portion of the Collateral and to exercise all rights of Bank under this Agreement.

The remedies in this Section are in addition to, not in limitation of, any other right, power, privilege or remedy, either in law, in equity, or otherwise, to which Bank may be entitled. No failure or delay on the part of Bank in exercising any right, power or remedy will operate as a waiver thereof, nor will any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right hereunder. The remedies in this Agreement are in addition to, not in limitation of, any other right, power, privilege or remedy, either in law, in equity, or otherwise, to which Bank may be entitled. All of Bank's rights and remedies, whether evidenced by this Agreement or by any other agreement, instrument or document, shall be cumulative and may be exercised singularly or concurrently.

16.    **STANDARDS FOR EXERCISING RIGHTS AND REMEDIES.** To the extent that applicable law imposes duties on Bank to exercise remedies in a commercially reasonable manner, Borrower acknowledges and agrees that it is not commercially unreasonable for Bank (a) to fail to incur expenses reasonably deemed significant by Bank to prepare Collateral for disposition or otherwise to fail to complete raw material or work in process into finished goods or other finished products for disposition; (b) to fail to obtain third-party consents for access to Collateral to be disposed of, or to obtain or, if not required by other law, to fail to obtain governmental or third-party consents for the collection or disposition of Collateral to be collected or disposed of; (c) to fail to exercise collection remedies against account debtors or other persons obligated on Collateral or to fail to remove liens or encumbrances on or any adverse claims against Collateral; (d) to exercise collection remedies against account debtors and other persons obligated on Collateral directly or through the use of collection agencies and other collection specialists; (e) to advertise dispositions of Collateral through publications or media of general circulation, whether or not the Collateral is of a specialized nature; (f) to contact other persons, whether or not in the same business as Borrower, for expressions of interest in acquiring all or any portion of the Collateral; (g) to hire one or more professional auctioneers to assist in the disposition of Collateral, whether or not the Collateral is of a specialized nature; (h) to dispose of Collateral by utilizing Internet sites that provide for the auction of assets of the types included in the Collateral or that have the reasonable capability of doing so, or that match buyers and sellers of assets; (i) to dispose of assets in wholesale rather than retail markets; (j) to disclaim disposition warranties; (k) to purchase insurance or credit enhancements to insure Bank against risks of loss, collection or disposition of Collateral or to provide to Bank a guaranteed return from the collection or disposition of Collateral; or (l) to the extent deemed appropriate by Bank, to obtain the services of other brokers, investment bankers, consultants and other professionals to assist Bank in the collection or disposition of any of the Collateral. Borrower acknowledges that the purpose of this Section is to provide non-exhaustive indications of what actions or omissions by Bank would fulfill Bank's duties under the UCC of the State or any other

- 10 -

7550294.2

relevant jurisdiction in Bank's exercise of remedies against the Collateral and that other actions or omissions by Bank shall not be deemed to fail to fulfill such duties solely on account of not being indicated in this Section. Without limitation upon the foregoing, nothing contained in this Section shall be construed to grant any rights to Borrower or to impose any duties on Bank that would not have been granted or imposed by this Agreement or by applicable law in the absence of this Section.

17. **NO WAIVER BY THE BANK.** Bank shall not be deemed to have waived any of its rights and remedies in respect of the Obligations or the Collateral unless such waiver shall be in writing and signed by Bank. No delay or omission on the part of Bank in exercising any right or remedy shall operate as a waiver of such right or remedy or any other right or remedy. A waiver on any one occasion shall not be construed as a bar to or waiver of any right or remedy on any future occasion. All rights and remedies of Bank with respect to the Obligations or the Collateral, whether evidenced hereby or by any other instrument or papers, shall be cumulative and may be exercised singularly, alternatively, successively or concurrently at such time or at such times as Bank deems expedient.

18. **SURETYSHIP WAIVERS BY COMPANY.** Borrower waives demand, notice, protest, notice of acceptance of this Agreement, notice of loans made, credit extended, Collateral received or delivered or other action taken in reliance hereon and all other demands and notices of any description. With respect to both the Obligations and the Collateral, Borrower assents to any extension or postponement of the time of payment or any other indulgence, to any substitution, exchange or release of or failure to perfect any security interest in any Collateral, to the addition or release of any party or person primarily or secondarily liable, to the acceptance of partial payment thereon and the settlement, compromising or adjusting of any thereof, all in such manner and at such time or times as Bank may deem advisable. Bank shall have no duty as to the collection or protection of the Collateral or any income therefrom, the preservation of rights against prior parties, or the preservation of any rights pertaining thereto beyond the safe custody thereof as set forth in Section 10(b) above. Borrower further waives any and all other suretyship defenses.

19. **MARSHALLING.** Bank shall not be required to marshal any present or future collateral security (including, but not limited to, the Collateral) for, or other assurances of payment of, the Obligations or any of them or to resort to such collateral security or other assurances of payment in any particular order, and all of its rights and remedies hereunder and in respect of such collateral security and other assurances of payment shall be cumulative and in addition to all other rights and remedies, however existing or arising. To the extent that it lawfully may, Borrower hereby agrees that it will not invoke any law relating to the marshalling of collateral which might cause delay in or impede the enforcement of Bank's rights and remedies under this Agreement or under any other instrument creating or evidencing any of the Obligations or under which any of the Obligations is outstanding or by which any of the Obligations is secured or payment thereof is otherwise assured, and to the extent that it lawfully may, Borrower hereby irrevocably waives the benefits of all such laws.

20. **PROCEEDS OF DISPOSITIONS; EXPENSES.** Borrower shall pay to Bank on demand any and all reasonable expenses, including reasonable attorneys' fees and disbursements, incurred or paid by Bank in protecting, preserving or enforcing Bank's rights and

- 11 -

7550294.2

remedies under or in respect of any of the Obligations or any of the Collateral. After application to said expenses in accordance with the Loan Agreements, the residue of any proceeds of collection or sale or other disposition of Collateral shall, to the extent actually received in cash, be applied to the payment of the Obligations in such order or preference as required under the Loan Agreements. In the absence of final payment and satisfaction in full of all of the Obligations, Borrower shall remain liable for any deficiency.

    **21.    OVERDUE AMOUNTS.** Until paid, all amounts due and payable by Borrower hereunder shall be a debt secured by the Collateral and shall bear, whether before or after judgment, interest at a rate per annum equal to the interest rate payable under the Notes plus 4.0%.

    **22.    GOVERNING LAW; CONSENT TO JURISDICTION.** This Agreement shall be governed by, and construed in accordance with, federal law applicable to Bank and to the extent not preempted by federal law, the laws of the State of New York, without reference to conflicts-of-laws principles. Borrower hereby irrevocably submits to the non-exclusive jurisdiction of any New York state or federal court sitting in Albany County over any action or proceeding arising out of or relating to this Agreement, or any document related to the Obligations, and Borrower hereby irrevocably agrees that all claims in respect of such action or proceeding may be heard and determined in such New York state or federal court. Borrower hereby waives any objection that it may now or hereafter have to the venue of any such suit or any such court or that such suit is brought in an inconvenient court.

    **23.    WAIVER OF JURY TRIAL. THE COMPANY AND THE BANK EACH WAIVE ANY RIGHT TO HAVE A JURY PARTICIPATE IN RESOLVING ANY DISPUTE, WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE, BETWEEN THE BANK AND THE COMPANY ARISING OUT OF, IN CONNECTION WITH, RELATED TO OR INCIDENTAL TO THE RELATIONSHIP ESTABLISHED BETWEEN THEM IN CONNECTION WITH THIS AGREEMENT OR ANY PROMISSORY NOTE OR OTHER INSTRUMENT, DOCUMENT OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH OR THE TRANSACTIONS RELATED THERETO.**

    **24.    NOTICES.** All notices, requests, demands or other communications provided for hereunder shall be in writing and, if to Borrower, mailed or delivered to it, addressed to it at the address specified in the preamble of this Agreement with a copy (which shall not constitute notice) mailed or delivered to Aaron Dautch Sternberg & Lawson LLP, 730 Convention Tower, 43 Court Street, Buffalo, New York 14202 Attention: Francis P. Weimer, Esq, or, if to Bank, mailed or delivered to it, addressed to the address of Bank specified in the preamble of this Agreement. All notices, statements, requests, demands and other communications provided for hereunder shall be deemed to be given or made when delivered or forty-eight (48) hours after being deposited in the mail with postage prepaid, by registered or certified mail, addressed as aforesaid, or sent by facsimile with telephonic confirmation of receipt, except that notices from Borrower to Bank pursuant to any of the provisions hereof shall not be effective until received by Bank.

7550294.2

25. **MISCELLANEOUS.** The headings of each section of this Agreement are for convenience only and shall not define or limit the provisions thereof. This Agreement and all rights and obligations hereunder shall be binding upon Borrower and its successors and assigns, and shall inure to the benefit of Bank and its successors and assigns. If any term of this Agreement shall be held to be invalid, illegal or unenforceable, the validity of all other terms hereof shall in no way be affected thereby, and this Agreement shall be construed and be enforceable as if such invalid, illegal or unenforceable term had not been included herein. Borrower acknowledges receipt of a copy of this Agreement.

26. **AMENDMENT AND RESTATEMENT.** This Agreement amends and restates the Initial Security Agreement in its entirety and shall take effect upon the date hereof.

- 13 -

7550294.2

**IN WITNESS WHEREOF,** intending to be legally bound, Borrower and Bank caused this Amended and Restated Security Agreement to be duly executed as of the date first above written.

EASTERN NIAGARA HOSPITAL, INC.

By: _____
                Clare A. Haar
           Chief Executive Officer

RBS CITIZENS, N.A.

By: _____
            Patrick R. Szalach
          Senior Vice President

- 14 -

7550294.2

# SCHEDULE I

## LOCATION OF COLLATERAL

521 East Avenue, Lockport, Niagara County, New York

2600 William Street, Newfane, Niagara County, New York

7550294.2

## SCHEDULE II

## PENDING LITIGATION

Pending lawsuits previously disclosed in the letters from Michael J. Roach, Esq. of Connors & Vilardo LLP dated September 11, 2013, Clare A. Haar, CEO of Eastern Niagara Hospital dated September 11, 2013, Keith J. Vaverchak, Senior Claims Examiner of MLMIC dated September 11, 2013 and September 12, 2013, Joseph V. McCarthy, Esq. of Roach, Brown, McCarthy & Gruber, P.C. dated September 9, 2013 and James N. Schmit, Esq., of Jaeckle, Fleischmann & Mugel LLP dated September 6, 2013.

7550294.2

# EXHIBIT "D"

| RECEIPTS | 11/9/2019 Budget | Actual | Variance | 11/16/2019 Budget | Actual | Variance | 11/23/2019 Budget | Actual | Variance | 11/30/2019 Budget | Actual | Variance | 12/7/2019 Budget | Actual | Variance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Operating** | | | | | | | | | | | | | | | |
| Net Patient Service Revenue | $ 844,654 | $ 805,986 | $ (38,668) | $ 844,654 | $ 713,609 | $ (131,045) | $ 844,654 | $ 853,275 | $ 8,621 | $ 675,723 | $ 879,913 | $ 204,190 | $ 762,547 | $ 854,169 | $ 91,622 |
| Other Recurring Operating Revenue | $ 7,272 | $ 39,163 | $ 31,891 | $ 7,272 | $ 153,135 | $ 145,863 | $ 7,272 | $ 33,141 | $ 25,869 | $ 7,272 | $ 5,971 | $ (1,301) | $ 5,747 | | $ (5,747) |
| GPO | | $ - | | | | | $ - | | | | $ - | | | | $ - |
| **Non Operating** | | | | | | | | | | | | | | | |
| VAPAP | $ 1,500,000 | $ 1,530,756 | $ 30,756 | | | | $ - | | | | $ - | | $ - | | $ - |
| VAP | | | | | | | | | | | $ - | | $ - | | $ - |
| Stimulus / PPP Loan | | | | | | | | | | | $ - | | $ - | | $ - |
| Interest Revenue | $ 1,316 | | $ (1,316) | $ 1,316 | | $ (1,316) | $ 1,316 | | $ (1,316) | $ 1,053 | | $ (1,053) | $ - | | $ - |
| Donations | $ 2,632 | | $ (2,632) | $ 2,632 | | $ (2,632) | $ 2,632 | | $ (2,632) | $ 2,105 | | $ (2,105) | $ - | | $ - |
| Transfer from Cornerstone Bank (PPP Loan) | | | | | | | | | | | | | | | |
| Transfer from Payroll Account | | | | | | | | | | | | | | | |
| Transfer from Capital Funds Account | | | | | | | | | | | | | | | |
| Net proceeds from sale of assets | | $ - | | | $ - | | | $ - | | | $ - | | | $ - | |
| **Total Receipts** | $ 2,355,874 | $ 2,375,905 | $ 20,031 | $ 855,874 | $ 866,744 | $ 10,870 | $ 855,874 | $ 886,416 | $ 30,542 | $ 686,153 | $ 885,884 | $ 199,731 | $ 768,295 | $ 854,169 | $ 85,874 |
| Variance - Cumulative | | | | $ 3,211,748 | $ 3,242,649 | $ 30,901 | $ 4,067,622 | $ 4,129,065 | $ 61,443 | $ 4,753,775 | $ 5,014,949 | $ 261,174 | $ 5,522,070 | $ 5,869,118 | $ 347,048 |
| Variance % - Cumulative | | | | | | 1% | | | 2% | | | 5% | | | 6% |
| | | | | | | | | | | | | | | | |
| **EXPENSES:** | | | | | | | | | | | | | | | |
| **SALARIES & WAGES** | $ - | $ - | $ - | (793,779) | $ (890,608) | $ (96,829) | $ - | $ (1,854) | $ (1,854) | $ (793,779) | $ (901,511) | $ (107,732) | $ - | $ - | $ - |
| **PHYSICIAN FEES** | $ (90,753) | $ - | $ 90,753 | (90,753) | $ (24,257) | $ 66,496 | $ (90,753) | $ - | $ 90,753 | $ (90,753) | $ (98,474) | $ (7,721) | $ (251,042) | $ (5,590) | $ 245,452 |
| **FRINGE BENEFITS** | $ - | $ (85,614) | $ (85,614) | (577,997) | $ (456,137) | $ 121,860 | $ - | $ (26,448) | $ (26,448) | $ (172,997) | $ (67,441) | $ 105,556 | $ - | $ (332,628) | $ (332,628) |
| **MEDICAL SUPPLIES** | $ (61,042) | $ - | $ 61,042 | (61,042) | $ (42,829) | $ 18,213 | $ (61,042) | $ (80,875) | $ (19,833) | $ (61,042) | $ (41,451) | $ 19,591 | $ (65,123) | $ (87,265) | $ (22,142) |
| **PHARMACY SUPPLIES** | $ (37,530) | $ - | $ 37,530 | (37,530) | $ - | $ 37,530 | $ (37,530) | $ - | $ 37,530 | $ (37,530) | $ - | $ 37,530 | $ (19,422) | $ (10,595) | $ 8,827 |
| **OTHER DIRECT EXPENSES** | $ (253,928) | $ (159,467) | $ 94,461 | (253,928) | $ (272,979) | $ (19,051) | $ (253,928) | $ (129,113) | $ 124,815 | $ (253,928) | $ (242,799) | $ 11,129 | $ (223,978) | $ (34,893) | $ 189,085 |
| US Trustee Fees | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Debtor Professionals Expense | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Lender Professionals Expense | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Committee Professionals Expense | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| CRA Professionals Expense | | | | | | | | | | | | | | | |
| **DEPRECIATION** | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| **NYS ASSESSMENT** | $ (3,492) | $ - | $ 3,492 | (3,492) | $ - | $ 3,492 | $ (3,492) | $ - | $ 3,492 | $ (2,794) | $ - | $ 2,794 | $ (3,462) | $ (11,795) | $ (8,333) |
| **INTEREST** | $ (8,747) | $ (504) | $ 8,243 | (8,747) | $ (1,792) | $ 6,955 | $ (8,747) | $ (503) | $ 8,244 | $ (6,997) | $ - | $ 6,997 | $ - | $ - | $ - |
| Equipment Leases - Interest | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Citizens Loans - Interest | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ (28,515) | $ (29,039) | $ (524) |
| **Principal Payments** | | | | | | | | | | | | | | | |
| Equipment Leases - Principal | $ - | $ (5,740) | $ (5,740) | $ - | $ (6,033) | $ (6,033) | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ (6,780) | $ (6,780) |
| Citizens Loans - Principal | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ (12,756) | $ (12,756) | $ - |
| **Capital Purchases** | $ (10,000) | $ (25,375) | $ (15,375) | (10,000) | $ - | $ 10,000 | $ (10,000) | $ - | $ 10,000 | $ (10,000) | $ - | $ 10,000 | $ (10,000) | $ (3,782) | $ 6,218 |
| **Transfer to Capital Account - Non Legal** | | | | | | | | | | | | | | | |
| **Defined Benefit Pension payments** | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| | | | | | | | | | | | | | | | |
| **TOTAL EXPENSES** | $ (465,492) | $ (276,700) | $ 188,792 | (1,837,268) | $ (1,694,635) | $ 142,633 | $ (465,492) | $ (238,793) | $ 226,699 | $ (1,429,820) | $ (1,351,676) | $ 78,144 | $ (614,298) | $ (535,123) | $ 79,175 |
| Variance - Cumulative | | | | $ (2,302,760) | $ (1,971,335) | $ 331,425 | $ (2,768,252) | $ (2,210,128) | $ 558,124 | $ (4,198,072) | $ (3,561,804) | $ 636,268 | $ (4,812,370) | $ (4,096,927) | $ 715,443 |
| Variance %s - Cumulative | | | | | -61% | -14% | | -54% | -20% | | -71% | -15% | | -70% | -15% |
| | | | | | | | | | | | | | | | |
| **Net Cash Flow** | $ 1,890,382 | $ 2,099,205 | $ 208,823 | (981,394) | $ (827,891) | $ 153,503 | $ 390,382 | $ 647,623 | $ 257,241 | $ (743,667) | $ (465,792) | $ 277,875 | $ 153,996 | $ 319,046 | $ 165,050 |
| | | | | | | | | | | | | | | | |
| Cash Balance Beginning of period | $ 794,832 | $ 604,953 | $ (189,879) | $ 2,704,158 | $ 2,704,158 | $ - | $ 1,876,268 | $ 1,876,268 | $ - | $ 2,523,891 | $ 2,523,891 | $ - | $ 2,058,099 | $ 2,058,099 | $ - |
| Cash Balance -End of Period | $ 2,685,213 | $ 2,704,158 | $ 18,945 | $ 1,722,764 | $ 1,876,268 | $ 153,504 | $ 2,266,650 | $ 2,523,891 | $ 257,241 | $ 1,780,224 | $ 2,058,099 | $ 277,875 | $ 2,212,095 | $ 2,377,145 | $ 165,050 |
| | | | | | | | | | | | | | | | |
| Cash Balance (Citizens Bank) | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | |
| Cash Balance (PPP Loan) | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | |
| **Total Ending Cash Balance (Citizens & Cornerstone)** | | | | | | | | | | | | | | | |

| RECEIPTS | 12/14/2019 Budget | Actual | Variance | WE 12/21/19 Budget | Actual | Variance | WE 12/28/19 Budget | Actual | Variance | WE 1/4/20 Budget | Actual | Variance | WE 1/11/20 Budget | Actual | Variance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Operating** | | | | | | | | | | | | | | | |
| Net Patient Service Revenue | $ 762,547 | $ 637,213 | $ (125,334) | $ 762,547 | $ 1,016,255 | $ 253,708 | $ 610,038 | $ 716,395 | $ 106,357 | $ 646,382 | $ 641,158 | $ (5,224) | $ 853,408 | $ 1,048,013 | $ 194,605 |
| Other Recurring Operating Revenue | $ 5,747 | $ 14,871 | $ 9,124 | $ 5,747 | $ 10,335 | $ 4,587 | $ 5,747 | $ 754 | $ (4,993) | $ 6,216 | $ 10,825 | $ 4,608 | $ 6,568 | | $ (6,568) |
| GPO | $ - | | $ - | $ - | | $ - | $ 100,000 | | $ (100,000) | $ - | | $ - | $ - | $ 143,349 | $ 143,349 |
| **Non Operating** | $ - | | | $ - | | | $ - | | | $ - | | | $ - | | |
| VAPAP | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | | $ - |
| VAP | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | | $ - |
| Stimulus / PPP Loan | | | | | | | | | | | | | | | |
| Interest Revenue | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | | $ - |
| Donations | | | | | | | | | | | | | | | |
| Transfer from Cornerstone Bank (PPP Loan) | | | | | | | | | | | | | | | |
| Transfer from Payroll Account | | | | | | | | | | | | | | | |
| Transfer from Capital Funds Account | | | | | | | | | | | | | | | |
| Net proceeds from sale of assets | $ - | | $ - | $ - | | $ - | $ - | | $ - | $ - | | $ - | $ - | | $ - |
| **Total Receipts** | $ 768,295 | $ 652,084 | $ (116,211) | $ 768,295 | $ 1,026,590 | $ 258,295 | $ 715,785 | $ 717,149 | $ 1,364 | $ 652,598 | $ 651,982 | $ (616) | $ 859,976 | $ 1,191,362 | $ 331,386 |
| _Variance - Cumulative_ | $ 6,290,364 | $ 6,521,202 | $ 230,838 | $ 7,058,659 | $ 7,547,792 | $ 489,133 | $ 7,774,444 | $ 8,264,941 | $ 490,497 | $ 8,427,042 | $ 8,916,923 | $ 489,880 | $ 9,287,018 | $ 10,108,285 | $ 821,266 |
| _Variance % - Cumulative_ | | | 4% | | | 7% | | | 6% | | | 6% | | | 9% |
| | | | | | | | | | | | | | | | |
| **EXPENSES:** | | | | | | | | | | | | | | | |
| SALARIES & WAGES | $ (936,594) | $ (987,909) | $ (51,316) | $ - | $ - | $ - | $ (936,594) | $ (887,520) | $ 49,073 | $ - | $ (2,710) | $ (2,710) | $ (910,907) | $ (878,501) | $ 32,406 |
| PHYSICIAN FEES | $ (28,767) | $ (83,895) | $ (55,128) | $ - | $ (71,024) | $ (71,024) | $ (28,767) | $ (27,816) | $ 951 | $ (165,981) | $ (87,534) | $ 78,447 | $ (19,020) | $ (24,011) | $ (4,991) |
| FRINGE BENEFITS | $ (7,317) | $ (38,059) | $ (30,742) | $ (357,202) | $ (451) | $ 356,752 | $ (103,439) | $ (134,612) | $ (31,173) | $ - | $ (30,889) | $ (30,889) | $ (400,692) | $ (369,013) | $ 31,680 |
| MEDICAL SUPPLIES | $ (65,123) | $ (128,038) | $ (62,915) | $ (65,123) | $ (40,274) | $ 24,849 | $ (65,123) | $ (43,473) | $ 21,650 | $ (64,224) | $ (53,188) | $ 11,035 | $ (63,549) | $ (55,531) | $ 8,018 |
| PHARMACY SUPPLIES | $ (19,422) | $ (15,775) | $ 3,647 | $ (19,422) | $ (21,414) | $ (1,992) | $ (19,422) | $ (14,762) | $ 4,659 | $ (19,730) | $ (18,960) | $ 769 | $ (19,960) | $ (9,417) | $ 10,544 |
| OTHER DIRECT EXPENSES | $ (177,481) | $ (108,167) | $ 69,314 | $ (143,753) | $ (70,301) | $ 73,452 | $ (177,481) | $ (289,143) | $ (111,662) | $ (221,251) | $ (58,499) | $ 162,751 | $ (166,198) | $ (132,410) | $ 33,787 |
| US Trustee Fees | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ (20,000) | $ (20,000) | $ (12,851) | | $ 12,851 | $ (22,490) | | $ 22,490 |
| Debtor Professionals Expense | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ (20,000) | $ (20,000) | $ (6,452) | $ - | $ 6,452 | $ (11,290) | | $ 11,290 |
| Lender Professionals Expense | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ (4,516) | $ - | $ 4,516 | $ (7,903) | $ - | $ 7,903 |
| Committee Professionals Expense | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ (5,161) | $ - | $ 5,161 | $ (9,032) | $ - | $ 9,032 |
| CRA Professionals Expense | | | | | | | | | | | | | | | |
| DEPRECIATION | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| NYS ASSESSMENT | $ (3,462) | $ - | $ 3,462 | $ (3,462) | $ - | $ 3,462 | $ (2,770) | $ - | $ 2,770 | $ (2,724) | $ - | $ 2,724 | $ (3,349) | $ (15,219) | $ (11,870) |
| INTEREST | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Equipment Leases - Interest | $ - | $ (1,130) | $ (1,130) | $ - | $ (9,230) | $ (9,230) | $ (8,895) | $ - | $ 8,895 | $ - | $ (501) | $ (501) | $ - | $ (464) | $ (464) |
| Citizens Loans - Interest | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ (28,515) | $ (29,081) | $ (566) | $ - | $ - | $ - |
| **Principal Payments** | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Equipment Leases - Principal | $ - | $ (16,085) | $ (16,085) | $ - | $ (78,387) | $ (78,387) | $ - | $ (22,144) | $ 22,144 | $ - | $ (6,803) | $ (6,803) | $ - | $ (5,780) | $ (5,780) |
| Citizens Loans - Principal | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ (12,756) | $ (12,422) | $ 334 | $ - | $ - | $ - |
| Capital Purchases | $ (10,000) | $ (540) | $ 9,460 | $ (10,000) | $ - | $ 10,000 | $ (10,000) | $ - | $ 10,000 | $ - | $ (51,743) | $ (51,743) | $ (10,000) | $ - | $ 10,000 |
| Transfer to Capital Account - Non Legal | | | | | | | | | | | | | | | |
| Defined Benefit Pension payments | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| | | | | | | | | | | | | | | | |
| **TOTAL EXPENSES** | $ (1,248,166) | $ (1,379,598) | $ (131,432) | $ (598,962) | $ (291,081) | $ 307,881 | $ (1,374,634) | $ (1,437,327) | $ (62,693) | $ (544,160) | $ (352,331) | $ 191,830 | $ (1,644,391) | $ (1,490,346) | $ 154,045 |
| _Variance - Cumulative_ | $ (6,060,536) | $ (5,476,525) | $ 584,011 | $ (6,659,499) | $ (5,767,606) | $ 891,892 | $ (8,034,133) | $ (7,204,933) | $ 829,200 | $ (8,578,293) | $ (7,557,264) | $ 1,021,029 | $ (10,222,684) | $ (9,047,610) | $ 1,175,075 |
| _Variance %s - Cumulative_ | | | -84% | | | -10% | | | -76% | | | -13% | | | -87% |
| | | | | | | | | | | | | | | | |
| **Net Cash Flow** | $ (479,871) | $ (727,514) | $ (247,643) | $ 169,332 | $ 735,509 | $ 566,176 | $ (658,849) | $ (720,179) | $ (61,329) | $ 108,438 | $ 299,652 | $ 191,214 | $ (784,415) | $ (298,984) | $ 485,431 |
| | | | | | | | | | | | | | | | |
| Cash Balance Beginning of period | $ 2,377,145 | $ 2,377,145 | $ - | $ 1,649,631 | $ 1,649,631 | $ - | $ 2,385,140 | $ 2,385,140 | $ - | $ 1,664,961 | $ 1,664,961 | $ - | $ 1,964,613 | $ 1,964,613 | $ - |
| Cash Balance -End of Period | $ 1,897,274 | $ 1,649,631 | $ (247,643) | $ 1,818,963 | $ 2,385,140 | $ 566,176 | $ 1,726,290 | $ 1,664,961 | $ (61,329) | $ 1,773,399 | $ 1,964,613 | $ 191,214 | $ 1,180,198 | $ 1,665,629 | $ 485,431 |
| | | | | | | | | | | | | | | | |
| Cash Balance (Citizens Bank) | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | |
| Cash Balance (PPP Loan) | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | |
| **Total Ending Cash Balance (Citizens & Cornerstone)** | | | | | | | | | | | | | | | |

Case 1-20-10903-CLB,   Doc 7,   Filed 07/08/20,   Entered 07/08/20 11:30:37,
Description: Main Document  , Page 80 of 84

**EASTERN NIAGARA HOSPITAL**
*13 Week Cash Flow Projection*

| RECEIPTS | WE 1/18/20 Budget | WE 1/18/20 Actual | WE 1/18/20 Variance | WE 1/25/20 Budget | WE 1/25/20 Actual | WE 1/25/20 Variance | WE 2/1/20 Budget | WE 2/1/20 Actual | WE 2/1/20 Variance | WE 2/8/20 Budget | WE 2/8/20 Actual | WE 2/8/20 Variance | WE 2/15/20 Budget | WE 2/15/20 Actual | WE 2/15/20 Variance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Operating** | | | | | | | | | | | | | | | |
| Net Patient Service Revenue | 853,408 | 774,243 | (79,165) | 853,408 | 726,764 | (126,643) | 853,408 | 693,924 | (159,484) | 811,248 | 676,433 | (134,816) | 811,248 | 740,649 | (70,599) |
| Other Recurring Operating Revenue | 6,568 | 13,828 | 7,260 | 6,568 | 12,098 | 5,530 | 6,633 | 14,729 | 8,096 | 7,021 | - | (7,021) | 7,021 | 8,683 | 1,662 |
| GPO | - | - | - | - | - | - | 1,331,881 | 1,331,881 | - | - | - | - | - | - | - |
| **Non Operating** | | | | | | | | | | | | | | | |
| VAPAP | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| VAP | - | - | - | - | - | - | 393,750 | 393,750 | - | - | - | - | - | - | - |
| Stimulus / PPP Loan | | | | | | | | | | | | | | | |
| Interest Revenue | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Donations | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Transfer from Cornerstone Bank (PPP Loan) | | | | | | | | | | | | | | | |
| Transfer from Payroll Account | | | | | | | | | | | | | | | |
| Transfer from Capital Funds Account | | | | | | | | | | - | - | - | - | - | - |
| Net proceeds from sale of assets | | | | | | | | | | - | - | - | - | - | - |
| **Total Receipts** | 859,976 | 788,071 | (71,905) | 859,976 | 738,863 | (121,113) | 2,585,672 | 2,434,284 | (151,387) | 818,270 | 676,433 | (141,837) | 818,270 | 749,332 | (68,938) |
| Variance - Cumulative | 10,146,994 | 10,896,356 | 749,361 | 11,006,970 | 11,635,219 | 628,248 | 13,592,642 | 14,069,503 | 476,861 | 14,410,912 | 14,745,935 | 335,024 | 15,229,181 | 15,495,267 | 266,086 |
| Variance % - Cumulative | | | 7% | | | 6% | | | 4% | | | 2% | | | 2% |
| | | | | | | | | | | | | | | | |
| **EXPENSES:** | | | | | | | | | | | | | | | |
| SALARIES & WAGES | - | (76) | (76) | (910,907) | (866,471) | 44,436 | - | (366) | (366) | (870,677) | (863,377) | 7,300 | - | - | - |
| PHYSICIAN FEES | - | (120) | (120) | (19,020) | (10,395) | 8,625 | (40,000) | (127,763) | (87,763) | (17,885) | (86,813) | (68,927) | (156,082) | (480) | 155,602 |
| FRINGE BENEFITS | - | (650) | (650) | (145,524) | (115,463) | 30,061 | (91,000) | (22,442) | 68,559 | (26,963) | (19,662) | 7,302 | (476,381) | (363,955) | 112,426 |
| MEDICAL SUPPLIES | (63,549) | (74,735) | (11,186) | (63,549) | (83,339) | (19,791) | (63,509) | (68,679) | (5,169) | (63,275) | (61,341) | 1,934 | (63,275) | (83,453) | (20,178) |
| PHARMACY SUPPLIES | (19,960) | (23,211) | (3,250) | (19,960) | (41,397) | (21,436) | (19,938) | (13,481) | 6,457 | (19,805) | (25,163) | (5,357) | (19,805) | - | 19,805 |
| **OTHER DIRECT EXPENSES** | (134,768) | (129,460) | 5,308 | (166,198) | (166,856) | (659) | (137,413) | (217,445) | (80,031) | (261,594) | (183,003) | 78,591 | (153,285) | (164,694) | (11,409) |
| US Trustee Fees | (22,490) | (10,000) | 12,490 | (22,490) | - | 22,490 | (19,277) | - | 19,277 | - | (30,000) | (30,000) | - | (10,000) | (10,000) |
| Debtor Professionals Expense | (11,290) | (10,000) | 1,290 | (11,290) | - | 11,290 | (11,402) | - | 11,402 | (12,069) | (30,000) | (17,931) | (12,069) | (10,000) | 2,069 |
| Lender Professionals Expense | (7,903) | - | 7,903 | (7,903) | - | 7,903 | (7,981) | - | 7,981 | (8,448) | (68,295) | (59,847) | (8,448) | (10,000) | (1,552) |
| Committee Professionals Expense | (9,032) | - | 9,032 | (9,032) | - | 9,032 | (8,776) | - | 8,776 | (7,241) | (10,000) | (2,759) | (7,241) | (5,000) | 2,241 |
| CRA Professionals Expense | | | | | | | | | | | | | | | |
| DEPRECIATION | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| NYS ASSESSMENT | (3,349) | - | 3,349 | (3,349) | - | 3,349 | (3,349) | - | 3,349 | (3,450) | (18,674) | (15,224) | (3,450) | - | 3,450 |
| **INTEREST** | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Equipment Leases - Interest | - | (618) | (618) | - | (460) | (460) | (10,517) | (993) | 9,524 | - | (443) | (443) | - | (590) | (590) |
| Citizens Loans - Interest | - | - | - | - | - | - | - | - | - | (28,515) | (29,303) | (788) | - | - | - |
| **Principal Payments** | | | | | | | | | | | | | | | |
| Equipment Leases - Principal | - | (11,384) | (11,384) | - | (3,875) | (3,875) | (96,678) | (20,801) | 75,877 | - | (5,801) | (5,801) | - | (10,382) | (10,382) |
| Citizens Loans - Principal | - | - | - | - | - | - | - | - | - | (12,756) | (12,756) | (0) | - | - | - |
| Capital Purchases | (10,000) | - | 10,000 | (10,000) | - | 10,000 | (10,000) | - | 10,000 | (10,000) | - | 10,000 | (10,000) | (1,695) | 8,305 |
| Transfer to Capital Account - Non Legal | | | | | | | | | | - | - | - | - | - | - |
| Defined Benefit Pension payments | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| | | | | | | | | | | | | | | | |
| **TOTAL EXPENSES** | (282,342) | (260,254) | 22,088 | (1,389,223) | (1,288,257) | 100,966 | (519,842) | (471,969) | 47,873 | (1,342,680) | (1,444,632) | (101,952) | (910,037) | (660,248) | 249,789 |
| Variance - Cumulative | (10,505,027) | (9,307,864) | 1,197,163 | (11,894,249) | (10,596,121) | 1,298,128 | (12,414,091) | (11,068,090) | 1,346,001 | (13,756,771) | (12,512,722) | 1,244,049 | (14,666,808) | (13,172,970) | 1,493,838 |
| Variance %s - Cumulative | | | -85% | | | -11% | | | -91% | | | -11% | | | -79% | | | -11% | | | -85% | | | -9% | | | -85% | | | -10% |
| | | | | | | | | | | | | | | | |
| **Net Cash Flow** | 577,634 | 527,817 | (49,817) | (529,247) | (549,394) | (20,148) | 2,065,830 | 1,962,315 | (103,515) | (524,410) | (768,200) | (243,789) | (91,767) | 89,084 | 180,851 |
| | | | | | | | | | | | | | | | |
| Cash Balance Beginning of period | 1,665,629 | 1,665,629 | - | 2,193,445 | 2,193,445 | - | 1,644,051 | 1,644,051 | - | 3,606,366 | 3,606,366 | - | 2,838,167 | 2,838,167 | - |
| Cash Balance -End of Period | 2,243,262 | 2,193,445 | (49,817) | 1,664,199 | 1,644,051 | (20,148) | 3,709,881 | 3,606,366 | (103,515) | 3,081,956 | 2,838,167 | (243,789) | 2,746,400 | 2,927,251 | 180,851 |
| | | | | | | | | | | | | | | | |
| Cash Balance (Citizens Bank) | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | |
| Cash Balance (PPP Loan) | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | |
| **Total Ending Cash Balance (Citizens & Cornerstone)** | | | | | | | | | | | | | | | |

Case 1-20-10903-CLB,   Doc 7,   Filed 07/08/20,   Entered 07/08/20 11:30:37,
Description: Main Document  , Page 81 of 84

**EASTERN NIAGARA HOSPITAL**

*13 Week Cash Flow Projection*

| | WE 2/22/20 | | | WE 2/29/20 | | | WE 3/7/20 | | | WE 3/14/20 | | | WE 3/21/20 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **RECEIPTS** | **Budget** | **Actual** | **Variance** | **Budget** | **Actual** | **Variance** | **Budget** | **Actual** | **Variance** | **Budget** | **Actual** | **Variance** | **Budget** | **Actual** | **Variance** |
| **Operating** | | | | | | | | | | | | | | | |
| Net Patient Service Revenue | $ 811,248 | $ 780,956 | $ (30,292) | $ 811,248 | $ 815,726 | $ 4,478 | $ 832,445 | $ 902,741 | $ 70,296 | $ 832,445 | $ 905,331 | $ 72,887 | $ 832,445 | $ 857,294 | $ 24,849 |
| Other Recurring Operating Revenue | $ 7,021 | $ 13,955 | $ 6,934 | $ 7,021 | $ 15,156 | $ 8,135 | $ 6,568 | $ 112,039 | $ 105,471 | $ 6,568 | $ 21,405 | $ 14,837 | $ 6,568 | $ - | $ (6,568) |
| GPO | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| **Non Operating** | | | | | | | | | | | | | | | |
| VAPAP | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| VAP | $ - | $ - | $ - | $ - | $ - | $ - | 393,750 | 393,750 | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Stimulus / PPP Loan | | | | | | | | | | | | | | | |
| Interest Revenue | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Donations | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Transfer from Cornerstone Bank (PPP Loan) | | | | | | | | | | | | | | | |
| Transfer from Payroll Account | | | | | | | | | | | | | | | |
| Transfer from Capital Funds Account | $ - | $ - | $ - | $ - | $ 66,074 | $ 66,074 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Net proceeds from sale of assets | | | | | | | | | | | | | | | |
| **Total Receipts** | $ 818,270 | $ 794,911 | $ (23,358) | $ 818,270 | $ 896,957 | $ 78,687 | $ 1,232,763 | $ 1,408,530 | $ 175,767 | $ 839,013 | $ 926,736 | $ 87,723 | $ 839,013 | $ 857,294 | $ 18,281 |
| Variance - Cumulative | $ 16,047,451 | $ 16,290,178 | $ 242,727 | $ 16,865,721 | $ 17,187,135 | $ 321,414 | $ 18,098,484 | $ 18,595,665 | $ 497,181 | $ 18,937,497 | $ 19,522,402 | $ 584,905 | $ 19,776,510 | $ 20,379,695 | $ 603,185 |
| Variance % - Cumulative | | | 2% | | | 2% | | | 3% | | | 3% | | | 3% |
| | | | | | | | | | | | | | | | |
| **EXPENSES:** | | | | | | | | | | | | | | | |
| **SALARIES & WAGES** | $ (870,677) | $ (814,483) | $ 56,195 | $ - | $ (26,370) | $ (26,370) | $ (840,948) | $ (882,909) | $ (41,962) | $ - | $ (2,064) | $ (2,064) | $ (840,948) | $ (840,145) | $ 802 |
| **PHYSICIAN FEES** | $ (17,885) | $ (13,533) | $ 4,353 | $ - | $ (82,991) | $ (82,991) | $ (17,885) | $ (92,416) | $ (74,530) | $ (156,082) | $ (3,200) | $ 152,883 | $ (17,885) | $ (8,058) | $ 9,828 |
| **FRINGE BENEFITS** | $ (26,963) | $ (114,725) | $ (87,762) | $ (87,290) | $ (35,747) | $ 51,543 | $ (26,413) | $ (41,518) | $ (15,105) | $ (295,240) | $ (318,608) | $ (23,368) | $ (26,413) | $ (24,782) | $ 1,630 |
| **MEDICAL SUPPLIES** | $ (63,275) | $ (102,785) | $ (39,510) | $ (63,275) | $ (61,746) | $ 1,529 | $ (63,666) | $ (67,814) | $ (4,147) | $ (63,666) | $ (93,852) | $ (30,185) | $ (63,666) | $ (37,112) | $ 26,554 |
| **PHARMACY SUPPLIES** | $ (19,805) | $ (33,586) | $ (13,780) | $ (19,805) | $ (16,450) | $ 3,356 | $ (21,698) | $ (21,646) | $ 52 | $ (21,698) | $ (25,130) | $ (3,432) | $ (21,698) | $ (37,345) | $ (15,648) |
| **OTHER DIRECT EXPENSES** | $ (184,294) | $ (176,259) | $ 8,035 | $ (153,285) | $ (232,949) | $ (79,664) | $ (250,842) | $ (243,902) | $ 6,940 | $ (136,844) | $ (93,380) | $ 43,464 | $ (168,211) | $ (146,643) | $ 21,568 |
| US Trustee Fees | $ - | $ - | $ - | $ - | $ (66,174) | $ (66,174) | $ - | $ - | $ - | $ (10,000) | $ (10,000) | $ - | $ - | $ - | $ - |
| Debtor Professionals Expense | $ (12,069) | $ - | $ 12,069 | $ (12,069) | $ (15,000) | $ (2,931) | $ (11,290) | $ - | $ 11,290 | $ (11,290) | $ (10,000) | $ 1,290 | $ (11,290) | $ - | $ 11,290 |
| Lender Professionals Expense | $ (8,448) | $ (42,055) | $ (33,606) | $ (8,448) | $ (15,000) | $ (6,552) | $ (7,903) | $ (27,882) | $ (19,979) | $ (7,903) | $ (10,000) | $ (2,097) | $ (7,903) | $ - | $ 7,903 |
| Committee Professionals Expense | $ (7,241) | $ - | $ 7,241 | $ (7,241) | $ (5,000) | $ 2,241 | $ (6,774) | $ - | $ 6,774 | $ (6,774) | $ (5,000) | $ 1,774 | $ (6,774) | $ - | $ 6,774 |
| CRA Professionals Expense | | | | | | | | | | | | | | | |
| **DEPRECIATION** | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| **NYS ASSESSMENT** | $ (3,450) | $ - | $ 3,450 | $ (3,450) | $ - | $ 3,450 | $ (3,349) | $ - | $ 3,349 | $ (3,349) | $ - | $ 3,349 | $ (3,349) | $ - | $ 3,349 |
| **INTEREST** | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Equipment Leases - Interest | $ - | $ (438) | $ (438) | $ (1,769) | $ (455) | $ 1,315 | $ - | $ - | $ - | $ - | $ (984) | $ (984) | $ - | $ (416) | $ (416) |
| Citizens Loans - Interest | $ - | $ - | $ - | $ - | $ - | $ - | $ (28,515) | $ (26,153) | $ 2,362 | $ - | $ - | $ - | $ - | $ - | $ - |
| **Principal Payments** | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Equipment Leases - Principal | $ - | $ (3,897) | $ (3,897) | $ (22,144) | $ (7,364) | $ 14,780 | $ - | $ - | $ - | $ - | $ (16,232) | $ (16,232) | $ - | $ (3,919) | $ (3,919) |
| Citizens Loans - Principal | $ - | $ - | $ - | $ - | $ - | $ - | $ (12,756) | $ (12,756) | $ (0) | $ - | $ - | $ - | $ - | $ - | $ - |
| **Capital Purchases** | $ (10,000) | $ - | $ 10,000 | $ (10,000) | $ - | $ 10,000 | $ (10,000) | $ - | $ 10,000 | $ (10,000) | $ - | $ 10,000 | $ (10,000) | $ (11,623) | $ (1,623) |
| **Transfer to Capital Account - Non Legal** | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| **Defined Benefit Pension payments** | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| | | | | | | | | | | | | | | | |
| **TOTAL EXPENSES** | $ (1,224,108) | $ (1,301,760) | $ (77,652) | $ (388,777) | $ (565,245) | $ (176,468) | $ (1,302,040) | $ (1,416,995) | $ (114,955) | $ (712,847) | $ (588,449) | $ 124,398 | $ (1,178,137) | $ (1,110,044) | $ 68,093 |
| Variance - Cumulative | $ (15,890,916) | $ (14,474,731) | $ 1,416,186 | $ (16,279,693) | $ (15,039,976) | $ 1,239,718 | $ (17,581,733) | $ (16,456,971) | $ 1,124,762 | $ (18,294,580) | $ (17,045,420) | $ 1,249,161 | $ (19,472,717) | $ (18,155,463) | $ 1,317,254 |
| Variance %s - Cumulative | | -89% | -9% | | -88% | -8% | | -88% | -6% | | -87% | -7% | | -89% | -7% |
| | | | | | | | | | | | | | | | |
| **Net Cash Flow** | (405,839) | (506,849) | (101,010) | 429,493 | 331,712 | (97,781) | (69,277) | (8,465) | 60,812 | 126,166 | 338,288 | 212,122 | (339,124) | (252,750) | 86,374 |
| | | | | | | | | | | | | | | | |
| Cash Balance Beginning of period | $ 2,927,251 | $ 2,927,251 | $ - | $ 2,420,402 | $ 2,420,402 | $ - | $ 2,752,114 | $ 2,752,114 | $ - | $ 2,743,648 | $ 2,743,648 | $ - | $ 3,081,936 | $ 3,081,936 | $ - |
| Cash Balance -End of Period | $ 2,521,412 | $ 2,420,402 | $ (101,010) | $ 2,849,895 | $ 2,752,114 | $ (97,781) | $ 2,682,837 | $ 2,743,648 | $ 60,812 | $ 2,869,814 | $ 3,081,936 | $ 212,122 | $ 2,742,812 | $ 2,829,186 | $ 86,374 |
| | | | | | | | | | | | | | | | |
| Cash Balance (Citizens Bank) | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | |
| Cash Balance (PPP Loan) | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | |
| **Total Ending Cash Balance (Citizens & Cornerstone)** | | | | | | | | | | | | | | | |

**EASTERN NIAGARA HOSPITAL**
*13 Week Cash Flow Projection*

| RECEIPTS | WE 3/28/20 Budget | Actual | Variance | WE 4/4/20 Budget | Actual | Variance | WE 4/11/20 Budget | Actual | Variance | WE 4/18/20 Budget | Actual | Variance | WE 4/25/20 Budget | Actual | Variance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Operating** | | | | | | | | | | | | | | | |
| Net Patient Service Revenue | 832,445 | 891,976 | 59,531 | 832,081 | 708,515 | (123,566) | 831,838 | 744,385 | (87,453) | 506,755 | 513,588 | 6,833 | 506,755 | 523,191 | 16,435 |
| Other Recurring Operating Revenue | 6,568 | 4,914 | (1,655) | 6,693 | 633 | (6,060) | 6,787 | 17,262 | 10,475 | 6,787 | - | (6,787) | 6,787 | 38,938 | 32,151 |
| GPO | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Non Operating** | | | | | | | | | | | | | | | |
| VAPAP | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| VAP | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Stimulus / PPP Loan | | | | | | | | | | | | | | | |
| Interest Revenue | - | - | - | - | - | - | - | 630,792 | 630,792 | - | - | - | - | 488,534 | 488,534 |
| Donations | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Transfer from Cornerstone Bank (PPP Loan) | | | | | | | | | | | | | | | |
| Transfer from Payroll Account | | | | | | | | | | | | | | | |
| Transfer from Capital Funds Account | - | - | - | - | - | - | - | - | - | - | - | - | - | 114,454 | |
| Net proceeds from sale of assets | | | | | | | | | | | | | | | |
| **Total Receipts** | 839,013 | 896,889 | 57,876 | 838,774 | 709,148 | (129,626) | 838,626 | 1,392,440 | 553,814 | 513,543 | 513,588 | 45 | 513,543 | 1,165,116 | 537,120 |
| Variance - Cumulative | 20,615,523 | 21,276,585 | 661,062 | 21,454,297 | 21,985,733 | 531,436 | 22,292,923 | 23,378,173 | 1,085,250 | 22,806,466 | 23,891,761 | 1,085,295 | 23,320,008 | 25,056,877 | 1,736,869 |
| Variance % - Cumulative | | 3% | | | 2% | | | 5% | | | 5% | | | 7% | |

| EXPENSES: | WE 3/28/20 Budget | Actual | Variance | WE 4/4/20 Budget | Actual | Variance | WE 4/11/20 Budget | Actual | Variance | WE 4/18/20 Budget | Actual | Variance | WE 4/25/20 Budget | Actual | Variance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **SALARIES & WAGES** | - | - | - | (843,979) | (807,648) | 36,331 | - | - | - | (843,979) | (786,342) | 57,638 | - | - | - |
| **PHYSICIAN FEES** | - | (98,248) | (98,248) | (17,885) | (89,453) | (71,567) | (156,082) | (5,400) | 150,682 | (17,885) | (22,240) | (4,355) | - | (63,333) | (63,333) |
| **FRINGE BENEFITS** | (79,448) | (13,931) | 65,517 | (111,342) | (98,918) | 12,425 | (311,169) | (357,473) | (46,304) | (28,342) | (350) | 27,992 | (83,735) | (78,462) | 5,273 |
| **MEDICAL SUPPLIES** | (63,666) | (59,523) | 4,143 | (63,737) | (48,963) | 14,774 | (63,790) | (35,361) | 28,429 | (43,561) | (54,254) | (10,693) | (26,094) | (37,797) | (11,704) |
| **PHARMACY SUPPLIES** | (21,698) | (15,626) | 6,071 | (21,688) | (33,407) | (11,719) | (21,681) | (28,348) | (6,667) | (14,805) | (30,924) | (16,119) | (8,869) | (10,740) | (1,872) |
| **OTHER DIRECT EXPENSES** | (136,844) | (128,379) | 8,465 | (246,869) | (266,787) | (19,918) | (135,321) | (121,852) | 13,469 | (157,238) | (109,187) | 48,051 | (118,527) | (167,799) | (49,272) |
| US Trustee Fees | - | (20,000) | (20,000) | (15,749) | (10,000) | 5,749 | (27,561) | - | 27,561 | (27,561) | - | 27,561 | (27,561) | (114,454) | (86,893) |
| Debtor Professionals Expense | (11,290) | (20,000) | (8,710) | (11,505) | (20,000) | (8,495) | (11,667) | - | 11,667 | (11,667) | - | 11,667 | (11,667) | (15,000) | (3,333) |
| Lender Professionals Expense | (7,903) | (20,000) | (12,097) | (8,054) | (22,800) | (14,746) | (8,167) | - | 8,167 | (8,167) | - | 8,167 | (8,167) | (15,000) | (6,833) |
| Committee Professionals Expense | (6,774) | (10,000) | (3,226) | (6,903) | (5,000) | 1,903 | (7,000) | - | 7,000 | (7,000) | - | 7,000 | (7,000) | (5,000) | 2,000 |
| CRA Professionals Expense | | | | | | | | | | | | | | | |
| **DEPRECIATION** | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **NYS ASSESSMENT** | (3,349) | - | 3,349 | (3,285) | - | 3,285 | (3,243) | - | 3,243 | (3,243) | - | 3,243 | (3,243) | - | 3,243 |
| **INTEREST** | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Equipment Leases - Interest | (1,769) | (7,395) | (5,626) | - | (432) | (432) | - | (402) | (402) | - | (532) | (532) | - | (394) | (394) |
| Citizens Loans - Interest | - | - | - | (28,515) | (27,914) | 601 | - | - | - | - | - | - | - | - | - |
| **Principal Payments** | | | | | | | | | | | | | | | |
| Equipment Leases - Principal | (22,144) | (76,402) | (54,258) | - | (6,872) | (6,872) | - | (5,842) | (5,842) | - | (10,440) | (10,440) | - | (4,456) | (4,456) |
| Citizens Loans - Principal | - | - | - | (12,756) | (12,756) | (0) | - | - | - | - | - | - | - | - | - |
| **Capital Purchases** | (10,000) | (3,025) | 6,975 | (10,000) | - | 10,000 | (10,000) | - | 10,000 | (10,000) | - | 10,000 | (10,000) | (4,025) | 5,975 |
| **Transfer to Capital Account - Non Legal** | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Defined Benefit Pension payments** | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **TOTAL EXPENSES** | (364,887) | (472,529) | (107,642) | (1,402,269) | (1,450,949) | (48,680) | (755,680) | (554,678) | 201,002 | (1,173,448) | (1,014,269) | 159,180 | (304,862) | (516,462) | (211,600) |
| Variance - Cumulative | (19,837,604) | (18,627,992) | 1,209,612 | (21,239,873) | (20,078,941) | 1,160,932 | (21,995,553) | (20,633,619) | 1,361,934 | (23,169,002) | (21,647,888) | 1,521,114 | (23,473,863) | (22,164,350) | 1,309,514 |
| Variance %s - Cumulative | | -88% | -6% | | -91% | -5% | | -88% | -6% | | -91% | -7% | | -88% | -6% |
| **Net Cash Flow** | 474,126 | 424,360 | (49,766) | (563,495) | (741,801) | (178,306) | 82,946 | 837,762 | 754,816 | (659,906) | (500,681) | 159,225 | 208,681 | 648,655 | 439,974 |
| Cash Balance Beginning of period | 2,829,186 | 2,829,186 | - | 3,253,546 | 3,253,546 | - | 2,511,746 | 2,511,746 | - | 3,349,508 | 3,349,508 | - | 2,848,827 | 2,848,827 | - |
| Cash Balance -End of Period | 3,303,312 | 3,253,546 | (49,766) | 2,690,052 | 2,511,746 | (178,306) | 2,594,692 | 3,349,508 | 754,816 | 2,689,602 | 2,848,827 | 159,225 | 3,057,508 | 3,497,481 | 439,974 |
| Cash Balance (Citizens Bank) | | | | | | | | | | | | | | | |
| Cash Balance (PPP Loan) | | | | | | | | | | | | | | | |
| Total Ending Cash Balance (Citizens & Cornerstone) | | | | | | | | | | | | | | | |

| EASTERN NIAGARA HOSPITAL | | | | |
|---|---|---|---|---|
| *13 Week Cash Flow Projection* | | | | |
| | | WE 5/2/20 | | |
| RECEIPTS | Budget | Actual | Variance | Budget |
| **Operating** | | | | |
| Net Patient Service Revenue | $ 382,004 | $ 569,992 | $ 187,987 | $ 497,877 |
| Other Recurring Operating Revenue | $ 6,725 | $ 5,020 | $ (1,704) | $ 6,568 |
| GPO | $ - | $ - | | $ - |
| **Non Operating** | | | | |
| VAPAP | $ - | $ - | $ - | $ - |
| VAP | $ - | $ - | $ - | $ - |
| Stimulus / PPP Loan | | | | |
| Interest Revenue | $ - | $ - | $ - | $ - |
| Donations | $ - | $ - | $ - | $ - |
| Transfer from Cornerstone Bank (PPP Loan) | | | | |
| Transfer from Payroll Account | | | | |
| Transfer from Capital Funds Account | $ - | $ - | | $ - |
| Net proceeds from sale of assets | $ - | $ 41,848 | $ 41,848 | $ - |
| **Total Receipts** | $ 388,729 | $ 616,860 | $ 228,131 | $ 504,445 |
| Variance - Cumulative | $ 21,123,065 | $ 23,239,453 | $ 2,116,387 | $ 23,394,912 |
| Variance % - Cumulative | | | 10% | |
| | | | | |
| **EXPENSES:** | | | | |
| **SALARIES & WAGES** | $ (793,858) | $ (723,718) | $ 70,140 | $ - |
| **PHYSICIAN FEES** | $ - | $ (7,780) | $ (7,780) | $ (137,885) |
| **FRINGE BENEFITS** | $ (28,342) | $ (21,063) | $ 7,279 | $ - |
| **MEDICAL SUPPLIES** | $ (39,983) | $ (27,465) | $ 12,517 | $ (11,491) |
| **PHARMACY SUPPLIES** | $ (13,606) | $ (10,882) | $ 2,724 | $ (3,964) |
| **OTHER DIRECT EXPENSES** | $ (146,149) | $ (268,762) | $ (122,613) | $ (199,493) |
| US Trustee Fees | $ (19,687) | $ (10,000) | $ 9,687 | $ (10,000) |
| Debtor Professionals Expense | $ (11,559) | $ (10,000) | $ 1,559 | $ (12,000) |
| Lender Professionals Expense | $ (8,091) | $ (10,000) | $ (1,909) | $ (12,000) |
| Committee Professionals Expense | $ (6,935) | $ (5,000) | $ 1,935 | $ (6,000) |
| CRA Professionals Expense | | | | |
| **DEPRECIATION** | $ - | $ - | $ - | $ - |
| **NYS ASSESSMENT** | $ (3,331) | $ - | $ 3,331 | $ (2,947) |
| **INTEREST** | $ - | $ - | $ - | $ - |
| Equipment Leases - Interest | $ (10,517) | $ (409) | $ 10,109 | $ - |
| Citizens Loans - Interest | $ (28,515) | $ (27,518) | $ 997 | $ - |
| **Principal Payments** | $ - | $ - | $ - | $ - |
| Equipment Leases - Principal | $ (96,678) | $ (6,895) | $ 89,782 | $ - |
| Citizens Loans - Principal | $ (12,756) | $ (12,756) | $ - | $ - |
| **Capital Purchases** | $ - | $ - | $ - | $ (10,000) |
| **Transfer to Capital Account - Non Legal** | $ - | $ (41,848) | | $ - |
| **Defined Benefit Pension payments** | $ - | $ - | $ - | $ - |
| | | | | |
| **TOTAL EXPENSES** | $ (1,220,008) | $ (1,184,098) | $ 77,758 | $ (405,781) |
| Variance - Cumulative | $ (24,174,029) | $ (22,876,479) | $ 1,297,550 | $ (23,756,972) |
| Variance %s - Cumulative | | -98% | -5% | |
| | | | | |
| **Net Cash Flow** | $ (831,279) | $ (567,238) | $ 264,041 | $ 98,663 |
| | | | | |
| Cash Balance Beginning of period | $ 3,497,481 | $ 3,497,481 | $ - | $ 2,930,243 |
| Cash Balance -End of Period | $ 2,666,203 | $ 2,930,243 | $ 264,041 | $ 3,028,907 |
| | | | | |
| Cash Balance (Citizens Bank) | | | | |
| | | | | |
| Cash Balance (PPP Loan) | | | | |
| | | | | |
| **Total Ending Cash Balance (Citizens & Cornerstone)** | | | | |